# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DANIEL CARPENTER, *et al.*,
     Plaintiffs,

     v.

COMMISSIONER, IRS, *et al.*,
     Defendants.

No. 3:13-cv-563 (SRU)

## <u>ORDER</u>

On April 19, 2013, the plaintiffs, Daniel Carpenter and Grist Mill Capital, LLC, filed an action pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), against the defendants, IRS Commissioners Douglas Schulman and Steven Miller;[1] Victor Song, Chief of the IRS' Criminal Investigation Division; Shaun Schrader, a special agent of the Criminal Investigations Division, and Unknown Agents 1–72, special agents of the Criminal Investigation Division. The complaint seeks, *inter alia*, compensation for alleged Fourth, Fifth, and Sixth Amendment violations arising from the search of Grist Mill Capital for documents related to alleged tax fraud. (doc. 1) After significant motion practice, Schrader has now filed a renewed motion to dismiss the Second Amended Complaint ("SAC"), on the grounds that the claims are barred by qualified immunity and the rule articulated by the Supreme Court in *Heck v. Humphrey*, 512 U.S. 477 (1994). (doc. 72) He identifies two changed circumstances justifying this renewed motion: first, on December 24, 2015, in a criminal case involving a separate fraudulent scheme, U.S. District Judge Robert N. Chatigny denied Carpenter's motion to suppress the same evidence at issue here, and on June 6, 2016, Judge Chatigny found Carpenter guilty on all 57 counts of that indictment. *See United States v. Carpenter*, No. 3:13-cr-226

---

[1] Schulman has since been replaced with John Koskinen, the current IRS Commissioner.

(RNC) (D. Conn.). Second, on August 21, 2014, after the second motions to dismiss were filed but before they were decided, the Second Circuit issued *Terebesi v. Torreso*, 764 F.3d 217 (2d Cir. 2014), *cert. denied sub nom. Torresso v. Terebesi*, 135 S. Ct. 1842 (2015), which sets out principles of Fourth Amendment law that the parties agree may have impact in this case. On October 5, 2016, I denied Schrader's motion for conversion to a motion for summary judgment (doc. 82), and on October 18, 2016, I held a hearing on the pending motion to dismiss.

For the following reasons, I **grant in part and deny in part** Schrader's motion to dismiss.

## I.      Standard of Review

### A.   Motion to Dismiss for Failure to State a Claim Upon Which Relief May Be Granted

A Rule 12(b)(6) motion to dismiss for failure to state a claim is designed "merely to assess the legal feasibility of a complaint, not to assay the weight of evidence which might be offered in support thereof." *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984) (quoting *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980)).

When deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

Under *Twombly*, "[f]actual allegations must be enough to raise a right to relief above the speculative level," and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." 550 U.S. at 555, 570; *see also*

*Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). The plausibility standard set forth in *Twombly* and *Iqbal* obligates the plaintiff to "provide the grounds of his entitlement to relief" through more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (quotation marks omitted). Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (quotation marks omitted).

## II.    Background

### A.    Factual Background

The following relevant facts are alleged in the Second Amended Complaint (SAC). Carpenter is the owner of several companies, including Grist Mill Capital, LLC ("GMC"), which does business from 100 Grist Mill Road. SAC at ¶ 4. In 2010, Carpenter was being prosecuted in the District of Massachusetts for a matter unrelated to the present case. *Id.* at ¶ 12. In 2010, the Massachusetts case had been tried to a verdict against Carpenter, reversed on appeal, and Carpenter was in the process of challenging the second verdict against him.[2] *See United States v. Carpenter*, 1:04-cr-10029 (GAO) (D. Mass.) [hereinafter, "the Massachusetts case"].

On April 16, 2010, Shaun Schrader, a Special Agent of the Criminal Investigation Unit of the United States Internal Revenue Service, provided an affidavit in support of an application for a warrant to search 100 Grist Mill Road for evidence that Carpenter was engaging in criminal tax offenses, including conspiracy to impede the lawful function of the IRS, 18 U.S.C. § 371, and

---

[2] He ultimately lost that second appeal. Carpenter, however, continues to bring *pro se* collateral challenges to his sentence of 36 months' incarceration.

aiding and assisting the preparation of false income tax returns, 26 U.S.C. § 7206(2).[3] The affidavit does not reference any specific dangers anticipated in executing the proposed search nor any exigent circumstances justifying a highly armed raid on the property. SAC at ¶ 18. Carpenter alleges that Schrader knowingly included various misstatements in the affidavit. *See id.* at ¶ 16–17.

On April 20, 2010, Schrader and 72 unknown IRS agents (the "John Doe" defendants) executed the search warrant at 100 Grist Mill Road in order to obtain evidence against Daniel Carpenter and GMC. Carpenter alleges that the IRS agents wore "black Kevlar bullet-proof vests and were brandishing automatic weapons" during the execution of the search, which was conducted in the same manner as a SWAT operation. *Id.* at ¶¶ 8. During the search, Carpenter and the other GMC employees were not informed of which crime they were suspected of committing, nor were they provided with the search warrant affidavit or any other document indicating which crimes were at issue. *Id.*

During the search, the government seized 322 banker boxes of documents over the course of eighteen hours, a period in excess of what was authorized by the warrant. *Id.* at ¶ 9. During the search, the agents held numerous employees against their will for long periods of time and interrogated them. *Id.* Carpenter was "placed in custody, threatened with handcuffs, and questioned, despite his invocation of his right to have counsel present." *Id.* at ¶ 10. He was also "threatened with arrest" when he attempted to speak to counsel or leave the room to make a call. *Id.* Carpenter also alleges that the government "ransacked" his office during the search. *Id.* at ¶ 28.

---

[3] The affidavit has been filed on the docket in a criminal case pending in this district before Judge Chatigny, which is discussed further below. *See United States v. Carpenter*, 3:13-cr-226 (RNC) (D. Conn.) (doc. 83-2).

Carpenter alleges that Schrader had a duty to supervise the John Doe defendants in their use of force and the manner in which they carried out the search, and that he failed to do so. *Id.* at ¶¶ 21, 24. Specifically, he alleges that Schrader failed to supervise or instruct the agents on what was appropriate conduct during the search, and that Schrader was either "directly responsible" for the intimidating tactics or "deliberately indifferent" to the possibility that the search would be carried out in an unconstitutional manner. *Id.* at ¶ 21. Carpenter alleges that Schrader also "consciously disregarded the substantial risk that he had authorized the custodial interrogation" of Carpenter without reading him his *Miranda* rights in violation of his Fifth and Sixth Amendment rights to have counsel present. *Id.* at ¶ 28.

Carpenter alleges that Schrader's acts were intentional and motivated by animus against Carpenter because of his reputation as an "anti-government" actor and his litigation against the government in the Massachusetts case. *Id.* at ¶ 26. Accordingly, Carpenter alleges that the manner in which the search was carried out was deliberately intended to "harass, intimidate and humiliate" him. *Id.* Carpenter further claims that the IRS has a policy and practice of using armed agents to enforce search warrants for tax documents, despite the fact that the IRS manual "requires investigations to be carried out with the least intrusive means necessary." *Id.* at ¶ 22; *see also id.* at ¶ 25. Carpenter does not allege, however, that Schrader had any responsibility for setting IRS policies.

To date, Carpenter and his related entities have not been indicted for the tax offenses alleged in the warrant affidavit.

B. Procedural Background

1. *First Motions to Dismiss*

On April 3, 2014, I heard arguments and ruled on the defendants' first set of motions to dismiss. Schrader's first motion raised issues substantially similar to those raised in his present motion. I granted his motion to dismiss the complaint without prejudice to refiling in the interest of obtaining a more detailed complaint. At that time, I explicitly declined to reach the qualified immunity issue. 1st Mot. to Dismiss Tr. at 47 (doc. 35).

2. *Second Motions to Dismiss*

On May 30, 2014, the plaintiffs filed the Second Amended Complaint, (doc. 34), and the defendants, including Schrader, thereafter filed their second set of motions to dismiss (docs. 38 and 41). On December 4, 2014, I held a hearing on the motions to dismiss. I granted in part and denied in part a motion to dismiss filed by Song and Schrader, and specified that I was taking under advisement Schrader's motion to dismiss on qualified immunity grounds. (doc. 51) At that hearing, Schrader explicitly declined to address the new factual allegations that the search warrant affidavit was invalid, asserting that question was better dealt with as a factual question at summary judgment—otherwise, the Fourth, Fifth, and Sixth Amendment arguments were substantially similar to those raised in the instant motion.

With respect to the Fourth Amendment claims arising out of the unreasonable manner of the search, I asked the government whether there was anything alleged in the complaint, or likely to be put forward, indicating that the agents had specific safety concerns that might have justified using heavily-armed agents to conduct the search. 2d Mot. to Dismiss Tr. at 26, 31. The government conceded that there was nothing of that kind alleged in the complaint and suggested it was unlikely that a stronger safety justification would be forthcoming. *Id.* at 26.

6

3.  *The STOLI Case*

On December 12, 2013, after the initial complaint in this case was filed but before the

first motions to dismiss were filed, Carpenter was indicted in the District of Connecticut for his

participation in a fraudulent scheme involving stranger-originated life insurance. *See United

States v. Carpenter*, 3:13-cr-226 (RNC) (D. Conn.) [hereinafter, "the STOLI case"]. The

indictment resulted from a criminal investigation by the Department of Labor that included a

2011 search of the materials held by the IRS as a result of the 2010 search described above.

Accordingly, on September 15, 2014, after the second motions to dismiss were filed, but before

they were argued,[4] Carpenter filed a motion to suppress that evidence on the grounds that: (1)

Schrader's affidavit was materially defective because it included numerous misstatements and

deliberate omissions; (2) the affidavit and resulting warrant were overbroad and insufficiently

particularized; and (3) the defendants failed to provide Carpenter with the affidavit during the

search. STOLI Case, (doc. 83). The motion also alluded to the manner in which the search was

conducted as unreasonable and to Fifth Amendment violations, but did not provide substantial

briefing on those points. *Id.*

On December 24, 2015, Judge Chatigny denied Carpenter's motion to suppress. STOLI

case (doc. No 155). In relevant part, he found that the 2010 search warrant was "sufficiently

particularized." *Id.* at 9–10. In making that finding, he rejected Carpenter's arguments that the

warrant was defective because the supporting affidavit was not attached to it or because it

permitted a large amount of material to be seized. *Id.* at 11 n.4. He found that the 2010 warrant

also was not overbroad, observing that "uncontested statements" in Schrader's supporting

---

[4] At the Second Motion to Dismiss argument, the defendants suggested that this case should be stayed until the
resolution of the criminal proceedings. I observed that the materials at issue in the criminal proceedings appeared to
be limited to one box of documents, out of the 322 boxes taken in the search, and that GMC was not a party to the
criminal case and accordingly could not have its rights vindicated in that venue. I also observed that Judge Chatigny
was likely to rule on the suppression motion before I ruled on the motions before me, thereby avoiding inconsistent
decisions. 2d Mot. To Dismiss Tr. at 9–12.

affidavit adequately established probable cause for the search. *Id.* at 12–13. He also denied

Carpenter's motion for a *Franks* hearing on the veracity of statements in the 2010 warrant

affidavit, both because Carpenter had failed to make a preliminary showing that a false statement

was included in the warrant and because the uncontested statements in the warrant nevertheless

established probable cause. *Id.* at 15. Finally, he held that Carpenter had failed to allege facts

sufficient to support a claim that the manner in which the search was carried out violated his

substantive due process rights. *Id.* at 18–19. Judge Chatigny did not consider whether the manner

in which the search was conducted was unreasonable and thus in violation of the Fourth

Amendment.

    Carpenter subsequently waived his right to a jury trial, and on June 6, 2016, Judge

Chatigny entered a verdict finding Carpenter guilty on all 57 counts of the indictment in that

case. Verdict, STOLI case (doc. 212). Sentencing has been continued until Carpenter's post-

conviction motions are resolved.

## III.   Discussion

    The Second Amended Complaint appears to assert four claims: (1) Schrader violated

Carpenter's Fourth Amendment rights by knowingly including false statements in the warrant

affidavit; (2) Schrader violated Carpenter's Fourth Amendment rights by planning and

supervising an unreasonable search of 100 Grist Mill Road; (3) Schrader violated Carpenter's

Fifth Amendment rights by authorizing his custodial interrogation in a manner that created a

substantial risk of coerced self-incrimination without the benefit of any attorney or a *Miranda*

instruction; and (4) Schrader violated Carpenter's Sixth Amendment rights by authorizing his

custodial interrogation while Carpenter was represented by counsel in the Massachusetts case.

At the hearing, Carpenter abandoned several of those claims for the time being. He
conceded that, under the doctrine of *Heck v. Humphrey*, 512 U.S. 477 (1994), the Fourth
Amendment claims based on claims of an invalid warrant are precluded by Judge Chatigny's
rulings in the STOLI case. Accordingly, Schrader's motion to dismiss those claims is **granted
without prejudice to renewal if the conviction is invalidated.** Carpenter conceded that he was
withdrawing his Fifth Amendment claim as premature. Accordingly, Schrader's motion to
dismiss that claim is **granted without prejudice to renewal.** Carpenter also clarified at the
hearing and in his opposition brief that he does not assert a stand-alone Sixth Amendment claim.
*See* Pls.' Opp'n Br. at 23 n.9. Accordingly, Schrader's motion to dismiss that claim is **denied as
moot.** Two additional issues have been set on a separate briefing schedule: (1) whether the
identities of the John Doe defendants can be subject to discovery; and (2) the viability of any
claims asserted on behalf of GMC. *See* (docs. 85, 88). Thus, the sole issue to resolve on this
motion to dismiss is whether qualified immunity bars Carpenter's Fourth Amendment claims
arising from his allegations that the search was conducted in an unreasonable manner.

Schrader argues that the remaining Fourth Amendment claims,[5] which are based on
allegations that Schrader was personally responsible for conducting the search in an
unreasonable manner, are barred by the doctrine of qualified immunity.[6] Drawing all reasonable
inferences in favor of Carpenter, the Second Amended Complaint alleges that the force used to

---

[5] Those claims are not barred by *Heck* because Judge Chatigny's ruling on the motion to suppress did not decide the
reasonableness of the manner in which the search and seizure were conducted.

[6] Schrader also argued in his brief and at the hearing that he cannot be held liable under *Bivens* because he did not
have direct or personal involvement in the actions alleged to have caused a constitutional deprivation. *Barbera*, 836
F.2d at 99. Although *respondeat superior* liability is not available for *Bivens* claims, supervisors who "exhibited
deliberate indifference to the rights of [plaintiffs] by failing to act on information that unconstitutional acts were
occurring" may be held liable for those violations. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *see also*
SAC at ¶¶ 21, 24 (alleging that Schrader showed such indifference to the agents he was supervising). Further, as I
observed in the Order denying Schrader's motion to convert this motion under Rule 12(d) (doc. 82), Schrader may
also be held personally liable for any actions he took as the planner of the raid. *See Terebesi v. Torreso*, 764 F.3d
217, 234 (2d Cir. 2014), *cert. denied sub nom. Torresso v. Terebesi*, 135 S. Ct. 1842 (2015).

effectuate the search of his property was unreasonable and excessive because it involved 72

agents engaged in "commando" tactics, such as wearing bullet-proof vests and "brandishing"

automatic weapons specifically in order to intimidate Carpenter, and that the search resulted in

the needless destruction of Carpenter's property.[7] SAC at ¶¶ 8, 9, 19. Carpenter further alleges

that the excessive force was used deliberately, at least in part because of Carpenter's reputation

as an "anti-government" actor. *Id.* at ¶ 26. He also alleges that Schrader unreasonably seized

Carpenter during the search by subjecting him to an extended involuntary detention for the

purpose of coercing incriminating statements. *Id.* at ¶ 28.

A. Qualified Immunity

"Qualified immunity shields federal and state officials from money damages unless a

plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and

(2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-

Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).

Because qualified immunity provides "immunity from suit rather than a mere defense to

liability," *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citing *Saucier v. Katz*, 533 U.S. 194,

200–01 (2001)), the court should resolve qualified immunity questions "at the earliest possible

stage of a litigation." *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987). At the motion to

dismiss stage, however, the court must accept all factual allegations in the complaint as true and

draw all reasonable inferences in favor of the plaintiffs. *See al-Kidd*, 563 U.S. at 734.

The Supreme Court has articulated a three-part test for considering a claim of qualified

---

[7] Drawing all inferences in favor of Carpenter at the motion to dismiss stage, I assume that Carpenter had an ownership interest in personal property in his office, and that the allegation that his office was "ransacked" implies the improper search and destruction of those materials. *See* SAC at ¶ 28.

immunity. First,[8] the court must determine whether a constitutional violation could exist on the facts as presented to the court. *Saucier*, 533 U.S. at 201. Second, if the facts support a claimed violation of a constitutional right, the court must determine if the right alleged is "clearly established." *Id.* "To determine whether a right is clearly established, [courts] look to (1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question, and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010). Even if there is no Supreme Court or Second Circuit case law directly on point, a right may be considered "clearly established" if decisions by the Second Circuit or other circuit courts "clearly foreshadow a particular ruling on the issue." *Id.* (internal quotation marks and citation omitted) (collecting Second Circuit cases relying on other circuits' decisions). Finally, if the first two criteria are met, the court must determine if, based on the facts known to the officer at the time of events, "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

B. Fourth Amendment Reasonableness

The Fourth Amendment protects individuals "against unreasonable searches and seizures." "Determining whether the use of force[9] [during a search] was 'reasonable' under the Fourth Amendment 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at

---

[8] The Supreme Court has held that "lower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first," and has urged court to "think carefully" before deciding novel questions of constitutional law in the qualified immunity context. *al-Kidd*, 563 U.S. at 735; *Pearson*, 555 U.S. at 236 (2009). But in the highly specific Fourth Amendment context, the question whether there was a constitutional violation and whether that violation was "clearly established" as such are closely enmeshed.

[9] As discussed further below, force in the Fourth Amendment context may include intimidation and threats. *See Terebesi v. Torreso*, 764 F.3d 217, 240 (2d Cir. 2014).

stake.'" *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014), *cert. denied sub nom. Torresso v. Terebesi*, 135 S. Ct. 1842 (2015) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The Supreme Court has used the same analysis to assess the reasonableness of a seizure. *See Michigan v. Summers*, 452 U.S. 692, 699 (1981) (observing that "some seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause . . ."). And the Fourth Amendment's "reasonableness" standard requires that balancing be conducted through a careful examination of the totality of the circumstances at issue. *See Palacios v. Burge*, 589 F.3d 556, 563 (2d Cir. 2009) (citing *Samson v. California*, 547 U.S. 843, 848 (2006)).

Precisely because Fourth Amendment jurisprudence develops through a fact-specific examination of particular circumstances rather than immunizing certain kinds of conduct regardless of context, it has long been established that any use of force against a person *without justification* violates the Fourth Amendment. *See, e.g.*, *Tracy v. Freshwater*, 623 F.3d 90, 99 n.5 (2d Cir. 2010) (observing in the context of an unjustified use of pepper spray on an arrestee that it was clearly established in this Circuit by at least 2000 "that the use of entirely gratuitous force is unreasonable and therefore excessive"). Put another way, no reasonable officer could believe that the justification for the use of force to accomplish a search or seizure in one case automatically extends to any other circumstance in which he might find himself—such expansive logic is antithetical to the well-known and frankly fundamental principle that Fourth Amendment application is always *fact-specific*. *See, e.g.*, *Leveto v. Lapina*, 258 F.3d 156, 170–72 (3d Cir. 2001) (Alito, J.) (examining at length whether the government's actions were actually reasonably necessary to further its generalized interest in safety and holding, under the circumstances, they

were not); *Heitschmidt v. City of Houston*, 161 F.3d 834, 839 (5th Cir. 1998) (same).

Relevant to the present case, the Supreme Court has recognized that governmental interests in officer safety, facilitating the completion of a search for evidence and contraband, and preventing the flight of key suspects are generally present in every execution of a search warrant. *See, e.g.*, *Bailey v. United States*, 133 S. Ct. 1031, 1038 (2013); *Muehler v. Mena*, 544 U.S. 93, 98 (2005); *Summers*, 452 U.S. at 702–03. It does not follow from that observation, however, that in every search those governmental interests always carry more weight than any countervailing individual privacy interests at stake. Instead, as with any Fourth Amendment analysis, it is crucial to examine the context of the search, which includes the kinds of risks associated with particular kinds of offenses. For instance, the Supreme Court precedents I discussed above involved investigation of drug-, gun-, and gang-related crimes. *See Bailey*, 133 S. Ct. at 1036 (search for a handgun seen during a drug investigation); *Muehler*, 544 U.S. at 95 (search for evidence of a gang-related shooting); *Summers*, 452 U.S. at 693 (search for drugs). In the same vein, the Second Circuit "has repeatedly acknowledged the dangerous nature of the drug trade and the genuine need of law enforcement agents to protect themselves from the deadly threat it may pose." *United States v. Alexander,* 907 F.2d 269, 273 (2d Cir. 1990) (collecting cases).

By contrast, although guns may be the "tools of the trade" of drug distribution, *United States v. Becerra*, 97 F.3d 669, 671 (2d Cir. 1996), they are not the tools of tax evasion. Tax-related felonies are generally recognized to be nonviolent offenses. *See, e.g.*, *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003) (denying qualified immunity on summary judgment where IRS agent handcuffed a woman verbally objecting to execution of warrant). Accordingly, in the tax cases that discuss strong governmental interests in, for instance, officer safety, the courts

13

justified their rulings at least in part on a determination that the officers *in those circumstances* reasonably believed there was a meaningful risk of harm. *See, e.g.*, *Unus v. Kane*, 565 F.3d 103, 120 (4th Cir. 2009) (observing that the searched home was "believed to contain evidence of money laundering by entities suspected of assisting international terrorism"); *Dawson v. City of Seattle*, 435 F.3d 1054, 1067 (9th Cir. 2006) (discussing, *inter alia*, the specific context of searching a boardinghouse and that the property owner had resisted the search and had an associate with a violent criminal history, including a history of threatening government officials about inspections); *cf. Garavaglia v. Budde*, 43 F.3d 1472, 1994 WL 706769 (6th Cir. 1994) (unpublished) (granting summary judgment because the application of a specific Supreme Court case to the situation was unsettled in the Sixth Circuit).

The Supreme Court has frequently instructed that "clearly established law" in the Fourth Amendment context should not be defined "at a high level of generality." *See Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (collecting cases). That admonishment applies to the inappropriate expansion of qualified immunity through an unexamined assumption that all law enforcement investigations are equally dangerous. At the motion to dismiss stage, it is difficult to establish a specific and sufficiently weighty government rationale without making reference to materials outside the pleadings. For that reason, most qualified immunity cases are decided after some discovery. Granting a motion to dismiss—at which stage the plaintiff is required to meet only the notice pleading standard of Rule 8 and I am obligated to draw all reasonable inferences in his favor—on the sole basis that the government *generally* has a set of safety interests in *most* efforts to effectuate a search warrant, would vitiate the Fourth Amendment totality of the circumstances test and the availability of the *Bivens* remedy.

With those principles in mind, I now turn to a consideration of Carpenter's specific

14

Fourth Amendment claims.

    1.   *Excessive Show of Force Allegations*

    Carpenter alleges that the search, as planned and carried out, involved an unreasonable or excessive show of force. Contrary to Schrader's suggestion that an excessive show of force cannot constitute the basis for an excessive *use* of force claim, *see* Def.'s Br. at 17, the Second Circuit in *Terebesi v. Torreso*, 764 F.3d 217 (2d Cir. 2014), observed that: "[d]epending on the circumstances, a search may be unreasonable under the Fourth Amendment even if officers do no more than threaten the occupants with firearms." *Id.* at 240. In support of that determination, the *Terebesi* Court relied on, *inter alia*, *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179 (10th Cir. 2001), which stated:

> The display of weapons, and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force. Such a show of force should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at that time. "These are the very ingredients relevant to an excessive force inquiry." *McDonald,* 966 F.2d at 294. Where a person has submitted to the officers' show of force without resistance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use.

*Id.* at 1192–93. *Holland* involved the more dramatic context of officers who had pointed guns at minors; however, the same reasoning applies here.

    In the present case, Carpenter has at least arguably alleged a show of force that was in excess of any legitimate governmental interest. He alleges that seventy-two armed agents brandishing[10] weapons descended on a corporate building in the middle of the day to facilitate a

---

[10] The parties appear to agree that the term "brandish" is used here consistently with the definition provided in 18 U.S.C. § 924(c)(4):

search through his documents and to frighten him into a coercive interrogation. *Cf. United States v. Faux*, 828 F.3d 130, 137 (2d Cir. 2016) (in the Fifth Amendment context, observing that the need for 10–15 armed officers in a 4,900 sq. foot house was "not readily apparent" when "[n]othing in the record suggests that Faux was suspected of being particularly dangerous; she was being investigated for a paperwork fraud scheme, and the warrant was to search primarily for documents rather than (for example) weapons or drugs"). The warrant makes no mention of any possible threat to the officers' safety during the raid, nor any suggestion that Carpenter or any of the GMC employees was prone to violence or had access to weapons. *Cf. Terebesi*, 764 F.3d at 239 (holding that the exigent circumstances doctrine had not been shown to apply where there was no suggestion that the plaintiff "was ready to engage in violence, had any record of or propensity towards violence, that he had immediate access to weapons, or indeed that he was likely to offer any resistance at all"). And, drawing all inferences in favor of Carpenter, the complaint can be read to suggest that the agents continued to "brandish" their weapons throughout the search, despite the lack of resistance from Carpenter or any of the detained employees. *Cf. Unus*, 565 F.3d at 118 (basing its determination that the defendants had not violated the Fourth Amendment at least in part on indications in the record that they "drew their weapons only long enough to ensure their safety and control of the situation—once the plaintiffs complied with the agents' directives, the weapons were holstered"). In sum, Carpenter has alleged that Schrader and the agents under his supervision engaged in a show of force wholly unrelated to any "perceived risk of injury of danger to the officer or others," *Holland*, 268 F.3d at 1192, and continued to use such intimidation tactics long after the site was secure and it would

---

[T]he term "brandish" means, with respect to a firearm, to display all or part of the firearm, or otherwise make the presence of the firearm known to another person, in order to intimidate that person, regardless of whether the firearm is directly visible to that person.

have been clear to any reasonable officer that no plausible risk remained.

Schrader has pointed to several cases in which equivalent displays of force were deemed to be reasonable, *see* Def.'s Br. at 20–21; however, as discussed above, each of those cases involved violent crimes or other specific indicia of risk not obviously present in this case. Schrader also incorrectly attempts to extend the Second Circuit's observation in *Terebesi* that "there is no clearly established right . . . to be free from the deployment of a tactical team in general," 764 F.3d at 233, to mean that there will *always* be qualified immunity for the decision to use such procedures. The *Terebesi* Court was assessing the plaintiff-appellee's claim that "the decision to deploy a tactical team [rather than ordinary officers] can, under certain circumstances, constitute an unconstitutional use of force, regardless of the details of the planned operation." *Id.* at 232. The Second Circuit emphasized, however, that its reversal of the district court's denial of qualified immunity

> relates only to the decision to deploy [the SWAT team] to execute the search
> warrant. Neither Solomon nor any other defendant is qualifiedly immune at the
> summary judgment stage from any Fourth Amendment liability he may otherwise
> have in connection with the planning of the raid, including any liability for
> authorizing or directing the team members to carry out the search in an unlawful
> manner or for failing to intervene in constitutional violations committed by others.

*Id.* at 233. In the present case, where the plaintiffs complain about the alleged use of SWAT-*like* tactics without justification, rather than simply complaining about use of an actual tactical team, there is not even an equivalent claim to dismiss.

Carpenter also argues that Schrader's show of force exceeds the statutory authority granted to the IRS. In his brief, Carpenter argues that IRS agents lack statutory authorization to carry firearms in this context altogether. *See* Pl.'s Opp'n Br. at 12–15. He points out that the statutory sections discussing IRS enforcement of laws pertaining to alcohol, tobacco, and firearms and IRS enforcement of other tax laws are largely parallel, except that the former

includes an explicit authorization for agents to "carry firearms" and the latter does not. *Compare* 26 U.S.C. § 7608(a)(1) *with* 26 U.S.C. § 7608(b)(2). Although Carpenter's statutory construction is convincing, he has not identified any decision predating the April 2010 search adopting it—in fact, the First Circuit, considering the same theory in a suppression motion in *United States v. Adams*, 740 F.3d 40 (1st Cir.), *cert. denied,* 134 S. Ct. 2739 (2014), observed that it was "a novel one." *Id.* at 43. Unfortunately for Carpenter, novel theories do little work in the qualified immunity context, where a violation of "clearly established" law is required.

In the same vein, I note that the Internal Revenue Manual ("IRM") undercuts Carpenter's theory, observing that although there is "no specific statutory authority for special agents to carry firearms," such authority is *implied* by the statutory authority to make arrests. *See* IRM at § 9.1.2.4.1 (effective Nov. 10, 2004) (doc. 86-1); *see also id.* at § 9.1.2.5.1 (effective Jan. 23, 2004) (same).[11] Although the claimed authority is far from apparent and although an agency's official view of its own statutory authority is not dispositive of whether a Fourth Amendment violation has occurred, the existence of such a policy statement would make it extremely difficult for Carpenter to show that any reasonable officer would have known that the contested actions were unlawful. *See, e.g.*, *Mountain Pure, LLC v. Roberts*, 814 F.3d 928, 933 (8th Cir. 2016) (holding that qualified immunity applied to IRS agents carrying weapons during a search because, *inter alia*, that conduct was permitted by IRS policy).

Finally, Carpenter argues that the show of force violated IRS policy. Although agency policy would not provide the basis for a Fourth Amendment or statutory violation, a knowing violation of official policy would certainly have bearing on the third prong of the qualified

---

[11] The parties' joint submission of the IRM correctly points out that I may take judicial notice of information found on governmental websites, such as the IRM. *See Zurich Am. Ins. Co. v. Expedient Title, Inc.*, 2015 WL 9165875, at *10 (D. Conn. Dec. 16, 2015).

immunity test. *See Soares v. Connecticut,* 8 F.3d 917, 922 (2d Cir. 1993) ("To be sure the written policy might bear upon whether the officers' actions were objectively reasonable, but it has no bearing on whether the officers violated clearly established constitutional or statutory rights unless it somehow created a protected interest . . . ."). Carpenter has at least arguably alleged such violations. For instance, the IRM, at section 9.2.3.6, provides:

> (2) Special agents *must conceal* their handguns upon their persons, keeping them away from public view when conducting official business. However, special agents may display their handguns, if they feel it will relieve a threat against special agents or others.

> (3) Special agents should draw their handguns only if there is sufficient cause to expect they will be used and doing so affords the agent a tactical advantage.

Carpenter has alleged that those policies were not followed in several ways—he alleges that the agents were carrying "automatic weapons," rather than handguns; that those weapons were in plain view; and that they were "brandished" during the search, all despite the absence of any plausible threat. *See* SAC at ¶¶ 8, 22. A reasonable inference arises that Schrader, as the Special Agent in charge of planning the search, was aware of those policies.[12]

Discovery may quickly reveal that Carpenter's version of events is incorrect. I am particularly mindful of *Mountain Pure, LLC v. Roberts*, 814 F.3d 928 (8th Cir. 2016), a potentially similar case in which the Eighth Circuit upheld the district court's grant of qualified immunity. The use of force at issue in *Mountain Pure* was a search for business documents and seizure of employees that the IRS and the Small Business Administration carried out using thirty-five law enforcement agents carrying weapons and wearing ballistic vests.[13] But that case

---

[12]Section 9.2.3.2.4(1) of the version of the IRM that was effective during the time of the search requires that all special agents be aware of the agency's policies on the use of force. *See* IRM Cat. No. 36228A (effective March 26, 2008).

[13] The search was described by the court as follows:

was decided at the summary judgment stage, after the parties had an opportunity to investigate how much force was actually used, and why the government actors felt such force was necessary. Carpenter's allegations here are sufficient to entitle him to the same opportunity.

### 2. *Needless Destruction of Property*

Carpenter alleges that his office was "ransacked." SAC at ¶ 28. I infer from that allegation that there was an inappropriate destruction of his personal property and effects, conducted either by Schrader or, with his deliberate indifference, by agents under his supervision.

"Excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression." *United States v. Ramirez*, 523 U.S. 65, 71 (1998). In *Cody v. Mello*, 59 F.3d 13 (2d Cir. 1995), the Second Circuit stated that due process liability could be imposed for property damage during a lawful search if the law enforcement agent "acted unreasonably or maliciously," *id.* at 16, a principle that district courts have routinely extended to the Fourth Amendment context, *see, e.g.*, *Koller v. Hilderbrand*, 933 F. Supp. 2d 272, 278 (D. Conn. 2013); *Foreman v. Beckwith*, 260 F. Supp. 2d 500, 505 (D. Conn. 2003). Drawing all reasonable inferences in favor of Carpenter, he has plausibly alleged that Schrader or the agents under his

---

Thirty five federal and state law enforcement agents began their search of the bottling facility on January 18, 2012 at 8:45 a.m. The facility consisted of a bottling plant and office space totaling approximately 100,000 square feet. The agents drove to the plant in a convoy with their sirens sounding and lights flashing. Each federal agent wore a ballistic vest and carried a handgun and secondary weapon as required by SBA and IRS policies. During a protective sweep of the building, agents pushed Mountain Pure employees Tracy Bush and Scott Morgan against the wall, and one agent drew his weapon on vice president Court Stacks while entering his office. Neither Roberts nor Spradlin drew her firearm or instructed any agents to draw their weapons, instead leaving that decision to agent discretion. After finishing the protective sweep, the agents detained the employees in the facility's break room. The agents either confiscated the employees' cell phones or directed them to leave their phones in their offices, and they did not allow the employees to make phone calls while they were detained.

*Mountain Pure LLC*, 814 F.3d at 931.

supervision needlessly and maliciously destroyed his property, perhaps to coerce Carpenter into an interrogation or as retaliation for his perceived "anti-government" stance.

Again, I note that discovery may reveal that none of Carpenter's property was, in fact, destroyed; or that the destruction was reasonably necessary or inevitable in the course of conducting the search. For instance, in *Soichet v. Toracinta*, 111 F.3d 124, 1997 WL 183776 (2d Cir. 1997) (unpublished), the Second Circuit affirmed the district court's grant of summary judgment on the claim that law enforcement agents had violated her Fourth Amendment rights when they "'ransacked' [her] apartment and destroyed antique furniture" in the course of a search for drugs. *Id.* at 124. The Second Circuit observed that the plaintiff's "conclusory allegations," which failed to specify the nature of the agents' misconduct or the extent of the damage they caused, were insufficient to demonstrate that the destruction was unreasonable in the course of the search. *Id.* But that determination was made at the summary judgment stage. *Id.*; *see also Koller*, 933 F. Supp. 2d at 279 (observing that district courts have been "reluctant to resolve the issue [whether officers' destruction of property was unreasonable or malicious] at summary judgment") (collecting cases).

   3.   *Unreasonable Detention*

Carpenter alleges that the agents "detained the plaintiff [presumably Carpenter] and others for unreasonably long periods of time." SAC at ¶ 19. He further suggests that the detentions were intended to coerce witnesses into making statements without the assistance of counsel or other protections. *See id.* at ¶¶ 25, 28. As a preliminary matter, I note that Carpenter cannot assert claims on behalf of other parties, such as the GMC employees. Accordingly, I focus only on whether Carpenter's personal detention constituted an unreasonable seizure.

A seizure within the meaning of the Fourth Amendment occurs "whenever a police officer accosts an individual and restrains his freedom to walk away." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). A seizure becomes unlawful when it is "more intrusive than necessary." *Florida v. Royer,* 460 U.S. 491, 504 (1983). The scope of a detention "must be carefully tailored to its underlying justification." *Id.* at 500; *see also Los Angeles Cty., California v. Rettele*, 550 U.S. 609, 614 (2007) ("Unreasonable actions include the use of excessive force or restraints that . . . are imposed for a prolonged and unnecessary period of time.").

"[T]he general rule [is] that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause." *Michigan v. Summers*, 452 U.S. 692, 700 (1981).[14] In *Michigan v. Summers*, 452 U.S. 692 (1981), however, the Supreme Court held that a warrantless detention of an individual unsupported by probable cause but incident to a valid search warrant may be constitutionally permissible. The Court identified three factors: (1) the intrusiveness of the detention; (2) the law enforcement interests served by the detention; and (3) the nature of the articulable and individualized suspicion on which the search was conducted. *Id.* at 701–05. The *Summers* Court noted, however, that "special circumstances, or possibly a prolonged detention, might lead to a different conclusion in an unusual case. . . ." 452 U.S. at 705 n.21.[15]

The Supreme Court has subsequently indicated that the *Summers* exception to the warrant requirement for seizures is a broad, categorical rule permitting detention during a valid search

---

[14] I assume for the purposes of this motion that Carpenter has adequately alleged that he was "seized."

[15] The *Summers* Court also expressly declined to decide whether its holding would extend to a warrant that "merely authorized a search for evidence." Id. at 705 n.20. I note that limitation has been interpreted by other courts as an attempt to distinguish between the detention of third parties not believed to be implicated in the suspected crime, *see United States v. Ritchie*, 35 F.3d 1477, 1483 (10th Cir. 1994), and accordingly, I assume for the purposes of this ruling that the fact that this was a search for evidence rather than contraband does not itself exclude Carpenter's detention from the *Summers* rule. *See Dawson v. City of Seattle*, 435 F.3d 1054, 1066 (9th Cir. 2006) (asserting that extension is mandated by *Muehler v. Mena*, 544 U.S. 93 (2005)).

warrant even when law enforcement does not "have particular suspicion that an individual is involved in criminal activity or poses a specific danger to the officers." *Bailey*, 133 S. Ct. at 1037–38. But balancing the intrusion imposed by the detention against the governmental interests furthered by it and the individualized suspicion of Carpenter, who was apparently believed to be a perpetrator of the alleged offense,[16] Carpenter has plausibly alleged that his is the "unusual case" where the *Summers* rule should not apply.

      a.   The Intrusion Imposed by the Detention

With respect to the intrusion imposed by the detention, the *Summers* Court held that a detention in the home added only minimally to the intrusion already imposed by the search because: (1) most people would prefer to remain to observe the search; (2) the police would not be likely to exploit or unduly prolong the detention to gain information; and (3) being detained inside the home does not add significantly to the public stigma of being searched in the first place. *Summers*, 452 U.S. at 702–03.

The first of the *Summers* rationales is presumably applicable to some extent—Carpenter may plausibly have wished to remain on the premises of his business for the duration of the search. In *Summers* and its progeny, however, being detained for the duration of the search apparently entailed a detention of less than three hours. *See, e.g.*, *Muehler*, 544 U.S. at 100 (two to three hours); *Daniel v. Taylor*, 808 F.2d 1401, 1405 (11th Cir. 1986) (two hours and 45 minutes); *Dawson v. City of Seattle*, 435 F.3d 1054, 1066 (9th Cir. 2006) (two hours). The dissenting Justices in *Summers* expressed concern that the majority's new rule could permit a detention lasting more than five hours. *See* 452 U.S. at 712 n.3 (Stewart, J. dissenting); *see also*

---

[16] The third *Summers* factor appears to concern whether the detained individual was the perpetrator of the crime being investigated, or merely a bystander. Because Carpenter appears to be the former, there is no need to discuss that factor further.

*Leveto*, 258 F.3d at 169 (holding that an eight-hour detention, the duration of two inefficiently conducted searches, "undoubtedly qualifies as prolonged under any reasonable understanding of that term"); *Heitschmidt*, 161 F.3d at 838 (finding a violation where, *inter alia*, the plaintiff was "detained in pain without a restroom break for more than four hours"). *But see Unus*, 565 F.3d at 119–20 (finding no violation where the plaintiffs were subjected to a four-hour detention with bathroom breaks during execution of warrant to search for documentary-evidence of terrorist-financing); *Mountain Pure, LLC*, 814 F.3d at 934 (finding no "clearly established law" in the Eighth Circuit prohibiting detentions lasting up to eight hours during a document search). In the present case, the complaint can be read to suggest that Carpenter was detained for the full eighteen-hour duration of the search, a time period that eclipses any of the above precedents, and would seem to be unreasonable by any standard.

Moreover, Carpenter has alleged that the search, and his concurrent detention, lasted longer than what was permitted by the warrant. The warrant permitted a search from 6:00 a.m. to 10:00 p.m., *e.g.*, a sixteen-hour day. *See* Warrant (STOLI Case, doc. 81-1). The Second Amended Complaint alleges that the search lasted for eighteen hours, two hours longer than permitted. SAC at ¶ 9. It has long been clearly established that a search exceeding the scope of a validly-issued warrant and subject to no other exceptions from the warrant requirement is unconstitutional. *See Horton v. California*, 496 U.S. 128, 140 (1990). Because the *Summers* rule only applies to detentions incident to the execution of a valid warrant, as soon as Schrader's search exceeded the scope of the warrant, he needed to provide some other justification for Carpenter's on-going detention. None is indicated by the pleadings.

Carpenter's allegations directly challenge the second *Summers* rationale—he seems to suggest that the prolonged detention was imposed *for the purpose* of coercing a statement from

him outside the presence of counsel.[17] *See* SAC at ¶ 28; *see also Hill*, 785 F.3d at 245–46 (recognizing a Fourth Amendment claim "based on violence or threats used to extract [a] statement" as distinct from the *use* of a coerced statement, which triggers a Fifth Amendment claim); *Ganwich v. Knapp*, 319 F.3d 1115, 1121 (9th Cir. 2003) (same). That interrogation is discussed further below with respect to the governmental interests at stake.

The third *Summers* rationale also arguably supports a contention that Carpenter's detention—in his office and in front of all of his employees—represented a more significant intrusion onto his privacy than the in-home detention at issue in *Summers*. Several Circuit courts have recognized that the detention of an individual at his or her place of work may be significantly more stigmatizing than the in-home detention at issue in *Summers*. For instance, the Third Circuit stated in *Pikel v. Garrett*, 55 F. App'x 29 (3d Cir. 2002):

> The detention of the employees was, in some ways, more intrusive than the detention considered in *Summers*. For example, the detention of the employees took place in the public workplace rather than a private residence. It, therefore, implicated the "public stigma" and "indignity" associated with police detention to a greater degree. Moreover, the detention at issue here was relatively long and intrusive insofar as the employees were left handcuffed for nearly three and one half hours.

*Id.* at 31 (internal citation omitted); *see also Daniel v. Taylor*, 808 F.2d 1401, 1403–04 (11th Cir. 1986) (observing that a plaintiff's detention on business premises that she owned and in front of her employees was at least arguably more public and therefore intrusive than detention in the home). In sum, Carpenter has at least arguably alleged that the detention imposed a significant intrusion upon his privacy rights.

---

[17] Schrader is correct that his subjective intentions are generally irrelevant in determining whether his actions violated the Fourth Amendment, and accordingly, I do not discuss the plaintiffs' claims of animus. *See Bond v. United States*, 529 U.S. 334, 339 n.2 (2000). When force is used for the purpose of improperly coercing the plaintiff into an interrogation, however, that purpose may be considered. *See Ganwich v. Knapp*, 319 F.3d 1115, 1122 (9th Cir. 2003).

> b.   The Law Enforcement Interests Served by the Detention

The *Summers* Court identified "three legitimate law enforcement interests that provide

substantial justification for detaining an occupant:

> "preventing flight in the event that incriminating evidence is found"; "minimizing
> the risk of harm to the officers"; and facilitating "the orderly completion of the
> search," as detainees' "self-interest may induce them to open locked doors or
> locked containers to avoid the use of force."

*Muehler*, 544 U.S. at 98 (quoting *Summers*, 452 U.S. at 702–03). Presumably each of those

rationales applies to some extent in the present case. But, as then-Judge Alito observed, writing

for the Third Circuit in *Leveto v. Lapina*, 258 F.3d 156 (3d Cir. 2001), the tax context triggers

those governmental interests to a very different degree than the "inherently dangerous

situations," *Muehler*, 544 U.S. at 100, the Supreme Court had in mind when it issued its

*Summers* rule.

First, Judge Alito observed that the governmental interest in prevention of flight is

lessened when the search is for complicated documentary evidence in the tax context because

that search

> is much less likely to uncover items that lead to an immediate arrest. Thus, even if
> the search is successful, the suspect may well remain at liberty for some time until
> the evidence is examined and an indictment is obtained. As a result, the incentive
> to flee is greatly diminished.

*Leveto*, 258 F.3d at 170.

Second, Judge Alito observed that the need for detention to reduce the risk of harm to the

agents was also reduced.

> If the agents had been conducting an investigation into a type of offense often
> accompanied by violence, detention for some length of time might have been
> reasonable. *See Summers*, 452 U.S. at 702, 101 S. Ct. 2587; *Torres,* 200 F.3d at
> 185, 186 (quoting *Summers,* 452 U.S. at 702, 101 S. Ct. 2587, for the proposition
> that narcotics searches may erupt in "sudden violence or frantic efforts to conceal
> or destroy evidence"); *Baker*, 50 F.3d at 1191 (noting that occupants of a
> residence subject to a drug raid "are likely to be armed"); *Barlin*, 686 F.2d at 87

(noting "the violent nature of narcotics crime") (quoting *United States v. Vasquez,* 634 F.2d 41, 43 (2d Cir. 1980)). By the same token, if the agents had possessed information that [the plaintiffs] were tied to a violent group or had violent backgrounds, detention for some period might have been justified. *See Clay,* 640 F.2d at 162 (knowledge that individual "previously had been engaged in serious criminal conduct" might justify pat down). Here, however, there is no evidence that such a threat existed. [The male plaintiff] was under investigation for tax crimes, and the alleged facts do not suggest that he had any ties to violent organizations or a record of violence. Accordingly, it does not appear that there was any compelling safety reason for detaining him during the lengthy search.

*Id.* at 171. Judge Alito's reasoning is thus consistent with the holding in *Unus v. Kane,* 565 F.3d 103 (4th Cir. 2009), a case cited by Schrader in support of the proposition that lengthy detentions are justified when effecting a search warrant for financial documents, because the Fourth Circuit's holding relied in part on the fact that the plaintiffs' residence was "believed to contain evidence of money laundering by entities suspected of assisting international terrorism." *Id.* at 120.

Third, Judge Alito observed there was no indication that the agents had relied on the detained plaintiff to facilitate the search. *Leveto,* 258 F.3d at 171. Judge Alito further asserted that, given that fifteen IRS agents executing the search in that case—which he characterized as a "large group"—the plaintiff's extended detention was not justified by a need to prevent the destruction of evidence. *Id.* ("[H]ad [the plaintiff] attempted to disrupt the evidence at either [of the search locations], the agents would have been present to intervene.").

Judge Alito's analysis of the government's rationales transfers easily to Carpenter's case, where he has alleged a lengthy search for a large number of documents that indeed still have not led to an arrest, during which Carpenter posed no meaningful risk of violence or harm, and in which Carpenter was not required to provide any meaningful assistance.

Carpenter's allegation that his detention was used as a means of extracting statements from him outside the presence of counsel similarly does not appear to be balanced by any

pressing governmental need at this stage of the proceedings. The Ninth Circuit held in *Ganwich v. Knapp*, 319 F.3d 1115 (9th Cir. 2003), that the law enforcement interests identified in *Summers* may justify ordering someone to remain on the premises and in a specified location, but they do not justify "coercing [that person] into submitting to interrogations." *Id.* at 1122. Instead, the *Ganwich* court observed that:

> The interrogations did not deter the plaintiffs' flight, did not reduce the risk of harm to officers, and did not assist the officers in the orderly completion of the search. Because the interrogations of the plaintiffs were not carefully tailored to the detention's underlying justification, the detention was more intrusive than necessary. This rendered the detentions unlawful.

*Id.* I would add that, in the absence of some kind of emergency, it is unclear why the government would have any kind of legitimate interest in using detention to obtain an un-*Mirandized* statement from their primary suspect, which statement cannot actually be used in any proceeding against him.

Despite Schrader's effort to rely on drug and gun cases, *see* Def.'s Br. at 20–21, the government's interests in the violent crime context do not automatically translate with the same force to the context of tax offenses. As discussed above, Schrader is at a disadvantage in assessing the *Summers* factors at the motion to dismiss stage. Without presenting evidence outside the pleadings, it is difficult for him to assert with particularity the specific circumstances and concerns that may have made his conduct entirely reasonable. But until such evidence is put before me through the adversarial system, I cannot simply rely on its possible existence to dismiss Carpenter's claims.

### 4.  *The Need for Discovery*

At several points in the above discussion, I have observed the need for discovery. I am mindful, however, of the Supreme Court's instruction that the issue of qualified immunity should

be decided at the earliest available stage of the case to avoid needlessly subjecting public officials to "broad-ranging discovery." *Anderson*, 483 U.S. at 646 n.6 (discussing *Harlow*, 457 U.S. at 817–18). I want to make clear that in the present case—as in the vast majority of the cases I discussed above—a motion to dismiss would not fairly present such a stage.

Contrary to Schrader's suggestion at the hearing on this motion, a complaint alleging a *Bivens* violation is only required to meet the Rule 8(a)(2) standard for notice pleading, meaning that it must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *See Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009). And as I noted in my Order on October 5, 2016, doc. 82, the complaint adequately alleges that Schrader had sufficient personal involvement to be held liable for the unconstitutional acts discussed above—Carpenter alleges that Schrader planned the search and that he was "deliberately indifferent" to whether the agents he was supervising during the search were violating Carpenter's constitutional rights. *See* SAC at ¶¶ 21, 24, 28; *see also Terebesi*, 764 F.3d at 234 (collecting cases). This case is thus distinguishable from *Iqbal*, where the complaint failed to adequately allege the personal involvement of the defendants, and accordingly dismissal on the pleadings was appropriate. 556 U.S. at 682–83. In the same vein, as discussed at length above, drawing all reasonable inferences in favor of Carpenter, his complaint has adequately and plausibly alleged various Fourth Amendment violations.

In sum, as I stated in my October 5th Order, whether and to what extent Schrader was personally involved in the search, the force he used and witnessed being used in its execution, and the circumstances of Carpenter's extended seizure are questions on which adversarial discovery is required. *See also Terebesi*, 764 F.3d at 236 (declining to resolve the qualified immunity question at the summary judgment stage, holding that whether the plan in that case

was "unreasonable" as demonstrated by "clearly established law" turned on the resolution of disputed and material facts). The parties' early discovery efforts, however, should be "tailored specifically to the question of [Schrader's] qualified immunity." *Anderson*, 483 U.S. at 668 n.6.

**IV.     Conclusion**

In conclusion, I **grant in part and deny in part** Schrader's motion to dismiss. Specifically, I **grant** the motion to dismiss the Fourth Amendment claims alleging defects in the warrant, as well as the Fifth Amendment claim. I **deny as moot** the motion to dismiss the Sixth Amendment claim. I **deny** the motion with respect to the Fourth Amendment claims involving the unreasonableness of the search, the search exceeding the warrant, and the prolonged detention and coercive interrogation. The parties shall confer with one another and propose a scheduling order for discovery within two weeks of this Order.


So ordered.

Dated at Bridgeport, Connecticut, this 14th day of December 2016.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge