# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DANIEL CARPENTER and GRIST MILL CAPITAL, LLC, | : | Civil Action No. |
| | : | 3:13-cv-00563-SRU |
| | : | |
| Plaintiffs, | : | |
| | : | |
| vs. | : | |
| | : | |
| COMMISSIONER, INTERNAL REVENUE SERVICE, JOHN KOSKINEN, SHAUN SCHRADER, VICTOR SONG, and JANE AND JOHN DOES 1 TO 72, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants | : | September 22, 2017 |

## PLAINTIFFS' OPPOSITION TO
## MOTION TO FOR SUMMARY JUDGMENT
## BY DEFENDANT SHAUN SCHRADER

The plaintiffs Daniel Carpenter and Grist Mill Capital, LLC ("GMC") respectfully submit this memorandum in opposition to the Motion for Summary Judgment (ECF 129) filed by the defendant Shaun Schrader.  Schrader was Case Agent on the IRS-CI investigation that included a search warrant execution at Plaintiffs offices on April 20, 2010.  Schrader was responsible, in collaboration with Defendant Kathy Enstrom, for investigation strategy; Search Warrant execution design, planning and paperwork; the risk assessment; selecting agents to execute the Search Warrant; preparing and executing the Search Warrant affidavit; pre-operational briefing of agents and Search Warrant compliance.  Plaintiffs claim violations of their Fourth Amendment rights due to (1) the use of unreasonable force, (2) seizures outside the scope of the warrant authorization that Schrader caused, deliberately or negligently, and (3) the failure to apprise them of alleged violations and the description of the items to be seized.  Decisional law

has clearly established that these were violations, and Schrader is personally responsible for them as the Case Agent who planned and implemented the raid.

There exist genuine disputes of material fact as to what occurred during the execution of the search warrant, Schrader's role in planning and implementing this so-called "enforcement action" and Schrader's knowledge and motives throughout.  As a result, Plaintiffs respectfully submit that summary judgment cannot be rendered, and the motion should be denied.

## I.    FACTUAL SUMMARY

Defendant's Local Rule 56(a)1 statement (ECF 129-2) fails to comply with the letter and spirit of that rule.  Instead of being a precise list of distinct, undisputed facts that reduces the need for the Court to compare evidence, it is a position statement that includes paragraph after paragraph of clearly disputed facts, and which required a painstaking and lengthy rebuttal with substantial rebuttal evidence.  As described in the second section of Plaintiffs' 56(a)2 Statement, the disputes of material fact in this case are numerous.  These differences underscore the need for a fact-finder to weigh the varying accounts, which the Court cannot do on summary judgment.

### A.  RAID

On April 20, 2010, agents of the IRS criminal investigative division ("IRS-CI") executed a search warrant at a single-story office building at 100 Grist Mill Road in Simsbury, Connecticut. (56(a)1 ¶ 1.)  The building was rented by Benistar Admin Services, Inc. ("BASI"). (Carp. Tr. 9:13-17.)  At the time, approximately 45 BASI employees worked there on any given weekday.  (Carp. Tr. 15:18-24.)  Both Carpenter and GMC had offices and personal property in the building.  (Carp. Tr. 236:15-237:24; Seizure Inventory, IRS00101, -112, -135, -136, -148.)

2

### B.  PLANNING AND TRAINING FAILURES

The search warrant was part of an IRS-CI investigation out of the Milwaukee branch office of the St. Paul field office.  (Enstrom Tr. 19:13-21; Schrader 17:9-17.)  According to the Search Warrant Plan, the investigation related to employee welfare benefit plans under Internal Revenue Code § 419 ("419 plans").  (Search Warrant Plan, IRS00011-14.)  It was called the "Guy Neumann" investigation, which was the name of a person who worked at 100 Grist Mill Road.  (Carp. Tr. 50:24-51:8.)  As the "Case Agent," Schrader devised the investigative strategy.  (56(a)2 ¶ 3.)  Schrader drafted a Search Warrant Plan, drafted a Risk Assessment, set the number of agents who would participate, assembled the roster, and drafted and swore an affidavit in support of the Search Warrant.  (Schrader Tr. 22:3-13 (Affidavit), 35:14-17 (Plan), 42:11-14 (number of agents), 67:24-68:2 (risk assessment), 108:6-11 (assembled).)

Despite the fact that Schrader assessed that the execution of the Search Warrant would be "low risk," he assembled a roster of fifty-seven IRS-CI agents to execute the search warrant.  (EARF, IRS0009-10; Search Warrant Plan, IRS00021-22.)  Agents were not selected for their familiarity with 419 plans.  (56(a)2 ¶ 20; Enstrom 116:12-117:17.)  On the evening before the raid, Schrader and Enstrom held a pre-operational briefing to review the Search Warrant Plan, which included an "Items to Be Seized" list that had been attached to the search warrant affidavit.  (Schrader Tr. 59:1-8.)  Schrader described 419 plans and read the Items to Be Seized list to the agents.  (Schrader 50:23-54:17; Enstrom 206:13-207:24.)  Schrader was satisfied that the agents understood the "generalities" of 419 plans.  (Schrader Tr. 52:18-21.)  Schrader did not provide the agents with criteria to distinguish between responsive and non-responsive 419 plans.  (Schrader Tr. at 52:22-55:16.)  There is no evidence that Schrader instructed agents on the proper use of firearms in a low risk search warrant execution, or proper entry through secondary doors.

### C. UNREASONABLE FORCE

#### 1. <u>Show of force</u>

More than fifty IRS agents entered the front of the building without invitation shortly after 9:00 AM.  (Enstrom Tr. 86:6-17, 199:24-200:8.)  Every agent had a handgun.  (Schrader Tr. 39:12-22.)  Two agents entered by a back door that led directly into Carpenter's back office. Carpenter was seated at his desk.  (Carp. Tr. 83:24-85:8.)  One of the agents was carrying an assault rifle, which pointed at Carpenter as the agent moved into the room, ordered him out and followed him into the hallway.  (Carp. Tr. 95:12-96:18, 108:18-109:18; M. Carp. 16:12-22.)  The two agents ordered Carpenter to go to the conference room.  (Carp. Tr. 111:9-112:15.)  All other occupants of the building were herded to the conference room as well.  (*Id.*)

#### 2. <u>Seizure of occupants; Denial of counsel</u>

Upon entering the conference room, Carpenter immediately demanded to speak to his attorneys.  (Carp. Tr. 140:21-141:18.)  The agent in charge, Special Agent Kathy Enstrom, refused and told him to wait.  (*Id.*)  Agents pulled out the occupants one by one.  (Mem. of Activity, IRS00219.)  The occupants were ordered to give their names, escorted to their desks, ordered to unlock cabinets, gather their belongings and leave.  (*Id.*)  After thirty to forty minutes, the agents had dismissed all of the occupants except for Carpenter, his wife Molly Carpenter (chairman of BASI), his daughter Caroline Meckel, office assistant Amanda Rossi and another employee Joe Castagno.  (M. Carp. Tr. 30:18-31:2.)  Carpenter was then permitted to telephone counsel.  (*Id.*)

#### 3. <u>Threats; Coercion</u>

Carpenter, his wife and daughter and Rossi remained in the conference room after the other occupants left the building.  (Meckel Tr. 71:8-18, 39:1-42:24.)  Agents asked Carpenter

about business in the building involving 419 plans, including the location of documents.  (Carp. Tr. at 224:8-225:12.)  Agents asked for Carpenter's phones, then grabbed his arm and escorted him to his office and back to locate and seize his cell phone.  (Carp. Tr. 164:24-165:10, 168:5-12.)  Enstrom then wanted to find out if Carpenter had an electronic device in his pocket. (Enstrom Tr. 154:25-158:6.)  As a pretext, she told him he would have to be searched for "safety" reasons.  (*Id.*)  Carpenter refused to be searched.  (Carp. Tr. 166:7-170:23; M. Carp. Tr. 44:5-47:9; Meckel Tr. 48:8-51:9; Enstrom Tr. 158:8-14.)  Agents threatened to handcuff him, and yanked him out of his chair and put his hands behind his back until he emptied his pockets. (*Id.*)  One agent (Patrick Leahy) watched these events from the doorway and laughed and made faces at Molly Carpenter.  (M. Carp. Tr. 48:18-52:4; Enstrom Mem. of Activity, IRS00220.) When Molly Carpenter scolded him, Leahy challenged her to fight him outside.  (Mem. of Activity, IRS00220.)  Enstrom told Leahy to leave the room.  (*Id.*)

Meckel, Rossi and Castagno were told that they were free to go, and that they could not return to the building thereafter.  The Carpenters were not free to leave.  (Carp. Tr. 281:1-284:4; M. Carp. Tr. 37:10-38:25; Meckel Tr. 71:8-18.)  Around noon, the Carpenters were permitted to exit the building, and their attorneys were waiting outside.  (Carp. Tr. 116:12-117:10; M. Carp. Tr. 63:24-64:5; Enstrom Tr. 166:21-167:2.)

### 4.  Interrogations

While detained in the conference room, Carpenter was interrogated about the business of 419 plans, including the location of documents.  (Carp. Tr. at 224:8-225:12.)  He was not free to leave at the time.  (Carp. Tr. 281:1-284:4; M. Carp. Tr. 37:10-38:25; Meckel Tr. 71:8-18.) Thereafter, he was escorted to his desk and threatened with handcuffs, as described above.

Additionally, two other employees were interrogated on the premises: Stefan Cherneski and Kevin Slattery.  (M. Carp. Tr. 64:9-65:9; Meckel Tr. 78:15.)  Slattery was not in the building at the start of the raid; he had been stopped on the street and escorted to the building for interrogation.  (Slattery Tr. 18:7-21:17.)  These interrogations continued after Enstrom had told Molly Carpenter that no employees were still in the building.  (M. Carp. Tr. 62:11-63:3, 69:12-71:17; Enstrom Tr. 168:23-169:9.)  After Molly Carpenter saw Cherneski's and Slattery's vehicles in the parking lot, she informed BASI's attorneys.  (M. Carp. Tr. 62:11-63:23; Meckel Tr. 76:6-15, 78:15-79:4.)  When confronted by the attorneys, agents escorted Cherneski out by the elbow.  (M. Carp. Tr. 64:9-21; Meckel Tr. 76:6-15, 78:15-79:4.)  Molly Carpenter and Caroline Meckel heard Slattery screaming from a conference room at the front of the building.  (M. Carp. Tr. 69:12-70:15; Meckel Tr. 76:15-77:9.)  Molly Carpenter heard Kevin Slattery yell that he wanted a lawyer.  (M. Carp. Tr. 69:12-70:15.)  BASI attorneys asked to see Enstrom.  (M. Carp. Tr. 69:17-70:7.)  Enstrom came out, but not immediately, and then went and released Slattery.  (*Id.*)

### 5.  <u>Length of time</u>

Carpenter left the premises after noon.  (Carp. Tr. 200:4-9.)  Attorneys remained for the duration of the search and, at 10:00 PM, Attorney Jim Somers insisted that the agents must leave.  (Schrader Tr. 94:22-95:13.)  Enstrom argued with Somers, but then ordered agents to leave, and handed the building keys to Somers.  (Enstrom Tr. 171:13-24.)  Carpenter returned to the property at 11:30 PM, at which time agents were continuing to carry boxes to the rental truck.  (Carp. Tr. 118:18-120:10.)

### D.  FAILURE TO DISCLOSE ALLEGED VIOLATIONS
   AND ITEMS TO BE SEIZED

IRS policy provides that a search warrant must "contain on its face or in an incorporated and attached search warrant application, sufficient information to instruct both the executing officer and the occupant of the place to be searched of the nature of the alleged violation(s) and the description of the items to be seized."  Note to Internal Revenue Manual ("IRM") § 9.4.9.3. During the thirty- to forty-minute period before agents allowed Carpenter to contact his counsel, Carpenter repeatedly asked for a copy of the full search warrant.  (Carp. Tr. 127:23-128:11, 129:21-131:21.)  Enstrom handed him a single page.  (Carp. Tr. 130:11-14; Enstrom Tr. 191:6-17.)  Carpenter noted that the affidavit was missing, and that he was entitled to it.  (Carp. Tr. 127:23-128:11, 129:21-131:21.)  Enstrom said that she would not give him the affidavit because it was under seal.  (*Id.*; Enstrom 191:11-17.)  Two agents told Enstrom that Carpenter was entitled to see the search warrant attachments.  (Carp. Tr. 131:3-21.)  Enstrom then gave Carpenter a grand jury subpoena, but those pages did not pertain to the search warrant.  (Carp. Tr. 132:1-134:4; Enstrom Tr. 95:11-100:7.)  Enstrom did not give Carpenter the "Items to Be Seized" list.  (*Id.*)

Carpenter advised Enstrom that he was already the subject of IRS civil enforcement proceedings.  (Mem. of Activity, IRS00219-220.)  Enstrom represented that the search warrant had nothing to do with the civil proceedings, which was inaccurate.  (*Id.*; Enstrom Tr. 152:5-154:23; Schrader Tr. 127:17-22 (obtaining plan participant names "is why we wanted to do the search warrant"); Enforcement Action Review Form ("EARF"), IRS00008 ¶¶ 5 and 8 ("The case is stalled due to the fact that NOVA and Wayne Bursey have not complied with an IRS summons for documents and testimony"; civil enforcement was seeking "customer lists"); Items to Be Seized, IRS00028 ("client lists, complete client files, client databases").)

7

### E.  SEIZURES EXCEEDED THE SCOPE OF THE WARRANT

Attached to the Search Warrant was a list of "Items to Be Seized" limiting the scope of the Search Warrant.[1]  (IRS00028-30.)  IRS policy provides: "Evidence not covered within the scope of the search warrant can only be seized by obtaining a new search warrant or from obtaining the consent of the owner of the property."  IRM § 9.4.9.3.5.3.  During the April 20, 2010 search, agents seized 322 boxes of documents and imaged 11 computers or servers, one thumb drive, and one external hard drive.  (56(a)2 ¶ 66.)  Among the items seized from Carpenter's suite of offices were "atty correspondence" (Box 313) and "legal corresp & motions" (Box 322).  (Seizure Inventory, IRS00135-136.)  Also seized were GMC's business documents, which did not include any documents of 419 plan business.  (Seizure Inventory, IRS00112-148.)

Schrader does not offer credible evidence that he ensured that his team was adhering to the scope of the search warrant.  (Schrader Tr. 90:6-91:2 ("I assume I assisted with the search somehow"; "people were probably coming up to me and asking if this was relevant"; "I mean, if it was a Benistar or Nova document, it was probably relevant, in my opinion, or one of these other 419 plans that we discussed").)  In Schrader's view, every business at 100 Grist Mill was related to the investigation.  (Schrader Tr. 91:3-10 ("our view was that everything there was related").)  Schrader was off-site for substantial periods during the pendency of the search.  (Schrader Tr. 31:4-10, 128:19-129:13.)

Even before April 20, 2010, Schrader clearly intended for the agents to seize a huge volume of documents beyond the scope of the Search Warrant.  The plan was to seize a "sheer

---

[1] The list was not sufficiently particularized or related to enumerated, suspected crimes, but those issues are not before this Court.

volume" of documents that was "a lot, compared to what [IRS] normally take[s]." (Schrader Tr. 9:20-10:11.) In fact, Schrader and Enstrom rented a large truck to take the documents from Connecticut to Wisconsin. (Schrader Tr. 10:12-20; Enstrom Tr. 190:7-17.) Agents left the offices in shambles, and took documents that disrupted ongoing business. (Meckel 100:17-101:2.)

### F.  TRUE GOVERNMENTAL MOTIVATION

Prior to the IRS-CI investigation, the IRS served civil summonses, including document requests, on Carpenter, Benistar Ltd., NOVA Benefit Plans and Wayne Bursey. (EARF, IRS00008; Mem. of Activity, IRS00219-220.) The Search Warrant Plan noted that "NOVA and BENISTAR are currently under civil investigation." (Search Warrant Plan, IRS00018.) Schrader and Enstrom had knowledge of this. (Enstrom Tr. 200:19-201:8.)

As of May 3, 2010, two weeks after the raid, Special Agent in Charge Julio La Rosa affirmed in the civil enforcement proceedings that Carpenter had not been recommended for a grand jury investigation or criminal prosecution. (La Rosa Decl. ¶¶ 1-2.) Instead, the purpose of the Search Warrant was to overpower legal objections to the civil summons, punish the summonsed parties for raising those objections and obtain the names of NOVA and Benistar's clients. (Schrader Tr. 127:17-22 (obtaining plan participant names "is why we wanted to do the search warrant") EARF, IRS00008 ¶¶ 5 and 8 ("The case is stalled due to the fact that NOVA and Wayne Bursey have not complied with an IRS summons for documents and testimony"; IRS seeking "customer lists"; "it appears that NOVA makes a living out of impeding the IRS"); Items to Be Seized, IRS00028 ("client lists, complete client files, client databases . . .").) The IRS-CI held open the criminal investigation for almost six years, then closed it with no indictments. (IRS App't Br., No. 16-1036 (2d Cir.), ECF 36 at 15.)

## II.   LEGAL STANDARDS

### A.  STANDARD OF REVIEW

Summary judgment may not be rendered unless "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If If the non-moving party disputes a factual assertion, he must present evidence supporting his position and indicating that fact-finding is required.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).  However, the Court must view the evidence in the light "most favorable" to the non-moving party and draw "all reasonable inferences" in its favor, *Sologub v. City of New York*, 202 F.3d 175, 178 (2d Cir. 2000), and the ultimate burden of showing no genuine dispute of material fact rests at all times on the movant, *Carlton v. Mystic Transp.*, 202 F.3d 129, 133 (2d Cir. 2000).  "Only when no reasonable trier of fact could find in favor of the non-moving party should summary judgment be granted."  *White v. ABCO Eng'g Corp.*, 221 F.3d 293, 300 (2d Cir. 2000).

### B.  QUALIFIED IMMUNITY STANDARD

Where a defendant official seeks summary judgment on qualified immunity grounds, the motion should only be granted "if either the evidence, viewed in the light most favorable to the plaintiff, is insufficient to establish the violation of a statutory or constitutional right, or if that right was not clearly established at the time of the alleged violation."  *Soto v. Gaudett*, 862 F.3d 148, 156 (2d Cir. 2017) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

Whether a rights violation can be made out on a favorable view of the plaintiff's submissions is the "threshold question."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The "next, sequential step" is to ask whether the right was clearly established, i.e., "whether it would be

clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at

201-202.  As explained the Second Circuit,

> To determine whether the relevant law was clearly established, we consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law. . . . Even if this Court has not explicitly held a course of conduct to be unconstitutional, we may nonetheless treat the law as clearly established if decisions from this or other circuits "'clearly foreshadow a particular ruling on the issue.'"

*Terebesi v. Torreso*, 764 F.3d 217, 230-31 (2d Cir. 2014) (internal citation omitted).

## C.  PERSONAL INVOLVEMENT STANDARD

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court confirmed that *respondeat superior* is not a basis for finding a constitutional violation by a supervisory government official.

*See Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014).  This was not a sea change in the Second Circuit, which has long applied this principle by requiring a plaintiff to allege "personal involvement" by the supervisor in order to state a claim against him *Bivens* or § 1984. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). Specifically,

> In this circuit, to sufficiently allege that a supervisor committed a constitutional violation, a plaintiff must show that "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [the plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring."

*Diaz-Bernal v. Myers*, 758 F. Supp. 2d 106, 129 (D. Conn. 2010) (quoting *Colon* at 873).  As a subcategory, courts in the Second Circuit recognize that "a failure to train can be an active violation on the part of a supervisor who has willfully chosen to allow the harm resulting from a lack of training." *Id.* at 132.

While noting the abstract possibility that *Iqbal* altered the *Colon* factors, courts in the Second Circuit have continued to rely on the *Colon* factors for guidance. *See*, *e.g.*, *Shaw v. Prindle*, No. 15-2883-CV, 2016 WL 4578630, at *1 (2d Cir. Sept. 1, 2016) (summary order) ("the District Court properly determined that [plaintiff] failed to state a plausible claim for relief . . . under *Colon*"); *Cecchini v. Schenck*, No. 3:14-CV-1704 (MPS), 2016 WL 777901, at *6 (D. Conn. Feb. 29, 2016) ("After the Supreme Court's decision in *Iqbal*, the Second Circuit has continued to apply the *Colon* categories to cases brought by police officers against police department supervisors.").

## III.     ARGUMENT

Schrader's brief does not follow the sequential analysis required under *Saucier v. Katz*, insofar as it tangles the distinct inquiries – rights violation, personal involvement and clearly established – without fully analyzing any of them.  Instead of attempting to address Schrader's brief point-by-point, Plaintiffs will focus on their claims in order to demonstrate why they are entitled to trial before a fact-finder.  Specifically, Plaintiffs will explain the violations of their rights, explain Schrader's personal involvement and show that the violated rights were clearly established.  In so organizing the argument, Plaintiffs are <u>not</u> assuming the burden of proving their case based on the limited discovery to date – rather, they are simply rebutting Schrader's argument that no trial is necessary, on which Schrader has not carried his burden.

### A.  UNREASONABLE FORCE

On April 20, 2010, Plaintiffs' Fourth Amendment rights were violated in three ways relevant to the pending motion.[2]  First, agents used unreasonable force to execute the Search

---

[2] Plaintiffs' claims that the Search Warrant was invalid have been dismissed without prejudice to renewal pending the outcome of criminal proceedings before Judge Chatigny.  (ECF 92 at 9.)

Warrant, which resulted from the Search Warrant Plan designed by Schrader.  Second, agents seized property that the Search Warrant did not authorize them to seize, which resulted from Schrader's Plan, his failure to train and his failure to supervise on scene.  Third, agents failed to provide Plaintiffs with a description of the alleged violations or the items to be seized, to which Schrader turned a blind eye.

### 1.  <u>Rights violated</u>

The above-described use of force violated Plaintiffs' Fourth Amendment rights.  With respect to the execution of searches, law enforcement may not to intrude upon the security of "persons, houses, papers, and effects" without good reason.  *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (reasonable force analysis "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake" (internal quotation marks omitted)).  The Second Circuit has instructed,

> We ask "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." . . .  In doing so, we consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."

*Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014)

In this case, the intrusions on the security of Plaintiffs' property and persons were not reasonable.  The alleged crime was white collar, and the site was an office building on a weekday morning.  This was not a drug raid at a residence.  The risk assessment was low, and the facts on the ground proved that out.  Fifty agents were never going to be needed.  Carpenter and the other occupants did not attempt to flee or physically impede the agents on the scene.  There was no need to have a rifle.  There was no need to point a gun at Carpenter.  There was no

need to yank him out of his chair and threaten to handcuff him in front of his wife and daughter, based on a pretextual need for a "safety" search. There was no need to intimidate the occupants. There was no need to challenge Carpenter's wife to a fight outside after she confronted agents for making fun of the mistreatment of Carpenter. There was no need to prevent Plaintiffs from contacting their attorneys – certainly one of the more than fifty agents on scene could have been dispatched to accompany him to a phone. And if the interrogations of employees were not coercive, there would have been no need to conceal them.

Furthermore, the arming of agents was a statutory violation. Whereas subsection (a) of 26 U.S.C. § 7608, which applies to ATF officers, expressly permits the use of guns, subsection (b), which applies to IRS-CI officers, conspicuously does not.[3] The agents' use of guns at 100 Grist Mill Road exceeded their enforcement authority; therefore, by definition, it violated Plaintiffs' Fourth Amendment rights. In fact, Plaintiffs' rights were violated by the armed intrusion.

In sum, the usual governmental interests do not explain the force used on April 20, 2010. Given the low risk assessment, safety was not at issue. Given the lack of physical resistance, control was not an issue. To the extent that Schrader attempts to justify the show of force by saying that the swarm of agents was needed to seize all the documents that the IRS was authorized to take, the numbers do not add up. Even conservatively estimating that 35 out of 57

---

[3] Although the Internal Revenue Manual has suggested that IRS-CI agents may carry guns, *see* IRM § 9.2.3.5.1, that does not trump the statute. And even if Schrader relied on the IRM, that does not answer the threshold question of whether a right was violated, which is necessary to answer before determining whether Schrader should have known better. *See United States v. Adams*, 740 F.3d 40, 42-44 (1st Cir. 2014) (court deemed it "prudential" not to automatically adopt the IRS's construction of § 7608(b) and, instead, "assum[ed] without deciding that the agents who executed the search of the defendant's home violated 26 U.S.C. § 7608 because they were armed").

agents were seizing documents and that the seizure of 322 boxes occurred from 11:00 AM to

8:00 PM (10 of the more than 13 hours that agents were in the building), that would mean that

each agent filled less than one box per hour.  In fact, after testifying that he "could have used

more agents that day," Schrader admitted that the only impact might have been a quicker

departure.  (Schrader Tr. 43:4-8, 45:1-14.)  In short, the numbers were unnecessary, and

unreasonable.

    **2.   Schrader's direct participation and failure to train**

   Schrader directly participated in the above-described violations, and failed to adequately

train the agents as necessary to prevent overseizure.  *See Colon v. Coughlin,* 58 F.3d 865, 873

(2d Cir. 1995) (supervisory liability for direct participation); *Diaz-Bernal v. Myers*, 758 F. Supp.

2d 106, 132 (D. Conn. 2010) (post-*Iqbal*, "a failure to train can be an active violation on the part

of a supervisor who has willfully chosen to allow the harm resulting from a lack of training").

He planned the Search Warrant raid as part of the "Guy Neumann" investigation out of his office

in Wisconsin.  He was the Case Agent responsible for strategy and logistics.  He determined that

the risk assessment was low, yet assembled more than fifty agents to gather in Connecticut from

out-of-state to storm it.  He set interview targets.  He planned to seize a "sheer volume" of

documents.  Schrader was supposed to train and prepare the agents during pre-operational

briefing, including on the existence of the civil investigation.  His planning, preparation and

instruction resulted in the application of unreasonable force described above.

   Furthermore, although Schrader's personal motivations do not speak to the

reasonableness of his Plan, the governmental interests that he was advancing are relevant.

Schrader knew, according to the pre-operational documents, that several people and entities in

the building, including Carpenter, were under IRS civil investigation, and that the IRS was

frustrated with the objections of the summonsed parties.  One objective of the Search Warrant Plan that Schrader designed was to use IRS criminal investigative authority to overpower the persons and entities who had raised civil objections.  That objective was improper and unreasonable, and the unreasonable force applied on April 20, 2010 was a logical result and manifestation of that Plan.

Finally, the record is devoid of any indication that Schrader instructed to agents during pre-operational briefing as to whether it would be appropriate to carry and/or brandish their firearms.  It had been determined and documented that the risk was low and forcible entry would not be needed.  Given that knowledge, there should have been some firearms guidance.  There also should have been instruction as to whether the rear cover agents should have entered the back door.  At their depositions, Schrader and Enstrom were surprised to be asked about the agent who entered Carpenter's office brandishing a gun, which confirms that the action was improper, and should have been forestalled.

### 3.  <u>Clearly established right</u>

The Defendant's brief urges the Court to apply the "clearly established" test in a manner that would nullify basic constitutional protections.  Seizing on the Supreme Court's caution "not to define clearly established law at a high level of generality," *see Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023, 188 L. Ed. 2d 1056 (2014), Schrader's brief attempts to parse Plaintiffs' rights into oblivion.  For example, he argues that there is no appellate case holding that a specific number of agents is beyond reason (ECF 129-1 at 31); however, despite the fact that there could be a case in which more than fifty agents were appropriate for execution of a search warrant, this is not that case.

The "clearly established" test is not so rigid.  Instead, it asks whether "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  *Plumhoff v. Rickard*, 134 S. Ct. at 2023.  With respect to the execution of searches, law enforcement has received clear judicial instructions not to intrude upon the security of "persons, houses, papers, and effects" without good reason.  *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (reasonable force analysis "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake" (internal quotation marks omitted)).

The Second Circuit has held: "As with a seizure, the use of excessive force in the conduct of the search may render the police's actions unreasonable. . . . Because [a] raid plan concern[s] the method used to execute a search warrant, it [is], as a matter of clearly established constitutional law, subject to Fourth Amendment protections . . . ."  *Terebesi v. Torreso*, 764 F.3d 217, 235 (2d Cir. 2014).  Consequently, it was clearly established that, by designing the Search Plan such that it would result in the application of unreasonable force to Plaintiffs, Schrader violated the Fourth Amendment rights of the Plaintiffs.

## B.  SEIZURES EXCEEDED THE SCOPE OF THE WARRANT

### 1.  Rights violation

IRS policy provides: "Evidence not covered within the scope of the search warrant can only be seized by obtaining a new search warrant or from obtaining the consent of the owner of the property."  IRM § 9.4.9.3.5.3.

A review of the Inventory of the 322 boxes that the IRS-CI seized on April 20, 2010 quickly reveals documents that could not possibly be within the scope of the warrant.  The Items

to Be Seized list (IRS00028-30) is focused on 419 plans.  There is no mention of Carpenter or

Grist Mill Capital in the Items to Be Seized list.  (*Id.*)  Although there is a catchall for items

maintained by or on behalf of "any other trusts, businesses or entities that promote, administer,

or utilize 419 plans" (IRS00028), GMC had no 419 plan business.  Agents should have easily

connected those dots given that the labels of the boxes they seized from GMC do not mention

419 plans whatsoever.

When agents seized GMC's property, it did so outside the scope of their warrant

authorization.  The same is true of the personal documents seized from Carpenter that clearly

were not being held "on behalf of" any entity, including attorney-client correspondence.  The

search warrant did not permit seizure of this information.  The fact that agents seized boxes

blatantly labeled "atty correspondence" (Box 313), "mock trial CD's" (Box 320) and "legal

corresp & motions" (Box 322) is astonishing, and defies any commonsense interpretation of the

Items to Be Seized list.  *See*, *e.g.*, *United States v. Wey*, No. 15-CR-611 (AJN), 2017 WL

2574026, at *35 (S.D.N.Y. June 13, 2017) (Fourth Amendment violated when "variety of hard-

copy materials purely personal in nature, or otherwise plainly outside the scope of the suspected

securities and wire fraud scheme described in the Affidavits").

## 2.  Schrader's direct participation and failure to train

Schrader directly participated in the above-described violations, was grossly negligent in

supervising subordinates who committed the wrongful acts and failed to adequately train the

agents as necessary to prevent overseizure.  *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.

1995) (supervisory liability for direct participation, negligent supervision); *Diaz-Bernal v.*

*Myers*, 758 F. Supp. 2d 106, 132 (D. Conn. 2010) (post-*Iqbal*, "a failure to train can be an active

violation on the part of a supervisor who has willfully chosen to allow the harm resulting from a lack of training").

Schrader was responsible for instructing and preparing agents to comply with the Items to Be Seized list.  He assembled the team of agents who conducted the search, but did not factor familiarity with 419 plans into his selection.  He conducted the pre-operational briefing in this regard.  Schrader was satisfied so long as agents understood the Items to Be Seized in "generalities."  He did not give them criteria for distinguishing between responsive and nonresponsive documents other than generally describing 419 plans and reading through the Items to Be Seized list.  Schrader was not concerned that not all agents were present for his instruction.  Meanwhile, he planned to seize a "sheer volume" of documents – which is his explanation for assembling a team of more than fifty agents to storm Plaintiffs' offices – and rented a truck to take the documents back to Wisconsin.

When the search commenced, Schrader was absent.  He presently does not know whether, upon arriving at the site, he assisted agents to ensure that they complied with the scope of the warrant.  Even if he did instruct them in the moment, his view was that "everything was related."  (Schrader Tr. 91:3-10.)  Then he went off-site again.

The Plan was not objectively reasonable, the training of agents was shoddy and Schrader was not present to provide good guidance.  The inevitable result was that agents grabbed everything in sight to fill the truck and sort it all out in Wisconsin.  In fact, there is evidence that overseizure was part of the plan, and no accident.  (*See* EARF, IRS00008 ¶¶ 5 and 8 ("The case is stalled due to the fact that NOVA and Wayne Bursey have not complied with an IRS summons for documents and testimony"; "it appears that NOVA makes a living out of impeding the IRS").)

### 3.  **Clearly established right**

The policy set forth in IRM § 9.4.9.3.5.3 accords with longstanding precedent.  "If the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more."  *See Horton v. California*, 496 U.S. 128, 140 (1990).  Although officers have some discretion in interpreting the search warrant, and should not be subjected to hyper-technical scrutiny after the fact, their interpretation must be "commonsensical."  *Johnson v. Massey*, No. 3:92 CV 178 (JAC), 1993 WL 372263, at *4 (D. Conn. Sept. 17, 1993) (Cabranes, J.) (considering § 1983 claim on summary judgment).  In other words, their conduct is subject to the general Fourth Amendment protection against unreasonable searches and seizures, and must meet a standard of objective reasonableness.  *Id.*

In this case, the agents seized a variety of hard-copy materials purely personal in nature, or otherwise plainly outside the scope of the 419 plan evidence described in the Items to Be Seized list.  They failed to reasonably interpret the scope of the Search Warrant because they were not properly educated, trained or supervised by Schrader.  That failure to train, whether negligent or part of a deliberate plan to overseize, violated Plaintiffs' clearly established rights. *See*, *e.g.*, *United States v. Wey*, No. 15-CR-611 (AJN), 2017 WL 2574026 (S.D.N.Y. June 13, 2017) (no indication that agents were properly prepared to adhere to scope of warrant; defendant failed to supervise search and ensure adherence to warrant scope; agents seized items not responsive to warrant).

### C. FAILURE TO DISLCOSE ALLEGED VIOLATIONS AND ITEMS TO BE SEIZED

#### 1. <u>Rights violation</u>

The IRM provides, in a Note to § 9.4.9.3, that a search warrant must "contain on its face or in an incorporated and attached search warrant application, sufficient information to instruct both the executing officer and the occupant of the place to be searched of the nature of the alleged violation(s) and the description of the items to be seized." The Note cites *Groh v. Ramirez*, in which the Supreme Court observed:

> "The presence of a search warrant serves a high function," *McDonald v. United States*, 335 U.S. 451, 455, 69 S. Ct. 191, 93 L. Ed. 153 (1948), and that high function is not necessarily vindicated when some other document, somewhere, says something about the objects of the search, but the contents of that document are neither known to the person whose home is being searched nor available for her inspection.

*Groh v. Ramirez*, 540 U.S. 551, 557-58 (2004). The IRM also cites *U.S. v. Bridges*, which found fault with a warrant that did not "state what criminal activity is being investigated by the IRS." *United States v. Bridges*, 344 F.3d 1010, 1018 (9th Cir. 2003)

Here, although Carpenter asked repeatedly for the full Search Warrant. Instead, all he received was the single cover page of the Search Warrant, which did not state the alleged violation, and in the section for description of property, referred to an "Attachment B" that was not attached. Although two rank-and-file agents agreed with him and recommended that Enstrom provide him with the Items to Be Seized, Plaintiffs were not given a copy.

#### 2. <u>Schrader's personal involvement</u>

Summary judgment cannot be rendered because it is unclear from the record whether Schrader was in the room at the time Enstrom refused Carpenter's requests for more than the top page of the search warrant. If he was in the room, or if he learned about while on-site, then he

either directly participated or exhibited deliberate indifference to the wrongful refusal of

Plaintiffs' request.  *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995) (supervisory liability

for direct participation; deliberate indifference).

### 3. <u>Clearly established right</u>

The IRM correctly interprets *Groh v. Ramirez* and *U.S. v. Bridges*.  As noted in *Groh*,

particularity is not only necessary to prevent the warrant from becoming an invalid general

warrant.  It also balances out the power differential between law enforcement and citizen by

"assur[ing] the individual whose property is searched or seized of the lawful authority of the

executing officer, his need to search, and the limits of his power to search."  *Groh v. Ramirez*,

540 U.S. at 561 (quoting *United States v. Chadwick*, 433 U.S. 1, 9 (1977)).  This discussion in a

Supreme Court case, as reinforced by the IRM, doubly demonstrates that it was clearly

established that Plaintiffs' repeated request for the full warrant should not have been refused.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that Schrader's motion for

summary judgment should be denied.  There are material disputes of fact as to Schrader's

responsibilities, Schrader's planning and preparation and what occurred during the April 20,

2010 raid.  Although the evidence that Plaintiffs have developed to date supports their right to

continue to pursue their claims, theirs is not the burden of proof at this stage, and there are

questions that require both further development and weighing by the fact-finder.  For these

reasons, Schrader fails to carry his burden of demonstrating no genuine dispute of material fact

as to his qualified immunity defense.

As a final note, to the extent that Schrader is suggesting that the government is entitled to

a presumption of correctness because a magistrate judge signed the Search Warrant, that is not

the standard.  As the Supreme Court has noted, the Constitution protects property owners not only by requiring *ex ante* magistrate review but "by providing, *ex post*, a right to suppress evidence improperly obtained **and a cause of action for damages**."  *United States v. Grubbs*, 547 U.S. 90, 99 (2006) (emphasis added); *see also Groh v. Ramirez*, 540 U.S. 551, 555 (2004) (finding no qualified immunity in *Bivens* case for failure to conform warrant to constitutional requirements).  What occurred in the IRS-CI investigation and search of 100 Grist Mill Road on April 20, 2010 was plainly improper, and remarkably similar to the Fourth Amendment violations recently denounced in *United States v. Wey*, No. 15-CR-611 (AJN), 2017 WL 2574026 (S.D.N.Y. June 13, 2017) (warrants to search defendant's business and apartment failed to identify suspected crimes; no indication that agents were properly prepared to adhere to scope of warrant; defendant failed to supervise search and ensure adherence to warrant scope; agents seized items not responsive to warrant; government retained nonresponsive information after identifying it; conscious effort was made to deem patently unresponsive materials responsive to warrant; government made subsequent searches of information deemed nonresponsive).  It is not Plaintiffs' burden to disprove qualified immunity; it is Schrader's burden to demonstrate that it should apply, and he has failed to carry that burden.

Respectfully submitted,

THE PLAINTIFF,
DANIEL CARPENTER

By:  /s/ Jeffrey P. Nichols
David A. Slossberg (ct13116)
Jeffrey P. Nichols (ct29547)
HURWITZ SAGARIN SLOSSBERG &
KNUFF, LLC
147 North Broad Street
Milford, CT  06460-0112
Telephone: (203) 877-8000
Fax: (203) 878-9800

THE PLAINTIFF,
GRIST MILL CAPITAL, LLC

By:  /s/ Jonathan J. Einhorn
JONATHAN J. EINHORN, ESQ.
129 Whitney Avenue
New Haven, Connecticut 06510
Federal Bar No. ct00163
203-777-3777
einhornlawoffice@gmail.com

JNichols@hssklaw.com
DSlossberg@hssklaw.com

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on September 22, 2017, a copy of the foregoing was filed

electronically and served by mail on anyone unable to accept electronic filing.  Notice of this

filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and

by mail to all parties that are unable to accept electronic filing.  Parties may access this filing

through the Court's electronic system.

<u>/s/ Jeffrey P. Nichols</u>
Jeffrey P. Nichols