## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DANIEL CARPENTER and GRIST MILL CAPITAL, LLC, | : : : | Civil Action No. 3:13-cv-00563-SRU |
| Plaintiffs, | : : | |
| vs. | : : | |
| COMMISSIONER, INTERNAL REVENUE SERVICE, JOHN KOSKINEN, SHAUN SCHRADER, VICTOR SONG, and JANE AND JOHN DOES 1 TO 72, | : : : : : : | |
| Defendants | : : | September 22, 2017 |

## PLAINTIFFS' LOCAL RULE 56(a)2 STATEMENT

## I.      RESPONSES TO 56(a)1 STATEMENT

1.  *Schrader served from April 2004 to August 2010 as a Special Agent with the Internal Revenue Service, Criminal Investigation division ("IRS-CI").  As a Special Agent of IRS-CI, his responsibilities included the investigation of possible criminal violations of the Internal Revenue laws, the Bank Secrecy Act, the Money Laundering Control Act, and related offenses.  (Schrader Decl. ¶ 2.)*

     ADMITTED.

2.  *Schrader was the IRS-CI case agent assigned to the investigation of NOVA Benefit Plans LLC, also known as Benistar, and related entities and individuals including plaintiff Daniel Carpenter ("Carpenter").  (Schrader Decl. ¶ 3; Schrader Depo. at 23 ¶¶ 3-9.)*

     ADMITTED IN PART that "Schrader was the IRS-CI case agent assigned to the

investigation of NOVA Benefit Plans LLC."

     DENIED that Carpenter was under investigation, as affirmed two weeks after the raid by

Special Agent in Charge Julio La Rosa.  (La Rosa Decl. ¶¶ 1-2.)

1

DENIED as to the characterization "Benistar and related entities and individuals," given that Benistar, NOVA, Benistar Admin Services, Inc. ("BASI"), and Grist Mill Capital, LLC ("GMC") were separate businesses.  (Carpenter Tr. 231:3-19.)

3. *A case agent is the lead investigator who designs investigative strategy, serves subpoenas, considers individuals who may be interviewed, identifies suspects, proposes charges for indictment, drafts operations plans for search warrant execution, conducts pre-search warrant briefing for participating agents, and generally manages a criminal investigation from initial receipt through prosecution.  (Schrader Decl. ¶ 3.)*

ADMITTED IN PART that these are <u>some</u> of the duties of a case agent.  (Schrader Tr. 23:7-22.)  In this case, Schrader drafted a Search Warrant Plan, drafted a Risk Assessment, set the number of agents who would participate, assembled the roster, and drafted and swore an affidavit in support of the Search Warrant.  (Schrader Tr. 22:3-13 (Affidavit), 35:14-17 (Plan), 42:11-14 (number of agents), 67:24-68:2 (risk assessment), 108:6-11 (assembled).)

4. *Almost every decision of the case agent – particularly those related to search warrant application and execution – must be approved by a supervisor, assistant special agent in charge, or counsel attorney.  (Schrader Decl ¶ 3.)*

ADMITTED IN PART; DENIED insofar as the "approval" was of the rubberstamp variety.  (Schrader Tr. 26:21-27:16, 29:22-25, 32:19-33:12, 34:4-8, 58:21-25; Enstrom Tr. 83:19-84:6, 88:12-89:2 ("<u>agent</u> would put that in there"), 179:1-10, 199:12-23.)

DENIED to the extent that the statement is asserting that Schrader had no autonomy or responsibility.  (56(a)1 Statement ¶¶ 8, 20; Schrader Interrog. Resp. ¶¶ 12-13.)

DENIED insofar as the assertion does not specify which investigative decisions relevant to this case might have required supervisor approval.  In this case, Schrader had responsibility for the investigative and search warrant strategy (Schrader Tr. 21:4-22:13), search warrant planning (28:24-29:25), risk assessment (58:21-25, 83:14-84:3).  Schrader trained agents on the items to be seized (Schrader Tr. 99:17-100:13; Enstrom Tr. 206:13-207:24.)  Schrader

determined the number of agents executing the search warrant (Schrader Tr. 42:11-14, Enstrom

Tr. 199:12-23.)

5. *Schrader was supervised by IRS-CI Supervisory Special Agent Kathy Enstrom ("Enstrom") during his assignment to the Benistar investigation. That is, Schrader reported to Enstrom. (Schrader Depo. at 23 ¶¶ 20-22; Enstrom Depo. at 19 ¶¶ 24 – 20 ¶ 6.) Schrader himself did not supervise any other agents assigned to the Benistar investigation during that time; he had no authority to instruct them what to do to further the investigation. (Schrader Depo. at 22 ¶ 24 – 23 ¶ 2 & 24 ¶¶ 10-16.)*

      ADMITTED IN PART that Schrader "reported to Kathy Enstrom" and was

"supervised" by her during the investigation.  DENIED that Schrader had "no authority to

instruct."  (Schrader Tr. 21:4-22:13 (discretion over investigation, search warrant), 99:17-

100:13 (items to be seized); Enstrom Tr. 206:13-207:24 (training on items to be seized).

      DENIED that this was a "Benistar" investigation.  (Carpenter Tr. 231:3-19.)

6. *The IRS-CI investigation into Benistar established probable cause to believe that NOVA/Benistar, its principals, and employees, were conspiring to impede the lawful function of the IRS and assisting in the preparation of false tax returns through the promotion and administration of abusive "419 welfare benefit plans." The IRS alleged that the plans, NOVA/Benistar and its related companies engaged in a fraudulent scheme in which individuals claimed that minor injuries were instances of permanent disablement and disfigurement in order to appear qualified for – and receive – tax-favored treatment under the Internal Revenue Code. (Schrader Decl. ¶ 4.)*

      ADMITTED IN PART as to what "[t]he IRS alleged."

      DENIED that this was a "Benistar" investigation.  (Carpenter Tr. 231:3-19.)

      OBJECT that establishment of probable cause is a legal proposition, not an assertion of

fact.  *See* L. Civ. R. 56(a)2 (non-moving party must state "whether each of the <u>facts</u> asserted by

the moving party is admitted or denied"); DENIED that there probable cause was "established."

7. *Schrader, other IRS-CI special agents, IRS-CI management, and the United States Attorney's Office decided to seek to obtain evidence by way of a federal search warrant. One reason for seeking evidence through a search warrant was that they believed that NOVA and Benistar had not complied with prior summonses or subpoenas. (Schrader Depo. at 27 ¶¶ 2-16; Enstrom Depo. at 41 ¶¶ 8-22.)*

ADMITTED that IRS-CI sought a search warrant.

ADMITTED IN PART that NOVA, Benistar and Carpenter had raised objections to IRS civil summons; DENIED as to Schrader's "belief" that they had "not complied prior summonses or subpoenas," given that raising legitimate legal objections are not equivalent to noncompliance. (Schrader Tr. 27:8-28:18; Enstrom Tr. 107:4-25.)

ADMITTED IN PART that the IRS-CI investigation was motivated to overcome legal objections to the civil investigation. (Schrader Tr. 127:17-22 (obtaining plan participant names "is why we wanted to do the search warrant"); Enforcement Action Review Form ("EARF"), IRS00008 ¶¶ 5 and 8 ("The case is stalled due to the fact that NOVA and Wayne Bursey have not complied with an IRS summons for documents and testimony"; civil enforcement was seeking "customer lists"); Items to Be Seized, IRS00028 ("Any and all documents and records that relate to current and former clients/participants (employers and beneficiaries) of 419 plans including client lists, complete client files, client databases . . .").) Schrader and Enstrom had knowledge of this. (Enstrom Tr. 200:19-201:8; Mem. of Activity, IRS00219-220.)

8. *As case agent of the Benistar investigation, Schrader was responsible for filling out all of the necessary paperwork to get internal approvals for seeking a federal search warrant. (Schrader Depo. at 26 ¶ 21 – 27 ¶ 1.)*

ADMITTED that Schrader was responsible for paperwork and obtaining approvals.

DENIED that this was a "Benistar" investigation. (Carpenter Tr. 231:3-19.)

9. *Schrader drafted an affidavit in support of a search warrant for the Benistar office located at 100 Grist Mill Road in Simsbury, Connecticut. The search warrant affidavit was drafted with the assistance of IRS legal counsel and the U.S. Attorney's Office, and was reviewed and approved by Schrader's supervisor and IRS Criminal Tax Counsel pursuant to Internal Revenue Manual (IRM) § 9.4.9.3.3, before it was submitted to the Court. The search warrant affidavit was not solely his work product. (Schrader Decl. ¶ 5; Schrader Depo. at 22 ¶¶ 3-5 & 8-13.)*

ADMITTED that Schrader drafted the Search Warrant Affidavit.

4

DENIED that this was a "Benistar" investigation.  (Carpenter Tr. 231:3-19.)

10. *The search warrant affidavit was based upon Schrader's personal knowledge; records and information that had previously been obtained by the investigation; subpoenas; interviews; and/or information provided by other law enforcement officers.  The information contained within the affidavit was true to the best of Schrader's knowledge, and at all times Schrader acted reasonably to assure the accuracy and truth of the statements therein.  (Schrader Decl. ¶ 6.)*

OBJECT that whether the affidavit was "true" or "reasonably" supported is a fact-intensive question concerning the validity of the Search Warrant, which is a claim that has been dismissed without prejudice.  *See* Order, ECF 92 at 8-9.  Because the statement is immaterial and has not been the subject of discovery, Plaintiffs cannot be expected to submit rebuttal evidence, and the statement should be stricken from Schrader's 56(a)1 submission.

11. *Schrader submitted the sworn 53-page affidavit, with attached descriptions of the premises to be searched and the items to be seized, to Judge Thomas P. Smith of the United States District Court on April 16, 2010.  Judge Smith found that there was probable cause to believe that evidence of criminal violations of 18 U.S.C. § 371 and 26 U.S.C. § 7206(2) was located at the business address of 100 Grist Mill Road, and he therefore approved the search warrant for execution during the daytime (6:00 A.M. to 10:00 P.M.) on or before April 25, 2010.  (Schrader Decl. ¶¶ 5 & 7.)*

ADMITTED.

12. *IRS-CI agents executed the federal search warrant on April 20, 2010.  (Doc. No. 114 at ¶ 8.)*

ADMITTED.

13. *Carpenter challenged the validity of the IRS-CI search warrant during his prosecution on 57 felony counts related to his conduct in devising and executing a scheme to defraud life insurance companies by using misrepresentations to induce them to issue high-value universal life insurance policies to straw insureds.  That case resulted from an investigation by the Department of Labor.  See United States v. Carpenter, No. 3:13-CR-226-RNC, Doc. Nos. 1 & 83.*

ADMITTED IN PART that Carpenter challenged the facial validity of the Search Warrant in a motion to suppress in a prosecution resulting from a DOL investigation.  (3:13-cr-00226-RNC at ECF 83, 155.)

5

DENIED as to the purported description of "his conduct," which is untrue and immaterial, and should be stricken from the 56(a)1 statement as improper, inflammatory and prejudicial.  The government has persistently attempted to prejudice these proceedings by mentioning the immaterial DOL criminal prosecution, as if that somehow absolves the government of the civil rights violations at issue here.  Notably, the government fails to mention that the IRS-CI investigation, which is material to these proceedings, resulted in zero indictments.  (*See* IRS App't Br., No. 16-1036 (2d Cir.), ECF 36 at 15 ("The Wisconsin investigation was terminated in January 2016 and the last statute of limitations ran on April 15, 2016.").)

14. *In his motion to suppress, Carpenter alleged that the IRS-CI search warrant was facially overbroad, non-particularized, and failed to give law enforcement proper guidance on the items to be seized; and that Schrader's affidavit included material misstatements and omissions.  Id. at Doc. No. 83.*

DENIED insofar as "alleged" is an argumentative characterization that does not belong in a 56(a)1 statement, and should be stricken.

ADMITTED that Carpenter filed a motion to suppress, which speaks for itself.  (3:13-cr-00226-RNC at ECF 83.)

15. *United States District Judge Robert N. Chatigny denied Carpenter's motion to suppress in its entirety, finding that the 2010 search warrant was sufficiently particularized, was supported by probable cause, and was not overbroad, and that Carpenter had failed to establish material omissions, misstatements, or reckless disregard for the truth in Schrader's search warrant affidavit.  United States v. Carpenter, No. 3:13-CR-226(RNC), 2015 WL 9461496, at *2 (D. Conn. Dec. 24, 2015).*

ADMITTED that Judge Chatigny issued a written decision on the motion to suppress, which speaks for itself.  (3:13-cr-00226-RNC at ECF 155.)  DENIED that the issue of "material omissions, misstatements, or reckless disregard for the truth in Schrader's search warrant

affidavit" was decided on the merits. Judge Chatigny declined to conduct a *Franks* hearing,

citing procedural deficiencies. (3:13-cr-00226-RNC at ECF 155.)

16. *Carpenter was found guilty of all 57 counts of indictment following a bench trial conducted by Judge Chatigny. United States v. Carpenter, 190 F. Supp. 3d 260, 264 (D. Conn. 2016).*

     DENIED insofar as the verdict is being challenged via post-trial motions that are still

pending. OBJECT that the verdict is immaterial and should be stricken from the 56(a)1

statement as improper, inflammatory and prejudicial. Notably, the statement fails to mention

that the IRS-CI investigation, which is material to these proceedings, resulted in zero

indictments. (*See* IRS App't Br., No. 16-1036 (2d Cir.), ECF 36 at 15 ("The Wisconsin

investigation was terminated in January 2016 and the last statute of limitations ran on April 15,

2016.").)

17. *Pursuant to Internal Revenue Manual procedures, Schrader drafted and distributed four primary documents in preparation for the search of the office building located at 100 Grist Mill Road: a Search Warrant Checklist, an Enforcement Action Review Form, a Risk Assessment Form, and a Search Warrant Plan. These documents were prepared with the input and approval of Supervisory Special Agent Kathy Enstrom, Assistant Special Agent in Charge Joan Totani, Special Agent in Charge Julio La Rosa and IRS Criminal Tax Counsel. (IRM § 9.4.9.3.3; Schrader Decl. ¶ 8; Enstrom Depo. at 52 ¶ 3 – 53 ¶ 5; Schrader Depo. at 29 ¶¶ 22-25 & 32 ¶ 16 – 34 ¶ 24.)*

     ADMITTED IN PART that Schrader and Enstrom collaborated on these documents.

DENIED that Totani and La Rosa provided material "input." (Schrader Tr. 33:21-25, 132:6-

133:16; Enstrom Tr. 62:2-6.)

18. *The purpose of the Search Warrant Plan was to ensure the safety of the agents and other individuals present during entry and the warrant execution; to secure evidence of abusive 419 welfare benefit plans; to secure evidence of Title 26 and Title 18 violations; and to interview key employees of the Benistar entities who were willing to consent to an interview. (Schrader Decl. ¶ 8.)*

     DENIED as to the existence of any "abusive 419 welfare benefit plans" or "Title 26 and

Title 18 violations." The IRS-CI held the investigation open for almost six years, then closed it

with no indictment.  (*See* IRS App't Br., No. 16-1036 (2d Cir.), ECF 36 at 15 ("The Wisconsin

investigation was terminated in January 2016 and the last statute of limitations ran on April 15,

2016.")).  DENIED as to the misnomer "Benistar entities."  (Carpenter Tr. 231:3-19.)

DENIED as to the "purposes" of the Plan, which was intended to use the tools of a

criminal investigation to circumvent legitimate objections that had been raised in response to a

civil summons (Schrader Tr. 127:17-22) and to punish the summonsed parties for raising legal

objections (Schrader Tr. 27:8-28:18; Enstrom Tr. 107:4-25).

*19. The Search Warrant Plan included a list of 57 individuals (including Schrader) who would*
    *be involved in some manner with the execution of the search warrant.  Some of those officers*
    *were assigned to conduct interviews of willing employees.  Other officers were assigned to*
    *identify employees of Benistar, provide outside cover, conduct the search itself, log evidence,*
    *or assure that the items seized did not violate the attorney-client privilege.  (Schrader Decl. ¶*
    *13.)*

DENIED as to "employees of Benistar" – they were BASI employees.  (Molly Carpenter

Tr. 87:7-9.).

DENIED that "the items seized did not violate the attorney-client privilege."  (Carpenter

Tr. 211:5-22; Seizure Inventory at IRS00116, IRS00135, IRS00152-53.)

DENIED that the interrogated employees were "willing."  (Search Warrant Plan,

IRS00014 ("Stefan Cherneski, Kevin Slattery and Richard Belding will be interviewed");

Slattery Tr. 29:19-30:3 ("It's not like I walked in on my own volition to have that happen for

the next couple of hours."), 31:4-12 (asked for attorney).)

ADMITTED IN PART that these were some of the agent assignments listed in the Plan.

(Search Warrant Plan, IRS00021.)

*20. Schrader was partially responsible for the selection of the particular agents who would*
    *execute the search warrant.  He did not know the majority of the agents, who were selected*
    *from the Boston and Connecticut field offices of IRS-CI, so he relied on discussions between*
    *supervisory special agents who requested assistance for the warrant execution.  (Schrader*
    *Depo. at 41 ¶ 15 – 42 ¶ 7.)*

ADMITTED.

21. *Schrader was not responsible for the supervision, instruction, or training of the officers who assisted with the execution of the search warrant. Schrader had no authority to discipline any of the officers who assisted with the search warrant execution or to remedy any complaints about alleged wrongdoing by them. In addition, Schrader had no role in determining IRS policies regarding to search warrant execution. (Schrader Decl. ¶ 14; Enstrom Depo. at 188 ¶ 15 – 189 ¶ 4, 196 ¶¶ 9-12, & 206 ¶¶ 13-16.)*

ADMITTED that Schrader does not set policy for the IRS as a whole.

DENIED that Schrader did not engage in "supervision, instruction, or training" in this

case. (Schrader Tr. 21:4-22:13 (discretion over investigation, search warrant), 28:24-29:25

(planning role), 83:14-84:3 (risk assessment), 99:17-100:13 (items to be seized); Enstrom Tr.

206:13-207:24 (training on items to be seized), 199:12-23 (number of agents).)

22. *Schrader was involved in proposing the number of agents that assisted the search warrant execution on April 20, 2010, in conjunction with IRS-CI management. He was not the "final approver" of how many agents were present for the search warrant execution. Kathy Enstrom and her supervisor made the final decision regarding the number of agents who would assist with the warrant execution. (Schrader Decl. ¶ 15; Schrader Depo. at 42 ¶¶ 8-11; Enstrom Depo. at 199 ¶¶ 12-23.)*

ADMITTED IN PART; DENIED to the extent that the statement is asserting that

Schrader was not responsible for setting the number of agents. (Schrader Tr. 42:11-14; Enstrom

Tr. 199:12-23.)

23. *The number of law enforcement officers that assisted with the search of 100 Grist Mill Road was determined by the need to ensure the safety of the officers and individuals present during the entry and search, interview willing employees, and execute the warrant with the least amount of disruption to the ongoing business as possible. Schrader, Enstrom, and La Rosa took into account the large square footage of the building that needed to be searched; the number of occupants that potentially could be present; the document-intensive nature of the case; the need to maintain control of the scene; and their intention to interview certain employees of Benistar during the warrant execution. (Enstrom Depo. at 186 ¶ 20 – 187 ¶ 2 & 200 ¶¶ 9-18; Schrader Depo. at 42 ¶¶ 12-25.)*

DENIED that the number of agents was "determined by the need to ensure the safety." The Risk Assessment was "low."  (IRS00009-10; *compare* Schrader Tr. 42:21-24 (number of agents needed to for entry) *with* Enstrom Tr. 84:4-21 ("no forced entry would be needed").)

DENIED that Schrader planned to cause the "least amount of disruption to the ongoing business as possible."  (Carpenter Tr. 73:20-76:6 (322 boxes of documents seized), 135:8-16 (occupants frightened); Meckel 100:17-101:2 ("things were missing. People couldn't find the things that they needed"); Schrader Tr. 9:20-10:20 ("sheer volume" of documents "a lot, compared to what we normally take").)

DENIED as to number of occupants.  (*Compare* Carpenter Tr. 15:18-24 (30 to 40 employees) *and* M. Carpenter Tr. at 25:17-23 (45 people) *with* Schrader Tr. 42:21-24 (we believed up to 70 employees).)

DENIED as to size of the building.  (Carpenter Tr. 24:3-8 (back side unoccupied); Meckel Tr. 22:24-23:6 (side of building not used).)

DENIED as to "employees of Benistar" – they were BASI employees.  (Molly Carpenter Tr. 87:7-9.)

*24. Schrader did not intend to "shock and awe" or create an excessive show of force, but instead to assure the safety of all individuals and efficiently conduct the search permitted by the federal search warrant.  (Schrader Decl. ¶¶ 15-17; Schrader Depo. at 42 ¶¶ 8-11.)*

DENIED.  The risk assessment was low, and Schrader and IRS-CI telegraphed their antipathy for Carpenter and other occupants of 100 Grist Mill Road.  (EARF, IRS00009-10 ("low"); EARF, IRS00008 ("it appears that NOVA makes a living out of impeding the IRS"); Mem. of Interview, IRS00242 ("Neumann admitted that he was familiar with Dan Carpenter's previous legal issues" . . . "SA Schrader stated that he knew Neumann was just a salesman and was not running the show at NOVA"); Schrader Tr. 27:8-16 ("we knew they had not

complied"), 65:8-18 ("we sat down and talked about how many bodies do we need to

accomplish this mission"); Carpenter Tr. 73:20-76:6 (322 boxes of documents seized), 135:8-16

(occupants frightened).)

25. *Under longstanding safety protocols of the IRS-CI, the Search Warrant Plan called for the entry team members to wear ballistic (or bullet proof) vests. See IRM § 9.4.9.3.5 (2). Schrader had no role in determining whether bullet proof vests would be worn by the individuals present at 100 Grist Mill Road. (Schrader Decl. ¶¶ 10-12; Schrader Depo. at 45 ¶¶ 21-25; Enstrom Depo. at 75 ¶ 10 – 76 ¶ 3.)*

      DENIED that ballistic vests were mandatory under IRM § 9.4.9.3.5(2), which speaks for

itself.  ADMITTED IN PART that Schrader did not decide whether ballistic vests must be

worn.

26. *Also under IRS procedures, the agents were required to wear clothing that clearly identified them as IRS-CI or police officers.  The individuals who were conducting the search of the premises were encouraged to wear business casual attire.  Schrader had no independent role in determining the clothing that would be worn for the entry or search warrant execution. The attire would have been discussed between Kathy Enstrom and the Assistant Special Agent in Charge.  (Schrader Decl. ¶¶ 11-12; Enstrom Depo. at 74 ¶ 23 – 75 ¶ 8.)*

      OBJECT that Defendant has not submitted the "IRS procedures" that the statement

purports to describe.  Fed. R. Civ. P. 56(c)(2).

      DENIED as to "would have been," which is speculative and not a statement of fact.

27. *The Internal Revenue Manual grants IRS-CI agents the authority to carry firearms.  See IRM §§ 9.1.2.4.1 & 9.2.3.5.1.  All IRS-CI special agents are assigned a handgun as a service weapon.  At the time of the search, IRS-CI policy required that all law enforcement officers involved with a search warrant execution must carry a holstered semi-automatic firearm. IRS-CI agents do not carry automatic weapons during the execution of search warrants. Schrader had no role in creating these policies.  (Schrader Decl. ¶¶ 12 & 22; Schrader Depo. at 39 ¶¶ 14-19; Enstrom Depo. at 65 ¶¶ 17-22.)*

      ADMITTED IN PART that agents are not <u>authorized</u> to carry automatic weapons during

search warrant executions; DENIED insofar as an agent entered Carpenter's office with an

assault rifle.  (Carp. Tr. 95:12-96:18.)

28. *Internal Revenue Service policies permit agents to request written approval to carry special weapons, such as rifles and shotguns, during the execution of a search warrant.  Schrader did not request approval for the presence of special weapons during the April 20, 2010 search warrant execution, no other individual requested to carry special weapons, and no such approval was given. (Enstrom Depo. at 65 ¶ 23 – 66 ¶ 13; Schrader Depo. at 39 ¶ 20 – 40 ¶ 22 & 41 ¶¶ 4-8.)*

OJBECT insofar as "automatic" versus "semiautomatic" is immaterial.

OBJECT that Defendant has not submitted the "policies" that the statement purports to describe.  Fed. R. Civ. P. 56(c)(2).

ADMITTED IN PART that no such "written approvals" were disclosed in discovery;

DENIED that no rifles were present.  (Carpenter Tr. 95:12-96:18, 108:18-109:18.)

29. *As part of the Search Warrant Plan, Schrader proposed that IRS-CI agents would enter the business through the unlocked main entrance of 100 Grist Mill Road at approximately 9:00 a.m. on April 20, 2010.  The Search Warrant Plan did not include the use of a SWAT or tactical team for entry.  (Schrader Decl. ¶ 9; Enstrom Depo. at 204 ¶¶ 13-23.)*

DENIED as to "proposed," given that agents were instructed to follow the Plan.

(Schrader Tr. 50:15-22; *compare* 56(a)1 ¶ 29 ("proposed") *with* ¶ 30 ("required");.)

ADMITTED IN PART that the Search Warrant Plan does not list "SWAT team";

DENIED as to "tactical team."  (Search Warrant Plan, IRS00019 ("Hartford POD will bring entry/extraction tools to SW site.")

30. *The Search Warrant Plan required the agents to make a general announcement to the individuals in the building regarding the warrant, and then each officer who encountered an employee would identify him or herself, tell the employee that he or she was executing a search warrant, and then instruct the employee to gather his or her purse or wallet and personal keys and proceed to a general area for identification.  (Schrader Decl. ¶ 18.)*

OBJECT that the statement incompletely paraphrases a portion of the Plan, which speaks for itself.  (Search Warrant Plan at IRS00014.)

31. *Previously-assigned agents were instructed to identify each employee prior to allowing them to leave the building.  IRS-CI anticipated that certain Benistar employees would agree to be interviewed in connection with the investigation.  They specifically hoped that particular, identified employees would consent to be interviewed.  The Search Warrant Plan specifically*

*excluded Carpenter as a possible interview subject.  (Schrader Decl. ¶ 19; Schrader Depo. at 118 ¶¶ 11-17.)*

OBJECT that this misstates the Search Warrant Plan: The Plan did not expressly "exclude" Carpenter as an interview subject and said nothing about "consent" of other interview targets.  (Search Warrant Plan, IRS00014-17).  Noably, the Plan provided that employees on-site "<u>will</u>" be interviewed, as opposed to an employee that the IRS was planning to confront off-site, whom IRS would "<u>attempt</u>" to interview, which accurately signals that the atmosphere at 100 Grist Mill Road was more coercive.  (Search Warrant Plan, IRS00014: *compare* "Ruse breakfast meeting with Guy Neumann in Hartford . . . attempt to interview him" *with* "Stefan Cherneski, Kevin Slattery and Richard Belding will be interviewed.")

*32. The Search Warrant Plan stated that Benistar employees Stefan Cherneski, Kevin Slattery, and Richard Belding would be interviewed.  All persons whose pictures were in the Search Warrant Plan, other than Carpenter, were potential interviewees.  At the pre-operational meeting and in discussions between IRS-CI and Criminal Tax Counsel, it was determined that Daniel Carpenter would not be interviewed.  (Schrader Depo. at 75 ¶ 9 – 76 ¶ 2.)*

DENIED that there was a plan not to interviewed/interrogate Carpenter, given that this occurred.  (Carpenter Tr. 220:2-15, 222:9-19, 224:8-225:1, 225:13-226:6; Meckel Tr. 64:22-65:1.)

*33. The search plan did not call for any employees from 100 Grist Mill Road to be held for custodial interrogation.  Schrader did not instruct anyone to conduct a custodial interrogation on April 20, 2010.  (Schrader Decl. ¶ 26.)*

OBJECT that the Search Warrant Plan speaks for itself.

DENIED insofar as "<u>will</u> be interviewed" signals coercion, as compared to "<u>attempt</u> to interview," both of which appear on the same page.  (Search Warrant Plan, IRS00014.)

*34. Due to the possible presence of attorney-client privileged documents at 100 Grist Mill Road, the Search Warrant Plan included the use of an on-site "taint team" of agents who would review documents that were potentially privileged in order to avoid the seizure of attorney-client privileged documents.  Those agents were not otherwise involved in the Benistar*

*investigation or subsequent review of the seized documents.  (Schrader Depo. at 119 ¶ 22 – 121 ¶ 1.)*

OBJECT that the Search Warrant Plan speaks for itself.  DENIED that this was a

"Benistar" investigation.  (Carpenter Tr. 231:3-19.)

DENIED that agents "avoid[ed] the seizure of attorney-client privileged documents."

(Carpenter Tr. 211:5-22; Schrader Tr. 120:21-123:17; Seizure Inventory at IRS00116, -135, -

152, -153.)

35. *Schrader and Enstrom conducted a pre-operational briefing on April 19, 2010 in preparation for the search of the office building at 100 Grist Mill Road.  All or nearly all of the agents assigned to assist with the search warrant execution were present.  Schrader provided an overview of the investigation, and Enstrom provided guidance as to the operational plan and what the agents were going to do the following day.  Enstrom provided the agents a copy of the search warrant attachment identifying the items to be seized, and both Schrader and Enstrom talked about exactly what was to be seized.  (Schrader Depo. at 49 ¶ 21 – 50 ¶ 11; 50 ¶¶ 15-21; & 131 ¶ 14 – 132 ¶ 2; Enstrom Depo. at 56 ¶ 13 – 57 ¶ 1, 77 ¶¶ 4-7, & 206 ¶ 17 – 207 ¶ 18.)*

DENIED as to "All . . . agents."  (Schrader Tr. 50:9-22.)

ADMITTED IN PART except that the characterization "talked about" minimizes

Schrader's responsibility and instruction regarding Items to Be Seized.  (Schrader Tr. 99:17-

100:13; Enstrom Tr. 206:13-207:24.)

36. *The office building located at 100 Grist Mill Road, Simsbury, Connecticut, is a large building that houses several different companies.  On April 20, 2010, the building was being rented to Benistar Admin Services, Inc.  Among the companies housed at 100 Grist Mill Road at that time were Benistar Admin Services, Inc.; Grist Mill Capital, LLC; U.S. Benefits Group; Rex Insurance Services; and Aria.  (Carpenter Depo. at 8 ¶¶ 4-9 & 9 ¶ 15 – 10 ¶ 4.)*

ADMITTED IN PART, except that "housed" should replace "houses."

37. The businesses located at 100 Grist Mill Road designed, installed, and administered employee benefit plans.  (Carpenter Depo. at 27 ¶¶ 10-16.)

ADMITTED IN PART as to <u>most</u> businesses located at 100 Grist Mill, but other businesses there did not deal with employee benefit plans. (Carpenter Tr. 27:10-16 ("most of the business"); 236:5-24 (e.g., not GMC or Charter Oak Trust).)

38. *The office building located at 100 Grist Mill Road was approximately 42,000 square feet, on a property covering 11.2 acres of land in what was then a secluded part of Simsbury, Connecticut. The building could house over 50 offices, had at least six conference rooms, separate filing rooms, a large record center, a secure storage facility in the heart of the building, and approximately 30-40 cubicles, 80 to 90 percent of which were occupied. The office building was so large that Daniel Carpenter estimated that a videographer might take as long as an hour and a half simply to get to Carpenter's personal office. (Carpenter Depo. at 23 ¶ 16 – 27 ¶ 6, 31 ¶¶ 11-20; & 33 ¶¶ 20-25.)*

ADMITTED IN PART; DENIED as to "simply to get to," which misconstrues the cited testimony, which estimated 150 to 200 feet from front door to back office. (Carpenter Tr. 32:20-33:25, 37:10-38:19.)

39. *Carpenter worked from a remote suite within 100 Grist Mill Road. The suite contained his personal computer room, main office, conference room, and a private bathroom. (Carpenter Depo. at 39 ¶¶ 10-21.)*

ADMITTED IN PART; DENIED as to "remote," which misconstrues testimony describing the office as "separate" and estimated 150 to 200 feet from front door to back office. (Carpenter Tr. 37:10-38:19.)

40. *The work conducted at 100 Grist Mill Road was very document intensive. Accordingly, the building contained a large amount of paper records and files. (Carpenter Depo. at 27 ¶¶ 21-25; Meckel Depo. at 12 ¶¶ 1-6.)*

ADMITTED IN PART, except that the word "very" is vague and meaningless.

41. *Schrader and Enstrom anticipated that as many as 70 employees would be present at 100 Grist Mill Road on April 20, 2010. In fact, between 40 and 55 people worked for or with Benistar Admin Services at 100 Grist Mill Road at that time. (Carpenter Depo. at 14 ¶¶ 9-15; M. Carpenter Depo. at 25 ¶ 17 – 26 ¶ 5 & 73 ¶¶ 9-13; Schrader Depo. at 42 ¶¶ 18-24; Enstrom Depo. at 186 ¶¶ 9-11.)*

ADMITTED IN PART that approximately 45 people worked at 100 Grist Mill Road at the time. (Carpenter Tr. 15:18-24 (30 to 40 people); M. Carpenter Tr. at 25:17-23 (45 people).)

DENIED that what Schrader and Enstrom "anticipated" was correct or properly

researched; OBJECT that the evidence does not establish the validity of any such "anticipation."

Fed. R. Civ. P. 56(c)(2).

42. *Because the officers arrived at or around 9:00 am on April 20, 2010, many of the employees who worked at 100 Grist Mill Road had not yet arrived or were turned away before entering the building.  (Carpenter Depo. at 15 ¶¶ 6-17; M. Carpenter Depo. at 26 ¶¶ 6-8.)*

ADMITTED.

43. *Benistar Admin Services, Inc. was the lawful custodian of all of the property that is alleged to have been unlawfully seized by the IRS on April 20, 2010.  (Carpenter Depo. at 235 ¶ 17 – 236 ¶ 4; M. Carpenter Depo. at 88 ¶¶ 15-21.)*

OBJECT that "lawful custodian" is a legal proposition, not an assertion of fact.  *See* L.

Civ. R. 56(a)2 (non-moving party must state "whether each of the <u>facts</u> asserted by the moving

party is admitted or denied").

DENIED: Carpenter and Molly Carpenter viewed BASI as a "custodian" in the sense

that it controlled the storage space as the building tenant, though it did not own the documents.

(Carpenter Tr. 235:23-236:4; M. Carpenter Tr. 87:17-88:6.)  The documents did not all belong

to BASI, either directly or as legal custodian.  (Carpenter Tr. 236:5-238:1 (GMC documents),

263:25-265:24 (Carpenter documents).)

44. *Other than Daniel Carpenter, all of the employees present on April 20, 2010 were employees or officers of Benistar Admin Services, Inc.  Carpenter states that he had no role with Benistar Admin Services, Inc., and claims that he never has had a role with Benistar Admin Services, Inc.  (Carpenter Depo. at 12 ¶¶ 3-13; Carpenter Interrogatory No. 1.)*

ADMITTED IN PART: The argumentative qualifiers "states that he" and "claims that

he" should be stricken; Defendant has identified the underlying fact as undisputed by including

it in his 56(a)1 Statement, so the attempt to diminish the fact with an argumentative qualifier is

improper.

16

45. *Carpenter was the chairman or managing member of Grist Mill Capital, LLC.  On April 20, 2010, he was the only person present who was affiliated with GMC.  The GMC documents were stored in Carpenter's back office, in filing cabinets found a long storage room, and in filing cabinets near the desk of Carpenter's assistant, Amanda Rossi.  (Carpenter Depo. at 13 ¶¶ 5-22 & 237 ¶¶ 4-24.)*

ADMITTED IN PART, except that "filing cabinets found a long storage room" is

nonsensical.

46. *Supervisory Special Agent Kathy Enstrom was the team leader of the April 20, 2010 search warrant execution.  She was in charge on scene.  Carpenter recognized that Enstrom was the "authority figure" who was in control of the site during the search.  She "definitely appeared to be the boss."  (Enstrom Depo. at 48 ¶ 21 – 49 ¶ 13; Carpenter Depo. at 127 ¶ 12 – 128 ¶ 3; Schrader Depo. at 102 ¶¶ 9-18.)*

ADMITTED.

47. *Enstrom led the IRS-CI employees into 100 Grist Mill Road through the unlocked front door at approximately 9:05 am on April 20, 2010.  Enstrom was the first person to encounter an employee at 100 Grist Mill Road.  Enstrom believed that employee to be a receptionist. Enstrom identified herself to the receptionist, explained who the individuals behind her were, and asked to see the individual in charge of the premises.  (Enstrom Depo. at 86 ¶¶ 6-17 & 145 ¶¶ 5-16.)*

ADMITTED IN PART; DENIED as to "explained," which attempts to minimize the

coercive nature of the interaction.  (Enstrom Tr. 86:6-17 ("advised her of who I was and who

the individuals behind me were").)

48. *At the time of the agents' initial entry into 100 Grist Mill Road, Schrader was off-site at the M&M Coffee Shop in Hartford, Connecticut, meeting with a target of the Benistar investigation.  It is not unusual for a case agent to be absent when the search warrant execution commences.  (Schrader Decl. ¶ 20; Schrader Depo. at 30 ¶ 25 – 31 ¶ 14.)*

ADMITTED IN PART that Schrader was off-site at the M&M Coffee Shop meeting

with the investigation target, Guy Neumann, when the raid started.

DENIED that it was "not unusual" for the case agent to be absent; OBJECT that

Schrader's subjective view does not support this categorical conclusion.  (Schrader Tr. 31:4-14

("in my instance"; "did that seem unusual to you").)

*49. Schrader did not witness the IRS-CI agents entering 100 Grist Mill Road on April 20, 2010. Schrader arrived at the search premises a few hours after entry was made by the other agents. (Schrader Decl. ¶ 20; Schrader Depo. at 97 ¶¶ 9-12.)*

ADMITTED.

*50. Schrader arrived after Carpenter left the building at 100 Grist Mill Road. Schrader was never inside 100 Grist Mill Road at the same time as Carpenter. Schrader did not interact with Carpenter at all. Carpenter states that he would not recognize Schrader, has never spoken to him, and has never seen him. Carpenter does not know what Schrader did inside 100 Grist Mill Road on April 20, 2010. Carpenter does not if Schrader had any supervisory role. (Schrader Decl. ¶ 28; Schrader Depo. at 89 ¶¶ 5-15 & 98 ¶¶ 7-11 & 14-17; Carpenter Depo. at 176 ¶¶ 7-19, 285 ¶¶ 20-25, & 311 ¶¶ 7-15.)*

ADMITTED IN PART that Carpenter would not recognize Schrader.

DENIED as to "Carpenter does not know" given that he now has the benefit of

testimony demonstrating Schrader's role in the Search Warrant planning and execution.

(Schrader Tr. 21:4-22:13 (discretion over investigation, search warrant), 28:24-29:25 (planning

role), 83:14-84:3 (risk assessment), 99:17-100:13 (items to be seized); Enstrom Tr. 206:13-

207:24 (training on items to be seized), 199:12-23 (number of agents)); OBJECT that this

"Carpenter does not know" assertion relies on an answer to an ambiguous question (*see*

Carpenter Tr. 285:20-22 ("Did you know what – or do you know what supervisory role Shaun

Schrader had on April 20th of 2010?"). Fed. R. Civ. P. 56(c)(2).

*51. Some, but not all, of the IRS-CI agents wore visible black Kevlar vests during the search warrant execution. Other agents concealed their Kevlar vests underneath blue windbreakers. The agents did not wear masks or any visible protective gear below the waist. (Carpenter Depo. at 87 ¶ 13 – 88 ¶ 2; Enstrom Depo. at 205 ¶¶ 1-9.)*

ADMITTED IN PART; DENIED to the extent that the statement is asserting that every

single agent wore a Kevlar vest. (Enstrom Tr. 75:23-76:9.)

*52. Carpenter does not criticize the attire worn by the IRS-CI agents on April 20, 2010. That is, he does not fault how the IRS-CI agents were dressed during the search warrant execution. (Carpenter Depo. at 99 ¶¶ 20-24 & 100 ¶¶ 12-21.)*

ADMITTED IN PART; OBJECT that this is not material.

*53. Kathy Enstrom carried a holstered handgun on April 20, 2010, but no other weapon. She did not draw her firearm. She did not see anyone who had anything other than a handgun on April 20, 2010. She did not see anyone unholster a firearm on April 20, 2010. She did not learn of anyone unholstering a firearm on April 20, 2010. To her knowledge, no rifles or shotguns were brought along for the warrant execution. (Enstrom Depo. at 66 ¶¶ 5-8 & 189 ¶¶ 5-25.)*

DENIED that Enstrom "did not learn of anyone unholstering a firearm," given that it is stated in the Complaint.

DENIED that "no rifles or shotguns were brought along." (Carpenter Tr. 108:3-109:18, 205:20-206:11.)

DENIED insofar as "[t]o her knowledge" is an argumentative qualifier that does not belong in a 56(a)1 statement, so the last sentence should be stricken.

*54. Schrader carried a semi-automatic pistol when he was at 100 Grist Mill Road. IRS-CI agents do not carry automatic weapons during the execution of search warrants, and Schrader was not carrying an automatic weapon. Schrader did not remove the pistol from his holster or brandish it in any way. He did not instruct any law enforcement officers to remove or brandish their weapons. (Schrader Decl. ¶ 21.)*

ADMITTED IN PART that agents are not <u>authorized</u> to carry automatic weapons during search warrant executions; DENIED that this did not occur on April 20, 2010. (Carpenter Tr. 107:12-108:17.)

OJBECT insofar as "automatic" versus "semiautomatic" is immaterial; OBJECT to "typical" given that Schrader has not submitted reliable statistical data to make a categorical statement regarding IRS-CI search warrant executions. Fed. R. Civ. P. 56(c)(2).

*55. Schrader did not see any law enforcement officer unholster or brandish a firearm during the time that he was at the search premises, and he was not made aware of any officer removing a weapon from his or her holster during the warrant execution. It is not typical for an officer to unholster his or her firearm during an IRS-CI search warrant execution, and Schrader would have remembered if that had occurred. Schrader would have been surprised if a rifle was at the scene, because he did not request authority for long guns for this search warrant execution. (Schrader Decl. ¶ 21; Schrader Depo. at 41 ¶¶ 4-8.)*

DENIED as to "if that had occurred," given that much occurred that day outside Schrader's presence and knowledge.  (Schrader Tr. 88:20-89:1, 97:12-98:4, 99:6-16.)

DENIED to the extent that the statement is asserting that no officer brandished a weapon.  (Carpenter Tr. 108:18-112:15; Molly Carpenter Tr. 16:11-16, 105:25-106:8.)

DENIED as to what Schrader "would have been," which is speculative and not a statement of fact.

56. *Carpenter contends that two officers entered his computer room through an unlocked door at the back of 100 Grist Mill Road around 9:00 A.M. on April 20, 2010.  The agents did not use a battering ram or otherwise break through the door to open it.  Carpenter claims that one of the agents was startled to see him, because the agent meant to secure a back entrance and did not know that there was a suite of offices there or realize that Carpenter would be inside the computer room.  That agent allegedly pointed a rifle at Carpenter.  Carpenter does not believe that the agent purposely pointed the weapon at him or intended to intimidate him; instead, the agent was "just as surprised to see [him] and [he] was to see them."  (Carpenter Depo. at 42 ¶ 18 – 43 ¶ 7 & 108 ¶ 20 – 109 ¶ 18.)*

ADMITTED IN PART: The argumentative qualifiers "Carpenter contends that," "Carpenter claims that" and "allegedly" should be stricken; Defendant has identified the underlying facts as undisputed by including them in his 56(a)1 Statement, so the attempt to diminish those facts with argumentative qualifiers is improper.  One agent who entered the back door pointed a gun at Carpenter.  (Carp. Tr. 95:12-96:18, 108:18-109:18; M. Carp. 16:12-22.)

57. *Enstrom and Schrader were unaware of any officer entering the building through the rear entrance at the commencement of the search.  (Schrader Depo. at 97 ¶¶ 20-23; Enstrom Depo. at 132 ¶¶ 22-25 & 133 ¶¶ 20-23.)*

OBJECT that the evidence does not establish this assertion, given that they were in charge and assigned agents to that area, and given that it happened.  Fed. R. Civ. P. 56(c)(2).

58. *Carpenter contends that he was escorted by IRS-CI agents on two occasions during which one of the agents cradled a rifle in his arms.  (Carpenter Depo. at 111 ¶ 12 – 113 ¶ 18.)*

ADMITTED IN PART: The argumentative qualifier "contends that he" should be

stricken; Defendant has identified the underlying fact as undisputed by including it in his 56(a)1

Statement, so the attempt to diminish the fact with an argumentative qualifier is improper.

*59. Carpenter did not see any agent point a firearm at any other individual on April 20, 2010. (Carpenter Depo. at 113 ¶¶ 2-10.)*

ADMITTED.

*60. Carpenter cannot state with certainty that any agents carried automatic weapons. (Carpenter Depo. at 108 ¶¶ 3-11.)*

DENIED insofar as the argumentative qualifier "Carpenter cannot state with certainty

that" does not belong in a 56(a)1 statement, and should be stricken.

ADMITTED IN PART that the rifles might have been semiautomatic.  (Carpenter Tr.

108:3-17.)  OJBECT insofar as "automatic" versus "semiautomatic" is immaterial.

*61. Carpenter contends that the agents conducting the search warrant execution on April 20, 2010 should not have been carrying weapons at all.  His complaint is not that the officers were unprofessional in their handling or use of firearms, but instead that they should not have had weapons on that day.  (Carpenter Depo. at 100 ¶¶ 12-21 & 114 ¶¶ 9-19.)*

ADMITTED IN PART: The argumentative qualifier "Carpenter contends that" should

be stricken; Defendant has identified the underlying fact as undisputed by including it in his

56(a)1 Statement, so the attempt to diminish the fact with an argumentative qualifier is

improper.

*62. Carpenter does not claim that the officers engaged in "commando tactics" throughout the entire search warrant execution.  At some point in time, "the people with the guns and the Kevlar vests wound down[.]" Carpenter's allegations relating to a "commando raid" are related to the method of entry, rather than anything that happened after the entry. (Carpenter Depo. at 199 ¶¶ 14-21 & 201 ¶¶ 2-13.)*

ADMITTED IN PART that the commando allegations pertain, in part, to the entry;

DENIED as to "rather than anything that happened after the entry."  (Carpenter Tr. 201:2-13

("change in tone" did not occur until "after being threatened with handcuffs").)

DENIED insofar as "[a]t some point in time" is vague and meaningless, and should be stricken.

63. *No one was "pistol-whipped" during the search warrant execution.  Carpenter did not see anybody pushed up against the wall with a rifle.  (Carpenter Depo. at 114 ¶¶ 12-19.)*

ADMITTED.

64. *During the April 20, 2010 search warrant execution, the agents assisting with the search were assigned primary and secondary roles.  Certain agents were assigned to make sure that people were not entering and exiting the building.  Teams of agents were designated to interview certain employees of the business.  Agents videotaped the premises and logged evidence.  Some of the IRS-CI agents were exclusively focused on searching for documents in the large building.  Computer investigative specialists imaged computers or made copies of servers and computers on site.  (Schrader Depo. at 42 ¶ 12 – 44 ¶ 20.)*

ADMITTED IN PART; DENIED insofar as "primary and secondary" is ambiguous.

DENIED insofar as "large" is vague and argumentative.

65. *Schrader states that IRS-CI could have used more agents that day, because 100 Grist Mill Road was a large building and this was a document-intensive case.  He believes that the search would have concluded sooner if more agents had been assigned to assist.  (Schrader Depo. at 42 ¶ 12 – 45 ¶ 11.)*

DENIED, especially given the "sheer volume" of documents that agents did seize, which was not "normal" in his experience, and given that the search exceeded the warrant authorization.  (Schrader Tr. 9:20-10:20 ("sheer volume" of documents "a lot, compared to what we normally take"); 50:23-55:16, 78:15-80:21, 85:25-86:11.)

DENIED insofar as the argumentative qualifiers "states that" and "believes that" do not belong in a Rule 56(a)1 statement, and should be stricken.

66. *During the search of 100 Grist Mill Road, IRS agents seized 322 boxes of documents and imaged 11 computers or servers, one thumb drive, and one external hard drive.  Carpenter contends that approximately 40 boxes of those materials constitute the files and records of Grist Mill Capital.  The remaining documents belong to Benistar.  (Schrader Decl. ¶ 29; Carpenter Depo. at 236 ¶ 16 – 237 ¶ 3.)*

22

ADMITTED IN PART as to the volume of materials seized, and the boxes belonging to

GMC.; DENIED that "[t]he remaining documents belong to Benistar," which appears to

confuse Benistar with Benistar Administrative Services, Inc. ("BASI").  (Carpenter Tr. 235:17-

236:4.)

DENIED insofar as the argumentative qualifier "Carpenter contends that" does not

belong in a 56(a)1 statement, and should be stricken; Defendant has identified the underlying

fact as undisputed by including it in his 56(a)1 Statement, so the attempt to diminish the fact

with an argumentative qualifier is improper.

OBJECT that this statement pertains to the 41(g) claims, which is not material to the

pending motion for summary judgment.

67. *Carpenter only observed two officers make entry into 100 Grist Mill Road.  Carpenter never*
*saw 57 IRS-CI agents in one spot.  (Carpenter Depo. at 36 ¶ 2 – 37 ¶ 2 & 206 ¶¶ 5-6.)*

ADMITTED.

68. *Schrader did not use any force when he was present at 100 Grist Mill Road on April 20,*
*2010.  He did not observe any other officer using any force.  Schrader did not engage in any*
*"commando" or "SWAT-team tactics," nor did he observe anyone else engage in any such*
*conduct.  (Schrader Decl. ¶ 23.)*

OBJECT that, although the agents' conduct is a factual question, whether their conduct

constituted "force" is part of a Fourth Amendment reasonableness assessment, which is a

question of law on a motion for summary judgment.  *Scott v. Harris*, 550 U.S. 372, 381 n.8

(2007) (whether officer's actions were objectively reasonable is "pure question of law").  The

statement should be stricken.

DENIED, given that "use any force" and "using any force" in this statement appears to

refer to the faulty definition of "force" that Schrader stated in his deposition testimony.  (*See*

Schrader Tr. 109:20-110:10 ("Q. And when you say <u>force</u> in this context, what do you mean?

A. Nobody was handcuffed, I don't believe handcuffs were placed on people to get their

control.").

69. *Schrader did not attempt to intimidate anyone at 100 Grist Mill Road, nor did he observe any other officer engage in conduct that appeared to be intimidating.  (Schrader Decl. ¶ 24.)*

      DENIED as to "appeared to be," which misquotes the source.  *See* Schrader Decl. ¶ 24

("appeared <u>to me</u> to be").  DENIED as to attempts to intimidate, but Plaintiffs have not yet

developed rebuttal evidence on this point.

70. *Carpenter was not subjected to physical force on April 20, 2010.  Carpenter only was touched once by an IRS-CI agent – on one occasion, an officer took Carpenter by the arm and led him back to his office in order to retrieve a cell phone.  (Carpenter Depo. at 168 ¶¶ 2-12.)*

      DENIED.  (Carpenter Tr. 168:5-12 ("grabbing" by the arm); Molly Carpenter Tr. 96:11-

19 ("yanked him out of his chair").)

71. *Carpenter was not handcuffed on April 20, 2010.  The agents believed that Carpenter possessed a BlackBerry or BlackBerry-type device, and that device was listed on the items to be seized during the search warrant execution.  An individual advised Enstrom that Carpenter's pockets seemed bulky.  An agent told Carpenter that they wanted to physically search him, and Carpenter refused.  Carpenter "definitely made a big deal" that he did not want to be searched.  Carpenter then was threatened with being handcuffed if he did not permit a pat-down search or produce the device.  However, Carpenter produced the device, so he was never handcuffed, and was not threatened with handcuffs again.  (Carpenter Depo. at 162 ¶ 18 – 164 ¶ 3 & 167 ¶ 4 – 168 ¶ 1; Enstrom Depo. at 92 ¶ 9 – 93 ¶ 20 & 158 ¶ 13 – 159 ¶ 10.)*

      ADMITTED IN PART that Carpenter refused to be searched, was threatened with

handcuffs, and was not handcuffed; DENIED that he produced a Blackberry or Blackberry-type

device from his pocket.  (Carpenter Tr. 169:16-22; M. Carpenter Tr. 47:2-9; Meckel Tr. 50:15-

22.)

      OBJECT that the evidence supports agent's alleged belief that Carpenter possessed a

Blackberry; DENIED that Carpenter owned or possessed a Blackberry.  (Carpenter Tr. 161:5-

20.)

DENIED that the Items to Be Seized listed "a Blackberry or Blackberry-type device" owned or possessed by Carpenter.  (IRS00028-29.)

OBJECT that "so" asserts a causal relationship not established by the cited evidence.

ADMITTED as to the rest.

72. *Schrader did not instruct any officer to interrogate any employee from 100 Grist Mill Road, and did not himself conduct any custodial interrogation on April 20, 2010.  Schrader is unaware of anyone being interrogated on that date.  (Schrader Decl. ¶ 26.)*

DENIED as to "unaware of anyone being interrogated," given the Search Warrant Plan provision that Cherneski and Slattery "will" be interviewed (Search Warrant Plan, IRS00014), the false statement that all employees had left when Cherneski and Slattery were still be interviewed (M. Carpenter Tr. 62:11-63:3, 69:12-71:17), the screaming at the Slattery interrogation (M. Carp. Tr. 69:12-70:15; Meckel Tr. 76:15-77:9; Slattery Tr. 29:19-30:3 ("It's not like I walked in on my own volition to have that happen for the next couple of hours.")), and given what happened to Carpenter (Carpenter Tr. 224:8-225:12, 228:4-229:21.)

73. *Some of the Benistar employees present at 100 Grist Mill Road agreed to be interviewed, but no one was forced to give a statement.  Schrader did not observe any custodial interrogations during the execution of the Benistar search warrant.  (Schrader Decl. ¶ 27.)*

ADMITTED IN PART that some occupants gave information regarding the location of documents; DENIED that this was "agreed to."  (Carpenter Tr. 228:4-229:21; Slattery Tr. 29:19-30:3 ("It's not like I walked in on my own volition to have that happen for the next couple of hours."), 31:4-12 (asked for attorney).)

DENIED that this was a "Benistar" search warrant.  (Carpenter Tr. 231:3-19.)

74. *Schrader did not interview anyone at the search premises on April 20, 2010.  Schrader did not question Carpenter, and did not place him in custody, threaten him with handcuffs, or threaten him with arrest.  Schrader does not believe that anyone attempted to interview Daniel Carpenter on April 20, 2010.  (Schrader Decl. ¶ 28.)*

DENIED as to the sentence beginning "Schrader does not believe that," which is an improper qualifier in a 56(a)1 statement. DENIED that this "belief" is true or supported by evidence. (Carpenter Tr. 224:8-225:12, 228:4-229:21.)

DENIED that no one attempted to interview Carpenter on April 20, 2010." (*Id.*)

75. *On April 20, 2010, Carpenter was questioned only about the location of documents and the location and presence of his cell phone. He did not answer questions about the location of documents. Carpenter was not asked questions about the 419 plans at issue in the IRS investigation, any topics related to the Department of Labor investigation, or his District of Massachusetts criminal case. Carpenter was not asked any questions the answers to which would have been incriminating. (Carpenter Depo. at 220 ¶ 2 – 225 ¶ 8 & 228 ¶¶ 1-13.)*

ADMITTED IN PART that Carpenter did not answer questions about documents, and was not asked about the DOL investigation or Massachusetts criminal case.

DENIED as to "was questioned only about the location of documents and the location and presence of his cell phone." (Carpenter Tr. 224:8-225:12.)

OBJECT that "not asked any questions the answers to which would have been incriminating" is a legal proposition, not an assertion of fact. *See* L. Civ. R. 56(a)2 (non-moving party must state "whether each of the <u>facts</u> asserted by the moving party is admitted or denied").

76. *Carpenter believes that he was asked questions by the IRS-CI agents because they did not know what they were looking for or why they were present at 100 Grist Mill Road. (Carpenter Depo. at 225 ¶ 13 – 226 ¶ 6.)*

ADMITTED IN PART: The argumentative qualifier "Carpenter believes that" should be stricken; Defendant has identified the underlying fact as undisputed by including it in his 56(a)1 Statement, so the attempt to diminish the fact with an argumentative qualifier is improper.

77. *At the time Carpenter was asked questions, he was not handcuffed. He was not threatened with force. The officers did not point firearms at him. No answers provided by Carpenter were used in any criminal proceeding against him. (Carpenter Depo. at 226 ¶¶ 7-19.)*

ADMITTED IN PART that Carpenter was never handcuffed, and that his verbal responses were not used in any criminal proceeding against him; DENIED that Carpenter was not threatened "with force," which misconstrues the cited testimony.  The testimony, which was limited to what occurred during "questions about the location of files," is that there were no verbal threats issued at that time; however, Carpenter was not free to leave.  (Carpenter Tr. 225:13-226:14; Pl. Response to Interrog. 20.)

ADMITTED IN PART that no one pointed firearms at Carpenter _while_ asking questions; DENIED that "officers did not point firearms at him," given that this occurred earlier.  (Carpenter Tr. 108:18-112:15);

78. *At or near the beginning of the search warrant execution, Daniel Carpenter asked Enstrom if he could contact an attorney.  Enstrom told Carpenter that he would be allowed to call an attorney when all of the employees were gathered into a conference room and identified. (Carpenter Depo. at 140 ¶ 24 – 142 ¶ 1; M. Carpenter Depo. at 26 ¶ 22 – 27 ¶ 17; Enstrom Depo. at 146 ¶ 3 – 147 ¶ 2.)*

ADMITTED IN PART that Carpenter immediately asked for an attorney and was told to wait.

79. *Enstrom then permitted Daniel Carpenter to call his attorney in another room.  (Enstrom Depo. at 150 ¶¶ 6-15; M. Carpenter Depo. at 29 ¶¶ 12-18.)*

ADMITTED IN PART; DENIED insofar as "then" fails to describe the length of time during which agents prevented Carpenter from contacting counsel.

80. *Enstrom provided a copy of the search warrant and the attachment listing the items that were to be seized during the search.  She did not provide a copy of Schrader's search warrant affidavit.  The affidavit was under seal at the time.  (Carpenter Depo. at 132 ¶ 2 – 133 ¶ 2.)*

ADMITTED IN PART that Enstrom provided the top page of the search warrant and did not provide a copy of the affidavit, which was under seal at the time; DENIED that Enstrom provided a copy of "the attachment listing the items that were to be seized during the search." (Carpenter Tr. 130:11-14, 132:1-134:4; Enstrom Tr. 95:11-100:7, 191:6-17.)

*81. At or near the beginning of the search warrant execution, the IRS-CI agents gathered the employees present at 100 Grist Mill Road into a large conference room.  (M. Carpenter Depo. at 25 ¶ 17 – 26 ¶ 11; Meckel Depo. at 26 ¶¶ 12-16.)*

ADMITTED IN PART; DENIED as to "gathered"; the occupants were <u>compelled</u>.

(Carpenter Tr. 16:19-22; ("herded"); M. Carpenter Tr. 23:12-15 ("to corral and move them").)

*82. After the employees were gathered into the conference room, the IRS-CI agents identified the employees and let them leave.  The agents would ask the employees their names and whether they had identification on them.  If they did not have identification, the agents escorted the employees to their offices.  The agents told the employees to gather anything that was a personal effect, but to take no files or anything that was a work record.  The process of identifying employees and letting them leave the premises of 100 Grist Mill Road only took a few minutes.  (M. Carpenter Depo. at 26 ¶¶ 17-23; Meckel Depo. at 36 ¶¶ 4-21.)*

DENIED as to "gathered"; the occupants were <u>compelled</u>.  (Carpenter Tr. 16:19-22;

("herded"); M. Carpenter Tr. 23:12-15 ("to corral and move them").)

DENIED as to "only took a few minutes."  (M. Carpenter Tr. 29:12-23; Meckel Tr.

19:6-7, 32:13-14, 36:4-8, 73:5-6.)

DENIED that employees were permitted to leave immediately upon identification.

Employees were asked about the location of documents.  (M. Carpenter Tr. 30:12-32:5.)

Agents interrogated Stefan Cherneski and Kevin Slattery.  (M. Carpenter Tr. 69:12-71:17,

74:25-75:10.)  The Carpenters were not free to leave.  (Carpenter Tr. 281:1-284:4; M. Carpenter

Tr. 37:10-38:25; Meckel Tr. 71:8-18.)

*83.  Molly Carpenter, the wife of plaintiff Daniel Carpenter, states that everyone, maybe even Molly and Daniel Carpenter, then were told that they were free to go.  However, Molly Carpenter did not believe that she was free to leave the building, because the lawyers had yet to arrive, and she did not want to leave the building in the possession of a "bunch of strangers."  Daniel Carpenter does not remember asking if he was free to leave the building. (M. Carpenter Depo. at 37 ¶ 10 – 38 ¶ 25; Carpenter Depo. at 282 ¶¶ 21-25.)*

DENIED insofar as the argumentative qualifiers "Molly Carpenter, the wife of plaintiff

Daniel Carpenter, states that" and "maybe even Molly and Daniel Carpenter" should be stricken

as improper in a 56(a)1 statement, which should only state undisputed facts.

DENIED that the Carpenters were free to leave.  (Carpenter Tr. 281:1-284:4; M. Carpenter Tr. 37:10-38:25; Meckel Tr. 71:8-18.)

OBJECT that "Daniel Carpenter does not remember asking is he was free to leave" is not a material fact.

84. *Enstrom told Molly Carpenter that if she left the building, she would not be permitted to come back in.  This was a deal-breaker for Molly Carpenter, and she chose to remain inside the building.  (M. Carpenter Depo. at 38 ¶¶ 3-15.)*

ADMITTED IN PART that Molly Carpenter might have stayed, if she had a choice; DENIED that she had the choice to leave the building.  (Carpenter Tr. 281:1-284:4; M. Carpenter Tr. 37:10-38:25; Meckel Tr. 71:8-18.)

85. *Caroline Meckel, the daughter of Molly and Daniel Carpenter, was asked to leave, but refused.  It seemed to Meckel that the agents wanted everyone to leave.  Most people left, but Amanda Rossi, Molly Carpenter, Daniel Carpenter, and Meckel stayed behind.  (Meckel Depo. at 39 ¶¶ 1-16 & 40 ¶ 12 – 41 ¶ 9.)*

ADMITTED IN PART that Meckel declined to leave; DENIED that Meckel believed the agents wanted everyone to leave – she excluded her parents from this assessment during her testimony.  (Meckel Tr. 40:25-41:11, 71:8-18.)

86. *Molly and Daniel Carpenter stayed and waited for their attorneys to arrive.  It took a long time before the attorneys arrived at 100 Grist Mill Road.  The attorneys were not permitted inside the premises during the search.  (Carpenter Depo. at 154 ¶¶ 7-16; M. Carpenter Depo. at 61 ¶¶ 15-23; Meckel Depo. at 69 ¶ 19 – 70 ¶ 12.)*

ADMITTED IN PART that the attorneys were not permitted inside, and that they were outside when the Carpenters exited the building.  (Carp. Tr. 116:12-117:10; M. Carp. Tr. 63:24-64:5; Enstrom Tr. 166:21-167:2.)  OBJECT that "long time" is vague.

DENIED that the Carpenters "stayed" voluntarily.  (Carpenter Tr. 281:1-284:4; M. Carpenter Tr. 37:10-38:25; Meckel Tr. 71:8-18.)

87. *Enstrom's contemporaneous notes indicate that Daniel and Molly Carpenter left the building located at 100 Grist Mill Road at 11:10 A.M.  Daniel Carpenter contends that he was inside*

*the building between three and three-and-one-half hours, and that he left the building around*
*noon.  (Enstrom Depo. at 150 ¶¶ 3-5; Carpenter Depo. at 117 ¶ 5 – 118 ¶ 4.)*

ADMITTED IN PART: The argumentative qualifier "notes indicate" and "contends that

he" do not belong in a 56(a)1 Statement.

DENIED to the extent that the statement asserts that the time notations on Enstrom's

handwritten notes were accurate.  (Enstrom Tr. 145:5-16 (noted times are "approximate")).

*88. Carpenter was not present for the entire duration of the search warrant execution at 100*
*Grist Mill Road.  (Carpenter Request for Admission No. 16.)*

ADMITTED IN PART: Carpenter was present at the start, left the premises, and

returned at 11:30 PM, at which time agents continued to load the truck.  (Carpenter Tr. 118:18-

120:3.)

*89. The April 20, 2010 search did not cause any damage to Carpenter's furniture, walls, doors,*
*windows, window blinds, paint, carpet, or fixtures.  No items were torn, damaged, or broken.*
*(Carpenter Depo. at 251 ¶ 14 – 253 ¶ 2 & 261 ¶ 21 – 262 ¶ 22.)*

ADMITTED.

*90. Carpenter contends that as a result of the April 20, 2010 search, files were strewn all over*
*the place and papers were taken out of filing cabinets and just stacked up on chairs, tables,*
*and the floor of his conference room, main office, and personal computer room.  (Carpenter*
*Depo. at 249 ¶ 7 – 253 ¶ 2 & 263 ¶ 1 – 264 ¶ 15.)*

ADMITTED IN PART: The argumentative qualifier "Carpenter contends that" should

be stricken; Defendant has identified the underlying fact as undisputed by including it in his

56(a)1 Statement, so the attempt to diminish the fact with an argumentative qualifier is

improper.

*91. Caroline Meckel, states that Carpenter's office typically was "organized chaos," with files*
*and papers everywhere.  "[A] normal person going in there would think, oh, my God, what a*
*mess."  His conference room and computer room normally were "disheveled," with lots of*
*files everywhere.  Carpenter's system of organization was "piles everywhere."  (Meckel*
*Depo. at 83 ¶ 19 – 84 ¶ 24.)*

ADMITTED IN PART; DENIED insofar as the statement omits crucial clarifying

testimony.  (Meckel Tr. 88:14-89:1 ("these are more chaotic than usual").)

DENIED insofar as the argumentative qualifier "Caroline Meckel, states that" does not

belong in a 56(a)1 statement, which should only state undisputed facts.

92. *Molly Carpenter confirmed that Carpenter's conference room normally was "a mess," his office usually was messy, and the computer room surfaces were filled with papers, stacks of paper, and stacks of boxes.  (M. Carpenter Depo. at 75 ¶ 20 – 78 ¶ 7.)*

DENIED insofar as the argumentative qualifier "Molly Carpenter confirmed that" does

not belong in a 56(a)1 statement, which should only state undisputed facts.

93. *When Schrader arrived at 100 Grist Mill Road, and during his entire time on scene, the building looked like it was "in pretty good shape."  The searching officers were taking documents out of file cabinets and placing them into boxes and imaging computers. Schrader did not notice any property damage.  He did not personally destroy any property. (Schrader Decl. ¶ 25.)*

OBJECT to "in pretty good shape" insofar as it is vague and subjective.

94. *The search began at approximately 9:05 A.M., and concluded by 10:00 P.M.  (Enstrom Depo. at 145 ¶¶ 5-16 & 198 ¶¶ 16-18.)*

DENIED as to "concluded by 10:00 PM."  (Carpenter Tr. 118:18-120:3; Schrader 96:5-

7; Enstrom Tr. 173:3-21.)

95. *The search did not take 18 hours, and did not exceed the 6:00 A.M. to 10:00 P.M. time frame set forth on the federal search warrant.  (Schrader Decl. ¶ 29.)*

DENIED.  (Carpenter Tr. 118:18-120:3; Schrader 96:5-7; Enstrom Tr. 173:3-21.)

96. *The agents' activity at 100 Grist Mill Road wound down as 10:00 P.M. approached.  After the building was searched and documents were identified for seizure, the documents were logged and boxed up to be brought to a truck.  Prior to the end of the night, an agent made an exit video of the interior of the building.  Upon the agents' exit, Enstrom did a cursory examination to make sure nothing was damaged.  (Schrader Depo. at 93 ¶ 15 – 94 ¶ 6; Enstrom Depo. at 171 ¶¶ 13-24 & 185 ¶¶ 1-12.)*

ADMITTED IN PART that a video was made and boxes were taken to a truck.

DENIED that "activity at 100 Grist Mill Road wound down as 10:00 PM approached," given that agents remained on the premises long after.  (Carpenter Tr. 118:18-120:3.)

97. *At some point at or near 10:00 P.M., Jim Somers, an attorney associated with Plaintiffs or Benistar, told the IRS-CI agents that the warrant said that they must leave by 10:00 P.M. There was a brief exchange between the attorneys and the IRS-CI agents, and then the IRS-CI agents hurried to leave the building in order to diffuse the situation.  (Schrader Depo. at 94 ¶ 19 – 96 ¶ 4.)*

ADMITTED IN PART; DENIED insofar "at or near 10:00 PM" obscures the fact that this occurred after 10:00 PM.  (Carpenter Tr. 118:18-120:3; Schrader Tr. 96:5-7; Enstrom Tr. 173:3-21.)

98. *Enstrom then approached Jim Somers, handed him a copy of the evidence log, and provided him the keys to lock up the building.  (Enstrom Depo. at 171 ¶¶ 13-24.)*

ADMITTED IN PART; DENIED insofar as "then" fails to describe the length of time between Attorney Somers reminded IRS-CI as to the 10:00 PM deadline and the handing over of keys and evidence log.

99. *The allegation that Schrader had any malice or hostility toward Carpenter is untrue. Although Schrader was aware that Carpenter was represented by counsel in a Massachusetts federal criminal case, he had no previous knowledge of Carpenter or his interactions with the government.  Schrader did not know that Carpenter was "perceived to be 'anti-government.'"  Schrader did not have any intent to "harass, intimidate and humiliate Mr. Carpenter and all of his associates and friends at 100 Grist Mill Road." Instead, Schrader's goal as case agent in this matter was to investigate the alleged criminal violations of the Internal Revenue laws taking place in connection with Benistar's 419 welfare benefit plans.  (Schrader Decl. ¶ 30.)*

DENIED.  (Schrader Tr. 75:19-77:17, 114:15-118:23, 123:18-125:13, 126:12-127:12, 127:17-22.)

100. *Daniel Carpenter sued Schrader mostly because Schrader signed the search warrant affidavit.  (Carpenter Depo. at 286 ¶ 15 – 287 ¶ 8.)*

DENIED.  The statement misconstrues the testimony regarding why Plaintiffs were forced to use "Doe" names.   (Carpenter Tr. 286:15-287:8.)  The Complaint speaks for itself.

101.   *Enstrom acted "very professionally" throughout her interactions with Carpenter. (Carpenter Depo. at 129 ¶¶ 14-16.)*

ADMITTED IN PART; DENIED that acting professionally in personal interactions

absolves planning, training and supervising errors.

102.   *Generally, all of the agents acted professionally during the search warrant execution. (Carpenter Depo. at 114 ¶¶ 1-8.)*

DENIED.  (Carpenter Tr. 194:12-196:22.)

103.   *There was an incident in which one IRS-CI agent was smirking or laughing in a manner that Molly Carpenter found to be unprofessional.  Enstrom removed that agent from the area and admonished him.  (Enstrom Depo. at 159 ¶ 18 – 160 ¶ 15 & 163 ¶ 21 – 164 ¶ 5.)*

ADMITTED IN PART: The argumentative qualifier "Molly Carpenter found to be"

should be stricken; Defendant has identified the underlying fact as undisputed by including it in

his 56(a)1 Statement, so the attempt to diminish the fact with an argumentative qualifier is

improper.

104.   *The reason that Carpenter brought this Bivens suit was because of the agent's actions. Had Carpenter known that Enstrom confronted the agent about his conduct, "we probably could have had a much different result than this extended four-year lawsuit." (Carpenter Depo. at 171 ¶ ¶ 6-23.)*

DENIED.  The Third Amended Complaint (ECF 114), which speaks for itself, sets forth

the reasons that Plaintiffs brought this suit.  The statement misconstrues the cited testimony,

which explains that only Schrader's name was known, that "Jane and John Doe" was needed to

discover Enstrom and Leahy's name, and that the claims against Leahy have been abandoned.

(Carpenter Tr. 171:15-18 ("why we added the Jane and John Does"), 286:15-287:11 (knew

Schrader's name, but not Enstrom and Leahy's names).)

## II.   DISPUTED ISSUES OF MATERIAL FACT

Unreasonable Force

1. Whether Schrader was responsible for the number of agents

2. Whether Schrader was responsible for use of force guidance

3. Whether Schrader had use of force authority on site

4. What times Schrader was on site

5. Why more than fifty agents were assembled

6. How many employees were on site

7. How many employees were reasonably expected to be on site

8. How many agents were reasonably needed

9. Whether agents were given guidance on low risk assessment

10. Whether agents were given guidance on entry

11. Whether agents were given guidance on firearms

12. Whether agents entered Carpenter's back office

13. Why Schrader has no knowledge of the back entry

14. Whether agents carried rifles

15. Whether guns were pointed at occupants

16. Whether Carpenter was yanked from chair

17. Whether Carpenter was interrogated

18. Whether Schrader told agents not to interrogate Carpenter

19. Whether the Carpenters were free to leave

20. How long the attorneys waited outside for the Carpenters to be released

21. When agents left the premises

22. Why agents hid the fact that Cherneski and Slattery were being interrogated

23. What was the true motivation of the "Guy Neumann" investigation

24. Schrader's pre-operational knowledge of the civil investigations

25. Schrader's pre-operational knowledge of Daniel Carpenter

26. Schrader's pre-operational knowledge of Grist Mill Capital

27. Whether agents used unreasonable force

28. Whether unreasonable force resulted from Schrader's planning or preparation of agents

Overseizure

29. Whether Schrader was responsible for ensuring adherence to scope of warrant

30. Whether Schrader was responsible for training agents on seizures

31. Whether Schrader made efforts to ascertain between types of businesses at 100 Grist Mill

Road

32. Whether Schrader advised agents what to avoid

33. Whether Schrader's pre-operational guidance on the Items to Be Seized was adequate

34. Whether agents understood 419 plans

35. Whether Schrader provided seizure guidance on site

36. Whether Schrader ever told an agent that any document was not relevant

37. Whether any on-site seizure guidance was adequate

38. Whether seizures exceed the scope of the Search Warrant

39. Whether overseizure was deliberate

Failure to Describe Alleged Violations and Items to Be Seized

40. Whether the "Items to Be Seized" list was provided to the occupants during the search

41. Whether Schrader knew that it was not provided

Respectfully submitted,

THE PLAINTIFF,                              THE PLAINTIFF,
DANIEL CARPENTER                           GRIST MILL CAPITAL, LLC

By:  /s/ Jeffrey P. Nichols                By:  /s/ Jonathan J. Einhorn
David A. Slossberg (ct13116)               JONATHAN J. EINHORN, ESQ.
Jeffrey P. Nichols (ct29547)               129 Whitney Avenue
HURWITZ SAGARIN SLOSSBERG &                New Haven, Connecticut 06510
KNUFF, LLC                                 Federal Bar No. ct00163
147 North Broad Street                     203-777-3777
P. O. Box 112                              einhornlawoffice@gmail.com
Milford, CT  06460-0112
Telephone: (203) 877-8000
Fax: (203) 878-9800
JNichols@hssklaw.com
DSlossberg@hssklaw.com

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on September 22, 2017, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by mail to all parties that are unable to accept electronic filing.  Parties may access this filing through the Court's electronic system.

<u>/s/ Jeffrey P. Nichols</u>
Jeffrey P. Nichols