DANIEL CARPENTER, *et al.*,
    Plaintiffs,

    v.

COMMISSIONER, INTERNAL
REVENUE SERVICE, *et al.*,
    Defendants.

No. 3:13-cv-563 (SRU)

## RULING ON MOTIONS TO DISMISS AND FOR SUMMARY JUDGMENT

This case arises out of a search conducted at 100 Grist Mill Road, in Simsbury,

Connecticut (the "Simsbury site"), on April 20, 2010, by the IRS's Criminal Investigation

Division (the "IRS-CI"). On April 19, 2013, the plaintiffs, Daniel Carpenter and Grist Mill

Capital, LLC, filed the present action pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents*,

403 U.S. 388 (1971), against multiple named defendants, including Shaun Schrader, a Special

Agent with IRS-CI ("Schrader"), and "Unknown Agents 1–72" of IRS-CI.[1]  (Doc. # 1.)

Carpenter has, in the various original and amended complaints in this action, alleged that

seventy-three agents "descended" on the Simsbury site "brandishing automatic weapons" in a

"'shock and awe' blitz[]" designed to "terrorize"  the people present at the site; that those agents

engaged in "commando" and "SWAT-team tactics" and left Carpenter's office "ransacked"; and

---

[1] Grist Mill Capital appears to operate out of the building at 100 Grist Mill Road, where Daniel Carpenter
("Carpenter") was also located on the day of the search.  Although Carpenter and Grist Mill Capital are both
plaintiffs in this action, Carpenter has been described as the Manager and sole officer of Grist Mill Capital and
Carpenter is plainly the center of attention here.  Carpenter has failed, either in his own capacity or in his capacity as
presumed agent of Grist Mill Capital, to distinguish any circumstances where the defendants might be liable to Grist
Mill Capital but not to Carpenter himself.  Accordingly, for the sake of simplicity, I will frequently refer to
Carpenter in what follows where I intend to speak generally of the plaintiffs in this action.

that Schrader was the officer responsible for organizing and executing the search and supervising the participating agents.

On December 14, 2016, I denied Schrader's motion to dismiss the Fourth Amendment claims related to the unreasonableness of the search brought against him in Carpenter's penultimate complaint. (Doc. # 92.)[2] I noted that subsequent discovery might show that Carpenter's colorful allegations were not supported by actual evidence of Fourth Amendment violations or Schrader's personal involvement in such violations, but the issue could not be determined at the pleading stage. Discovery ensued. On June 2, 2017, Carpenter filed a Third Amended Complaint, which acknowledged that IRS-CI Supervisory Special Agent Kathy Enstrom ("Enstrom") was at all relevant times Schrader's supervisor and the on-site "Team Leader" for the April 20, 2010 search. (Doc. # 114.) On September 1, 2017, Schrader simultaneously moved to dismiss the new complaint (doc. # 127), and sought summary judgment on the claims against him brought therein (doc. # 129).[3]

The record now before me on summary judgment reveals a different account of the April 20, 2010 search, and a different role therein for Schrader, than I was obliged to accept in my last ruling: On the day of the search, the agents, who were encouraged to wear business casual attire, and who had not received any permission to bring automatic weapons, were led into the building by Enstrom. Employees the searchers encountered were gathered into a conference room, and soon after the employees identified themselves, they were permitted to leave. Carpenter's

---

[2] My December 14, 2016 Order dismissed Carpenter's additional Fifth Amendment claims, and Carpenter's Fourth Amendment claims relating to defects in the search warrant authorizing the April 20, 2010 search, and noted that Carpenter had clarified that he was not asserting any stand-alone Sixth Amendment claims. Accordingly, following my December 14, 2016 Order, Carpenter's only remaining claims were Fourth Amendment violations relating to the unreasonableness of the search.

[3] On June 22, 2017, Enstrom also moved to dismiss the allegations against her in the Third Amended Complaint. (Doc. # 119.) During argument on Schrader's two pending motions and Enstrom's motion to dismiss, on November 14, 2017, I granted Enstrom's motion from the bench.

"ransacked" office was not damaged in any way, and was merely left messier than its usual already messy condition. Schrader was not the supervisor of the agents executing the search and was not even on site for much of the search.

I need not address in this ruling the constitutionality of every single isolated use of force alleged by Carpenter. Although most are unsupported by significantly probative evidence, even if Carpenter has produced evidence of any actionable uses of force, no reasonable juror could conclude that Schrader was personally involved in such uses of force. Carpenter has failed to provide evidence capable of showing Schrader's personal involvement in any Fourth Amendment violations related to the execution of the April 20, 2010 search. Accordingly, for the reasons set forth more fully below, I **GRANT** Schrader's Motion for Summary Judgment and **DENY** as moot Schrader's Motion to Dismiss.

## I. Standard of Review

Summary judgment is appropriate when the record demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

When ruling on a summary judgment motion, the court must construe the facts of record in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see also Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (court is required to "resolve all ambiguities and draw all inferences in favor of the

nonmoving party").  When a motion for summary judgment is properly supported by

documentary and testimonial evidence, however, the nonmoving party may not rest upon the

mere allegations or denials of the pleadings, but must present sufficient probative evidence to

establish a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986);

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

"Only when reasonable minds could not differ as to the import of the evidence is

summary judgment proper."  *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991); *see also*

*Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir. 1992).  If the nonmoving

party submits evidence that is "merely colorable", or is not "significantly probative", summary

judgment may be granted.  *Anderson*, 477 U.S. at 249–50.

> The mere existence of some alleged factual dispute between the parties will not
> defeat an otherwise properly supported motion for summary judgment; the
> requirement is that there be no genuine issue of material fact. As to materiality,
> the substantive law will identify which facts are material. Only disputes over facts
> that might affect the outcome of the suit under the governing law will properly
> preclude the entry of summary judgment. Factual disputes that are irrelevant or
> unnecessary will not be counted.

 *Id.* at 247–48.  To present a "genuine" issue of material fact, there must be contradictory

evidence "such that a reasonable jury could return a verdict for the non-moving party".  *Id.* at

248.

If the nonmoving party has failed to make a sufficient showing on an essential element of

his case with respect to which he has the burden of proof at trial, then summary judgment is

appropriate.  *Celotex*, 477 U.S. at 322.  In such a situation, "there can be 'no genuine issue as to

any material fact,' since a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 322–23; *accord*

*Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's

burden satisfied if he can point to an absence of evidence to support an essential element of

nonmoving party's claim).  In short, if there is no genuine issue of material fact, summary

judgment may enter.  *Celotex*, 477 U.S. at 323.

## II. Background

### A. Factual Background

#### 1. *Schrader's Role in the Investigation*

Schrader served as a Special Agent with the IRS-CI from April 2004 to August 2010

(Local Rule 56(a)(1) Statement of Undisputed Material Facts at ¶ 1, doc. # 129-2 [hereinafter

"Facts at ¶ _"]), and was the Case Agent assigned to the investigation of NOVA, Benistar, and

other related entities[4] (Facts at ¶ 2).  Schrader's role in the NOVA/Benistar investigation

included designing investigative strategy, serving subpoenas, considering individuals who may

be interviewed, identifying suspects, proposing charges for indictments, drafting operations plans

for search warrant execution, conducting pre-search warrant briefing for participating agents, and

generally managing a criminal investigation from initial receipt through prosecution.  (Facts at

¶ 3.)  Schrader reported to Enstrom over the course of the NOVA/Benistar investigation.  (Facts

---

[4] Carpenter appears to dispute whether Benistar and other entities or individuals including Daniel Carpenter can be
considered "related" to NOVA and/or the investigation, and whether Schrader was assigned to investigate such other
entities or individuals.  The affidavit Carpenter has adduced in support of his position that he and one other
individual were not the subject of any investigations merely supports a claim that no criminal referral had been made
from the IRS to the Department of Justice concerning the two men.  (Plaintiffs' Local Rule 56(a)2 Statement at ¶ 2,
doc. # 133-1 [hereinafter "Fact Response at ¶ _"]; Declaration of Julio La Rosa at ¶¶ 1-2, doc. # 133-8.)  The
affidavit does not establish that no pre-referral investigation was being conducted.  Carpenter's separate objection to
the characterization that the investigation involved business entities "related" to NOVA is supported by no more
than the assertion that the entities were each "separate businesses".  (Fact Response ¶ 2; Carpenter Dep. at 231:3-
19).  Although the entities may each be separately chartered organizations, they may still be related inasmuch as
they are either (a) the subject of the same investigation due to similar or coordinated conduct or (b) connected based
on relationships among the individuals that manage the companies.  The search warrant authorizing the April 20,
2010 search itself described "Benistar" as an alternate name for Nova, Search Warrant, Ex. 1, Defendant Carpenter's
Brief Motion to Suppress Evidence from the Raid of April 20, 2010, *United States v. Carpenter*, 3:13-cr-0026, doc.
# 83-1, and the Search Warrant Plan drafted in preparation for the search described Benistar as "related to NOVA"
and described both NOVA and Benistar as having sold the purportedly unlawful "419 Plans" at issue in the
investigation (Search Warrant Plan, at IRS00011-13, doc. # 133-10).  Noting that the precise relationship among the
various entities is not central to my reasoning, for simplicity's sake, this ruling will frequently refer to the
investigation at issue as the "NOVA/Benistar investigation".

at ¶¶ 4-5.)  Schrader did not himself supervise any other agents and had no authority to instruct

agents regarding actions to take to further the investigation.[5]  (Facts at ¶ 5.)

Following a decision within the IRS-CI to seek to obtain evidence in the NOVA/Benistar

investigation via search warrant, Schrader drafted an affidavit to support a search warrant for the

Benistar office located at the Simsbury site.  (Facts at ¶¶ 8-9.)  Schrader's search warrant

affidavit was submitted to U.S. Magistrate Judge Thomas P. Smith on April 16, 2010 and Judge

Smith approved a search warrant for execution during the daytime, from 6:00 a.m. to 10 p.m., on

or before April 25, 2010 (the "Search Warrant").  (Facts at ¶ 11.)

2. *Preparation for the Search of the Simsbury Site*

In preparation for the search of the Simsbury site, Schrader drafted a Search Warrant

Checklist, an Enforcement Action Review Form, a Risk Assessment Form, and a Search Warrant

Plan.  (Facts at ¶ 17.)  Those documents were approved by Enstrom, Assistant Special Agent in

Charge Joan Totani, Special Agent in Charge Julio La Rosa, and IRS Criminal Tax Counsel.

(Facts at ¶ 17.)  Although Schrader shared responsibility for the selection of the number of

agents participating in the search and the identity of such agents, he was not responsible for the

supervision, instruction, or training of the officers who assisted with the execution of the search

---

[5] Carpenter disputes Schrader's claim that he had "no authority to instruct", but the record evidence Carpenter points to provides no support for the assertion that Schrader had authority to instruct, insofar as the term "instruct" implies authority to command or control.  At best, the evidence Carpenter points to suggests that Schrader presented the "Items to Be Seized" list to the team at the pre-op meeting and "informed them that these are the items to be seized". (*See* Schrader Dep. at 99:23-100:3; *see also* Enstrom Dep. at 206:13-207:24.)  This presumably supports a claim that Schrader *instructed* the team, in the sense that Schrader provided them with information, but not in the sense that Schrader had authority to control team members' actions.  (*See* Enstrom Dep. at 206:13-207:24 ("Q: I believe you just testified that Agent Schrader had no responsibility for training the agents who effected the search; is that correct? A: Correct. Q: But he did participate in pre-operational briefing; is that correct? Yes. Q: So he gave some instructions during the course of that briefing as to how the agents were to effect their jobs? A: No. As I mentioned already, he was there to give an overview of the investigation, and I was there to talk about how to do – how we were going to act the next day. . . . Q: Did he explain 419 plans? A: Yes.").)  Carpenter ignores Schrader's assertion that he did not supervise any other agents.

warrant.[6]  (Facts at ¶¶ 20-22.)  Schrader likewise had no authority to discipline any of the agents or to remedy complaints about any alleged wrongdoing by the agents, and did not set IRS policies regarding search warrant executions.  (Facts at ¶ 21.)

a.  Planning related to the number of agents executing the search

The Search Warrant Plan included a list of 57 IRS-CI agents who would be involved with the execution of the Search Warrant.  (Facts at ¶ 19.)  The agents involved were assigned responsibilities including (i) interviewing employees, (ii) identifying Benistar employees, (iii) "provid[ing] outside cover", (iv) conducting the search, (v) logging evidence, and (vi) attending to attorney-client privilege issues related to the seized items.[7]  (Facts at ¶ 19; Search Warrant Plan, at IRS00021-22.)  Additional factors considered in determining the number of agents necessary for the search included the need to ensure the safety of the officers and other individuals present during the entry and search, the size of the building to be searched, the number of potential occupants present, the document-intensive nature of the case, and the need to maintain control of the scene.[8]  (Facts at ¶ 23.)  The Simsbury site consisted of a 42,000 square-

---

[6] As discussed above, Carpenter disputes any characterization of Schrader as not engaging in "supervision, instruction, or training", but evidence cited by Carpenter is not suggestive of authority held by Schrader over other agents, and at most acknowledges Schrader's role in planning the search. (*See* Schrader Dep. At 28:19-29:10 ("Q: I believe you said in your role as planning for the search warrant execution that you filled out paperwork to get approvals; is that correct? A: Correct. Q: What else did you do in a planning role prior to the search warrant? A: I guess what all would be outlined in that paperwork, but probably I took pictures, and then we tried to do some pre-surveillance on the location that we were going to be searching, trying to determine the size of the location, how many people are going to be present, the type of case. And a drug case is different than a tax case, so there's a lot of factors that go into how many people you're going to need, what tools we would need.").)

[7] Due to an ongoing civil investigation of NOVA and Benistar, it was anticipated that the Simsbury site would contain "attorney/client type documentation". (Search Warrant Plan, at IRS00018.)  The Search Warrant Plan thus called for a dedicated "taint team", comprising agents who were not otherwise involved in the investigation, who would review any documents that were potentially privileged, in order to determine if they should be seized. (Search Warrant Plan, at IRS00018; Schrader Dep. at 119:22-121:1.)

[8] Carpenter disputes the justifications for the number of agents involved, but the evidence he adduces at best seems to challenge the results of the decision-making process that considered the foregoing factors, rather than the relevance of those factors or the fact that the factors were considered.  (*See, e.g.*, Enstrom Dep. at 84:4-21 ("So you agree that the risk assessment that day was low? A: Yes. . . .  [What] suggest[ed] to you that this would be a low risk situation? A: Because no forced entry would be needed and, therefore, I would rate that as a low risk.").)  Often the evidence cited by Carpenter actually supports Schrader's position that the above factors were considered.  (*See, e.g.*,

foot building on 11.2 acres of land. (Facts at ¶ 38.) The building had space for over 50 offices, and included at least 6 conference rooms, separate filing rooms, a large record center, a secure storage facility, and approximately 30-40 cubicles, of which 80% to 90% were occupied.[9] (Facts at ¶ 38.) Carpenter estimated that a videographer might take an hour and a half to get to Carpenter's personal office (Facts at ¶ 38), which he estimated was 150 to 200 feet from the front entrance (Fact Response at ¶ 38). There were at least 30 to 40 employees who might be at the Simsbury site on a typical day.[10] (Carpenter Dep. at 14:9-15:24; M. Carpenter Dep. at 25:17-23; Schrader Dep. at 42:21-24.) There is no dispute that this was a document-intensive case, with a "sheer volume" of documents. (Fact Response at ¶ 23 (quoting Schrader Dep. at 10:2).)

      b.  Planning related to agents' attire

The Search Warrant Plan called for the entry team members to wear ballistic vests, pursuant to IRS-CI policies. (Facts at ¶ 25 (citing IRM § 9.4.9.3.5 ("All GS-1811 employees and their managers taking an active, participating role should wear a ballistic vest. The final judgment on whether a ballistic vest must be worn or whether an exception will be granted, rests with the SSA.")).) Schrader was not the SSA, and was not responsible for deciding whether vests would be worn by the agents.[11]

---

Schrader Dep. at 42:12-25 ("Q: Can you explain how you arrived at the decision regarding the number of agents that would be necessary? A: Sure. We knew it was a very large building and we knew this was going to be a paper document-intensive case, so just the search alone was going to take a long time. There was the initial entry where we believed there could be up to 70 employees, so we wanted to be able to make sure we could maintain control of the scene. We needed people outside the building to ensure people weren't coming in and out. There were teams designated to interview certain employees of the business.").)

[9] Carpenter points out that certain portions of the building were unused. (Fact Response at ¶ 23.)

[10] The 30 to 40 number appears to be the lowest possible. Schrader and Enstrom both claim that, during their planning, they estimated there would be 70 people at the site. (Schrader Dep. at 42:12-25; Enstrom Dep. at 186:9-11.) Molly Carpenter's (Carpenter's wife, and the CEO of Benistar Admin Services, Inc.) highest estimate was 45-55 people. (M. Carpenter Dep. at 73:9-13.) And, while Carpenter claims at one point that he "would just be guessing" that it's "at least 30, maybe 40" people (Carpenter Dep. at 15:22-24), he elsewhere claims that it's "easily something like maybe 50, 40 to 50 in that location" (Carpenter Dep. at 14:9-15).

[11] Carpenter disputes whether the IRM made vests mandatory, but appears to concede that Schrader did not decide whether vests must be worn. (*Compare* Facts at ¶ 25 *with* Fact Response at ¶ 25.)

Schrader had no independent role in determining the clothing that would be worn by the agents. (Facts at ¶ 26; Schrader Decl. at ¶ 11.) According to IRS procedures, the agents were required to wear clothing that identified them as IRS-CI or police officers. (Facts at ¶ 26; Schrader Decl. at ¶ 12.)

    c.   Planning related to firearms carried by agents

Schrader had no role in creating the IRS policies relating to firearms. (Facts at ¶ 27.) IRS-CI agents are permitted by IRS policy to carry firearms. (Facts at ¶ 27 (citing IRM § 9.1.2.4.1).) All agents are assigned a semiautomatic handgun as their service weapon (Facts at ¶ 27), and at the time of the search it was IRS-CI policy that agents involved in search warrant execution must carry a holstered semiautomatic firearm and handcuffs (Facts at ¶ 27 (citing Schrader Decl. at ¶ 12)). Before "long guns" (e.g., rifles and shotguns) may be brought along in search warrant executions, a specific written request must be submitted and approved, also in writing. (Schrader Dep. at 39:25-40:13.) If long guns were to be used, that fact would be noted in the Search Warrant Plan. (Enstrom Dep. at 73:2-25.) Schrader did not request authority for long guns to be used in the search of the Simsbury site, no approvals for long guns were given in this case, and the Search Warrant Plan does not indicate that long guns would be used. (Schrader Dep. at 39:25-40:13, 41:7-8; Enstrom Dep. at 66:2-13, 73:2-25.)

    d.   Planning related to entry and execution of the search

The Search Warrant Plan called for the agents to enter the Simsbury site through the unlocked main entrance at approximately 9:00 a.m. on April 20, 2010. (Facts at ¶ 29.) The Search Warrant Plan did not include the use of a SWAT team, but did note that the "Hartford POD [would] bring entry/extraction tools" to the site." (Facts at ¶ 29; Fact Response at ¶ 29.) The Search Warrant Plan called for the agents to "make a general announcement to the building

while walking through regarding the warrant".  (Search Warrant Plan, at IRS00014.)  Each officer who encountered an employee would then identify themselves, tell the employee that they were executing a search warrant, and ask the employee if they had any keys to unlock "their area or file cabinets and to leave the keys at their desk".  (Search Warrant Plan, at IRS00014.)  The employee would then be instructed to "gather their purse/wallet and personal keys and proceed to a general area in the front for identification".  (Search Warrant Plan, at IRS00014.)  The Search Warrant Plan did not contemplate lengthy questioning or detention of most employees during the search, simply stating that "[p]reviously assigned agents will identify each employee prior to allowing them to leave the building."  (Search Warrant Plan, at IRS00014.)  By contrast, the plan sought interviews with three specific employees:  The plan stated that "Stefan Cherneski, Kevin Slattery and Richard Belding will be interviewed, please ensure the assigned agents are in contact with them as soon as possible."[12]  (Search Warrant Plan, at IRS00014.)  Carpenter did appear on a list tiled "Background on Subjects/Interview Targets", which was included in the Search Warrant Plan (Search Warrant Plan, at IRS00015-17), but at the pre-operational meeting and in discussions between IRS-CI and Criminal Tax Counsel, it was determined that Carpenter would not be interviewed (Facts at ¶ 32 (citing Schrader Dep. at 75:9-76:2)).[13]

e.   Pre-search briefing of the agents assisting with the search

The day before the execution of the Search Warrant, Schrader and Enstrom conducted a

---

[12] Cherneski, Slattery, and Belding are described as "NOVA Salesm[e]n" in the Search Warrant Plan.  (Search Warrant Plan, at IRS00016-17.)  Carpenter suggests that the Search Warrant Plan anticipated a coercive atmosphere at the Simsbury site, pointing to the language stating that Cherneski, Slattery, and Belding "*will* be interviewed" (Fact Response at ¶ 31 (emphasis added) (citing Search Warrant Plan, at IRS00014)), as compared with the Search Warrant Plan's statement that, in an offsite meeting, Schrader would "attempt" to interview another employee (Fact Response at ¶ 31 (citing Search Warrant Plan, at IRS00014)).  However, the Search Warrant Plan elsewhere likewise states that interviews with Cherneski, Slattery, and Belding would be "attempted before they leave".  (Search Warrant Plan, at IRS00014.)
[13] Carpenter questions whether "there was a plan not to interview[]/interrogate [him], given that this occurred" (Fact Response at ¶ 32), but his flawed logic does not create a legitimate fact dispute on that point.

briefing for the agents who were assigned to assist with the search.[14]  (Facts at ¶ 35.)  Schrader provided an overview of the investigation, including the 419 plans at issue, and discussed the "whole op plan".  (Schrader Dep. at 131:18-21; Enstrom Dep. at 56:16-19, 207:17-24.)  Schrader did not give instructions concerning how the agents "were to effect their jobs".  (Enstrom Dep. at 206:20-207:1.)  Enstrom "provided guidance as to the operational plan and what [they] were going to do the following day" and "how [they] were going to act the next day" (Enstrom Dep. at 56:16-19, 206:24-207:1.)  Enstrom provided the agents with a copy of the Items to Be Seized list, and both Schrader and Enstrom discussed the list.  (Enstrom Dep. at 56:22-24.)

### 3.  *Execution of the Search of the Simsbury Site*

On the day of the search, April 20, 2010, at approximately 9:05 a.m., Enstrom, acting as the team leader of the Search Warrant execution, led the agents into the Simsbury site through the unlocked front door.  (Facts at ¶¶ 46-47.)  Schrader was not on site for the commencement of the search.  (Facts at ¶ 48.)  Upon entry, Enstrom first encountered an employee she believes was a receptionist.  (Facts at ¶ 47.)  Enstrom identified herself to the employee, explained what the agents were doing there, and asked to see the individual in charge of the premises.  (Facts at ¶ 47.)  Agents then gathered the employees into a large conference room.  (Facts at ¶ 81.)

Carpenter first encountered the search team when two male agents entered his suite of offices at the rear of the building around 9:00 a.m., through an unlocked door.[15]  (Facts at ¶ 56; Fact Response at ¶ 56.)  Carpenter observed that the agents appeared surprised to see him, and that although one of the agents entering his office had a rifle that was pointed at him when the

---

[14] Carpenter disputes whether "[a]ll or nearly all" agents were present for the briefing.  (Fact Response at ¶ 35; *but see* Enstrom Dep. at 77:3-7 ("Q: Did you and Agent Schrader conduct a face-to-face meeting of all personnel who will be working at the site? A: Yes.").)
[15] Schrader and Enstrom disavow knowledge of any officers entering the building through the rear entrance (Facts at ¶ 57), but the fact of such entry is treated as capable of proof at trial, for the purposes of summary judgment.

agents entered, the rifle was not purposely pointed at him.[16]  (Carpenter Dep. at 108:8-109:18.)
Carpenter was escorted by the two agents to the large conference room where other employees
had been gathered.  (Carpenter Dep. at 84:24-85:5.)  Carpenter does not know who the two
agents were.  (Carpenter Dep. at 85:9-11, 87:9-12.)

After gathering the employees into a large conference room, agents asked the employees
their names, and whether they had identification on them.  (Facts at ¶¶ 81-82.)  Employees who
did not have identification on them were escorted back to their offices to obtain their
identification.  (Facts at ¶ 82; Meckel Dep. at 36:10-15.)  Employees were allowed to take any
personal effects, but were told not to take any files or other work records.  (Facts at ¶ 82; Meckel
Dep. at 36:15-19.)  After identifying themselves, the employees were allowed to leave and most
did leave.[17]  Molly Carpenter recalls that everyone was told they were free to go, including

---

[16] Schrader and Enstrom both dispute that any agent was carrying a rifle on the day of the search, because there was
no planning for the search to involve rifles, and they were not themselves aware of the presence of any rifles.
(Enstrom Dep. at 66:7-8 ("[T]here was no approval, nor did we bring long guns in this warrant."), 73:19-25 ("Q: . . .
[Y]ou are saying that a person reading the search warrant plan could conclude reasonably that there was no long gun
on site? . . . The Witness: A reasonable person should conclude that there was no long gun on site, yes."); Schrader
Dep. at 41:4-8 ("Q: . . . If there were a rifle at the scene would you have found that surprising? . . . A: Yes, because I
did not request authority for long guns for this search warrant.").)

[17] Carpenter disputes whether the employees were permitted to leave *immediately* upon identification (Fact
Response at ¶ 82), but that is a minor distinction that is nevertheless supported by substantial evidence (M.
Carpenter Dep. at 26:18-19 ("I believe they were taking down people's names and then letting them leave.");
Meckel Dep. at 36:4 ("Q: Was there a process by which people were . . . let to leave the room? A: Yes. . . . [T]here
were, I think, multiple agents. I'm not sure how many, because there were a lot of people in the room. And they
would ask them their names, if they had identification on them. . . . If they didn't have their wallet or purse they
were allowed to go get it . . . . Q: How long did this process take? A: Only a few minutes, I think."), and the
evidence Carpenter cites in rebuttal either does not support his counterpoint at all (*e.g.*, M. Carpenter Dep. at 30:12-
14 ("Q: Were they identifying the individuals and letting them leave? A: I don't know what they were doing . . . ."),
addresses the limited set of cases where employees, due to individualized circumstances, remained behind despite
being allowed to leave, which does not undermine the general process by which employees were taken to the
conference room, and after having been identified, were allowed to leave (*compare* M. Carpenter Dep. at 30:23-31:2
("Q: By the time you observed Daniel Carpenter go into the kitchen, about how many people were left in that
conference room who were employees? A: There was myself, there was Caroline, there was Amanda Rossi, and Joe
Castagno.") *with* Caroline Meckel Dep. at 38:5-7 ("Q: What happened after they asked you to identify yourself? A:
They asked me to leave, and I refused.") *and* M. Carpenter Dep. at 31:9-32:5 ("Amanda was sort of the building
person and had the keys into various areas. . . . I think Amanda was asked questions. Q: Was that about the
employees and the location of documents and such? A: What's this room, what's that room.") *and* M. Carpenter
Dep. at 38:22-25 ("I do believe that Amanda and Caroline and Joe were given the option if they wanted to leave. But
if they left, they couldn't come back.")), or addresses employees who were never gathered into the conference room
in the first place (*compare* Fact Response at ¶ 82 ("Denied that employees were permitted to leave immediately

"maybe even Dan and [herself]", but she did not feel free to leave the building, because if she left she would not be let back in, and she was "not going to leave [her] building with a bunch of strangers"—she wanted to wait for their lawyers to arrive.[18]  (M. Carpenter Dep. at 37:14-38:15.)

Enstrom provided the Search Warrant to Carpenter, but did not provide the Search Warrant affidavit, which was under seal at the time.[19]  (Facts at ¶ 80.)

Daniel and Molly Carpenter left the building between approximately 11:10 a.m. and noon (Facts at ¶ 87), before Schrader had arrived at the site (Facts at ¶ 50).  Carpenter did not re-enter the building on the day of the search.  (Carpenter Dep. at 118:5-11.)

Enstrom, acting as the Team Leader of the Search Warrant execution, was "in charge on scene".  (Facts at ¶ 46.)  Carpenter recognized that Enstrom "was the 'authority figure' who was in control of the site during the search" and has stated that she "definitely appeared to be the boss".  (Facts at ¶ 46; Carpenter Dep. at 127:21-22.)  On the other hand, at the time of the initial entry at the Simsbury site, Schrader was off-site at the M&M Coffee Shop in Hartford, meeting with another target of the NOVA/Benistar investigation.  (Facts at ¶ 48.)  Schrader arrived at the Simsbury site a few hours after initial entry, and therefore did not witness the agents entering the

upon identification. . . . Agents interrogated Stefan Cherneski and Kevin Slattery.") *with* Meckel Dep. at 76:9-11, 78:17-19 (stating that Cherneski and Slattery were never in the conference room)).

[18] Carpenter disputes whether he and Molly Carpenter were free to leave the building, but the best evidence he cites for this point at most provides that there was a point in time when their attorneys were present that they were not allowed to leave.  (Carpenter Dep. at 283:10-21.)  Carpenter and Molly Carpenter asked Enstrom to speak to an attorney "right away" after Carpenter was brought to the conference room.  (Carpenter Dep. at 140:24-141:6.) Enstrom responded that they would be allowed to call an attorney once the employees were all identified (M. Carpenter Dep. at 27:9-11; Enstrom Dep. at 146:3-8), although Carpenter disputes that he was provided with this explanation (Carpenter 141:7-11).  Between 30 minutes to an hour and a half later, they were allowed to call. (M. Carpenter Dep. at 29:19-23 (30-45 minutes); Enstrom Dep. at 150:6-15 ("shortly after every one was gathered"); Carpenter Dep. at 141:19-23 (an hour to an hour and a half).)

[19] The parties dispute whether an attachment to the Search Warrant listing the items to be seized was provided to Carpenter, but there does not appear to be any dispute that the attachment was disclosed to occupants of the Simsbury site on the day of the search.  (*Compare* Enstrom Dep. at 191:23-192:3 ("Q: Do you recall if you showed the Carpenters the list of items that were going to be – that were called to be seized by the search warrant? A: I believe I did show them the list of items to be seized.") *with* Carpenter Dep. at 132:7-9 ("Then attachment B, the subpoena, was not attached to the search warrant. The subpoena was left by somebody up at the front desk.").)

site, and only arrived after Carpenter had left the building.  (Facts at ¶¶ 49-50.)  Schrader did not

interact with Carpenter at all, and Carpenter "still to this day couldn't pick Shaun Schrader out of

a lineup", and does not know what Schrader did while inside of the Simsbury site.  (Facts at ¶ 50;

Carpenter Dep. at 176:13-19, 311:7-15.)  Carpenter did not observe anyone seeking supervision

from Schrader.[20]  (Carpenter Dep. at 287:13-15.)

Schrader and Enstrom were both carrying holstered handguns on the day of the search.

(Facts at ¶¶ 53-54.)  Neither Schrader nor Enstrom removed their handguns from their holsters.

(Facts at ¶¶ 53-54.)  Neither Schrader nor Enstrom were aware of any agents carrying anything

other than a handgun on the day of the search, and neither Schrader nor Enstrom saw anyone

unholster their firearms nor were they made aware of anyone unholstering their firearms on the

day of the search.[21]  (Facts at ¶¶ 53, 55.)  Schrader did not instruct any law enforcement officers

to remove or brandish their weapons.  (Facts at ¶ 54.)

Schrader "did not use any force when . . . present at [the Simsbury site]".  (Facts at ¶ 68

(citing Schrader Decl. at ¶ 23).)  Schrader did not observe "any other officer using any force".[22]

(Facts at ¶ 68 (citing Schrader Decl. at ¶ 23).)  Schrader did not engage in any "commando" or

"SWAT-team tactics", and did not "observe anyone else engage in any such conduct".  (Facts at

---

[20] "Q: To your knowledge, did anyone seek supervision from Shaun Schrader in front of you on April 20th? A: No. If you – if I never knew Shaun Schrader signed the search warrant affidavit, I would have said that Agent Kathy was the boss."  (Carpenter Dep. at 287:13-15.)

[21] Carpenter inadequately disputes whether Enstrom learned of anyone unholstering a firearm as follows: "Denied that Enstrom 'did not learn of anyone unholstering a firearm' given that it is stated in the Complaint."  (Fact Response at ¶ 53.)

[22] Carpenter objects that "although the agents' conduct is a factual question, whether their conduct constituted 'force' is part of a Fourth Amendment reasonableness assessment, which is a question of law on a motion for summary judgment.  (Fact Response at ¶ 68 (citing *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (whether officer's actions were objectively reasonable is "pure question of law")).)  However, although a determination of whether any force that was used might be *reasonable* would be a question of law, a total absence of force can be a question of fact.  Carpenter has failed to adduce any evidence that Schrader observed any conduct by officers that could have constituted force, whether reasonable or unreasonable force.

¶ 68 (citing Schrader Decl. ¶ 23).)  Schrader did not attempt to intimidate anyone at the site.

(Facts at ¶ 69.)

Schrader did not instruct any officer to interrogate any employee.  (Facts at ¶ 72.)  The

Search Warrant Plan did not call for any custodial interrogations.  (Search Warrant Plan, at

IRS00014-22.)  Schrader did not observe any custodial interrogations during the execution of the

search warrant.  (Facts at ¶ 73.)  Schrader did not interview anyone, did not question Carpenter,

and did not place him in custody, threaten him with handcuffs, or threaten him with arrest.[23]

(Facts at ¶ 74.)

Some agents participating in the search wore visible black Kevlar vests, while others

concealed Kevlar vests underneath blue windbreakers.  (Facts at ¶ 51.)   The agents did not wear

masks or any visible protective gear below the waist.  (Facts at ¶ 51.)  Schrader was not wearing

a Kevlar vest on the day of the search.  (Facts at ¶ 22.)  The Search Warrant Plan encouraged the

agents to wear business casual attire (Search Warrant Plan, at IRS00019), but Schrader had no

independent role in determining the clothing worn by the agents, which would have been

determined by the Special Agent in Charge (Schrader Decl. at ¶11; Enstrom Dep. at 74:11-75:8).

Carpenter does not fault how the agents were dressed during the search.  (Facts at ¶ 52.)

---

[23] Because Schrader was not present in the building for any interactions with Carpenter during the search (and, as will be detailed below, cannot otherwise be found to have been personally involved in Carpenter's treatment during the search), I need not go into much detail concerning Carpenter's treatment by other agents during the search.  I note however, that it does not appear to be disputed that Carpenter was asked where plan documents were kept. (Carpenter Dep. at 220:6-15.)  The agents did not, however, attempt to "sit down with [him] and ask [him] questions in an organized fashion".  (Carpenter Dep. at 222:23-223-1.)  Carpenter was not asked about the 419 plans at issue in the investigation, the Charter Oak issues, Grist Mill Capital, or the District of Massachusetts criminal case. (Carpenter Dep. at 223:2-225:1.)  Carpenter was asked to identify files and offices.  (Carpenter Dep. at 224:17-22.) Carpenter recalls being asked "[a]bout plan documents, location of where plan documents were, do I have a cell phone, where is it . . . ."  (Carpenter Dep. at 228:4-7.)  "It was definitely about the plans, where is this located, things of that sort", but there were no questions "about the content of the plan documents".  (Carpenter Dep. at 228:1-13.) When Carpenter was being asked questions, he was not handcuffed or threatened in any way, and firearms were not pointed at him.  (Carpenter Dep. at 226:7-14.)

The search did not cause any damage to Carpenter's furniture, walls, doors, windows, window blinds, paint, carpet, or fixtures. (Facts at ¶ 89.) No items were torn, damaged, or broken. (Facts at ¶ 89.) After the search, Carpenter's office was left with papers taken out of filing cabinets and stacked up on chairs, tables, and the floor. (Facts at ¶ 90.) Files were strewn all over. (Carpenter Dep. at 252:24.) However, the ordinary pre-search state of Carpenter's office was "disheveled", with "[p]apers and files everywhere". (Meckel Dep. at 83:19-84:24.) Carpenter's office was normally "a mess" of piles, and co-workers had a "rule, never to give Dan an original copy of anything", because they "were afraid they'd get lost in the piles". (M. Carpenter Dep. at 75:20-78:7.) Pictures of Carpenter's office after the search show an office that is "more disshelved [sic] than usual", because Carpenter "wouldn't leave piles on top of each other or things falling over". (Meckel Dep. at 86:5-12.) The office was "more chaotic than usual". (Meckel Dep. at 88:17.) It looked "a little bit messier than normal". (Meckel Dep. at 89:16-17.) Carpenter's complaint that his office was "ransacked" was due to the fact that files were left "out of place". (Carpenter Dep. at 249:7-253:2.)

During Schrader's time on scene he only observed a building that looked like it was "in pretty good shape", with agents taking documents out of file cabinets and placing them into boxes and imaging computers. (Schrader Decl. at ¶ 25.) Schrader did not observe any property damage or himself destroy any property. (Schrader Decl. at ¶ 25.)

Shortly after 10:00 p.m., the agents turned over control of the building to Carpenter's attorney, who was present on site.[24] Schrader was not involved in surrendering control of the

---

[24] Schrader has testified that "the keys were turned over a few minutes after 10:00 in the evening" (Schrader Dep. at 94:22-23), and Enstrom has testified that she was out of the building at 10:00 and that the truck holding seized documents left the property "very shortly after 10:00" (Enstrom Dep. at 173:3-13). Carpenter disputes those claims, stating that at 11:30 that night, he returned to the property, and the truck was still parked on site, [a]nd there were a bunch of agents out there with boxes, loading boxes", and even after midnight, there were still "several agents walking in and out of there . . . bringing boxes out of the building". (Carpenter Dep. at 119:11-120:1.) However, Molly Carpenter has stated that Dan Carpenter was present with her at their house that night and

building, and he has been trained that they can stay on site until a search is complete. (Schrader Dep. at 95:16-21.)

Pursuant to the search, agents seized 322 boxes of documents and imaged 11 computers or servers, one thumb drive and one external hard drive. (Facts at ¶ 66.) Carpenter contends that 40 of the boxes belonged to Grist Mill Capital. The remaining boxes belong to either Benistar or Benistar Administrative Services, Inc. (Facts at ¶ 66; Fact Response at ¶ 66.)

B. Procedural Background[25]

Since filing this case, Carpenter has brought and amended a variety of claims against a number of defendants, all arising out of the April 20, 2010 search. The defendants have included Schrader, numerous John and Jane Doe agents of the IRS-CI, Victor Song, Chief of the IRS Criminal Investigation Unit, and Douglas Shulman and John Koskinen, Commissioners of the Internal Revenue Service.[26]

While proceedings in this action were ongoing, Carpenter was indicted in the District of Connecticut for his participation in a fraudulent scheme involving stranger-oriented life insurance. *United States v. Carpenter*, 3:13-cr-226 (RNC) (D. Conn.) [hereinafter, "the STOLI

_____

did not leave after 10:00 p.m. (M. Carpenter Dep. at 91:3-17 ("Q: Was Dan with you at the time? A: At 10 o'clock at night? Q: Yes. A: Yes. Q: Did he subsequently leave? A: Our home? Q: Yes. A: No. Q: Did you ever notice him leaving your home after 10 o'clock at night on April 20th of 2010? A: No. Q: Were you in a position to know whether he left your house? A: Yes.").) Moreover, Daniel Carpenter has himself stated that he only obtained his knowledge of when the agents left from Donna Wayne and Joe Castagno, who Molly reports as having contacted her when the agents had left, "shortly after 10" or "somewhere around 11" (M. Carpenter Dep. at 89:15-25), and an email from one of the building's occupants on which Dan and Molly Carpenter are copied, time-stamped at 10:32 p.m. states that "[w]e have retaken possession of the Bastille as of 10:00 p.m. and our servers are back up. . . . They also attempted to convince Jim Somers of H&S that their authority extended past 10pm, but when Jim showed them the warrant they gave up and left. We are now back in possession of our offices and have secured the premises. Donna Wayne and Joe Castagno of Benistar are securing the building and taking pics of the damage" (Ex. 1, Reply Br.).
[25] I summarize here briefly only the procedural background necessary to give context to my present ruling. A more thorough background of the earlier stages of this case can be found in my Order of December 14, 2016, granting in part and denying in part Schrader's motion to dismiss Carpenter's earlier Second Amended Complaint. (Doc. # 92.)
[26] The original complaint included a claim against Douglas Shulman in his official capacity, but subsequent complaints replaced him with John Koskinen, in conjunction with John Koskinen's replacement of Shulman as Commissioner of the IRS.

case"].  The indictment resulted from a criminal investigation by the Department of Labor that included a 2011 review of the materials held by the IRS as a result of the April 20, 2010 search of the Simsbury site.  On September 15, 2014, Carpenter filed in the STOLI case a motion to suppress the evidence obtained from that search on the grounds that:  (1) Schrader's affidavit in support of the Search Warrant was materially defective because it included numerous misstatements and deliberate omissions; (2) the affidavit and resulting warrant were overbroad and insufficiently particularized; and (3) the defendants failed to provide Carpenter with the affidavit during the search.  STOLI Case, (doc. # 83).  U.S. District Judge Robert N. Chatigny denied Carpenter's motion to suppress the same evidence at issue here, and on June 6, 2016, Judge Chatigny found Carpenter guilty on all 57 counts of that indictment.  *See United States v. Carpenter*, No. 3:13-cr-226 (RNC) (D. Conn.).

Based on Judge Chatigny's rulings in the STOLI case, I held, in my December 14, 2016 ruling, that Carpenter's Fourth Amendment claims based on the alleged invalidity of the Search Warrant were barred under the doctrine of *Heck v. Humphrey*, 512 U.S. 477 (1994).  In that ruling, I either dismissed or noted the abandonment of all of Carpenter's claims against Schrader, with the exception of Carpenter's Fourth Amendment claims relating to the unreasonableness of the April 20, 2010 search.  I observed that adversarial discovery was necessary to test the extent to which Schrader was personally involved in any constitutionally suspect aspects of the search, and whether Schrader could be shielded by qualified immunity.  Following that ruling, and the commencement of discovery, Carpenter (and/or Grist Mill Capital, LLC) filed a pair of amended complaints culminating in the Third Amended Complaint, which was filed on June 2, 2017.  The Third Amended Complaint abandoned any claims against Victor Song, and the unknown John and Jane Doe agents, but added Supervisory Special Agent Enstrom as a defendant.

On June 22, 2017, Enstrom moved to dismiss the allegations against her in the Third Amended Complaint, and on September 1, 2017, Schrader simultaneously brought two motions seeking, respectively, dismissal of, or summary judgment on, the claims brought against him in the Third Amended Complaint. On November 14, 2017 I dismissed any claims against Enstrom as barred by the statute of limitations, but took under advisement Schrader's two motions. I now write to address Schrader's pending motion for summary judgment and motion to dismiss.

## III. Discussion

In his motion for summary judgment, Schrader argues both that he did not commit any Fourth Amendment violations, and that he must, in any event, be shielded from liability by qualified immunity. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).

The Supreme Court has articulated a three-part test for considering a claim of qualified immunity. First, the court must determine whether a constitutional violation could exist on the facts as presented to the court. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Second, if the facts support a claimed violation of a constitutional right, the court must determine if the right alleged is "clearly established".[27] *Id.* "To determine whether a right is clearly established, [courts] look to (1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or

---

[27] The Supreme Court has held that "lower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first," but has urged courts to "think carefully" before deciding novel questions of constitutional law in the qualified immunity context. *al-Kidd*, 563 U.S. at 735; *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

court of appeals case law supports the existence of the right in question, and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010). If the first two criteria are met, the district court must determine if, based on the facts known to the officer at the time of events, "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. The majority of Carpenter's claims fail on the first prong of the *Saucier* analysis—based on the facts now before me, Schrader cannot have committed the pertinent violations alleged by Carpenter.

In opposition to Schrader's motion for summary judgment, Carpenter argues that Schrader can be held liable for Fourth Amendment violations related to (i) the use of unreasonable force in executing the search, (ii) the overbroad seizure of documents during the search, and (iii) a failure to provide to Carpenter with a "description of the alleged violations or the items to be seized". (Pl.'s Opp. Br. at 12-13.)

Unfortunately for Carpenter, Schrader's liability for any alleged Fourth Amendment violations must be based on his personal involvement in such violations, and not on a theory of *respondeat superior*. *Iqbal*, 556 U.S. at 676; *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). Schrader's liability thus depends on Carpenter's ability to adduce evidence capable of showing at least one of the five following categories of personal involvement: (1) direct participation in an alleged constitutional violation; (2) failure to remedy a violation after being informed of it; (3) creation or continuance of a policy or custom under which unconstitutional practices occurred; (4) gross negligence in supervising subordinates who committed the wrongful acts; or (5) deliberate indifference to Carpenter's rights by failing to act on information indicating that unconstitutional acts were occurring. *Colon*, 58 F.3d at 873. Carpenter has failed

to adduce evidence capable of proving any of the foregoing types of personal involvement by Schrader.[28]

A. Schrader Was Not Grossly Negligent in Supervising Subordinates

Carpenter has failed to provide evidence from which it could be concluded that Schrader was grossly negligent in supervising subordinates who committed any wrongful acts. As a preliminary matter, Schrader has provided evidence that he was not a supervisor of any of the agents who executed the search (Schrader Decl. at ¶ 14; Enstrom Dep. at 188:15-189:4, 196:9-12, 206:13-23), and Carpenter fails to adduce evidence from which the opposite could be concluded.[29] Even if Carpenter's role in explaining the Items to Be Seized list were sufficient to make him a de facto supervisor for the limited purpose of the agents' decision-making in seizing items during the search,[30] Carpenter has failed to adduce evidence that Schrader was *grossly negligent* in his supervision of the agents for that purpose. "'[G]ross negligence' denotes a higher degree of culpability than mere negligence. It is 'the kind of conduct where the defendant has reason to know of facts creating a high degree of risk of . . . harm to another and deliberately

---

[28] The second and third categories of personal involvement can immediately be rejected, because Carpenter has provided no evidence suggesting that Schrader was informed of any ongoing violations that he failed to remedy or that Schrader was responsible for any IRS-CI policies or customs. Accordingly, I will not discuss further in this ruling Schrader's liability for constitutional violations pursuant to those categories of personal involvement.

[29] Carpenter points to testimony stating that Schrader exercised discretion in deciding how the substance of the investigation's fact gathering should proceed (e.g., deciding what financial institutions or individuals to subpoena, and how to draft the search warrant affidavit) (Schrader Dep. 21:13-22:13), and that, during the pre-execution briefing, Schrader provided some explanation of the substance of the investigation to the agents, including discussing the Items to Be Seized list (Schrader Dep. 99:23-100:3; Enstrom Dep. 206:23-207:10). Schrader's involvement in evidence review and subpoena or search warrant drafting does not make him a supervisor of agents executing a search warrant. Nor does Carpenter's role in explaining the substantive import of items to be seized.

[30] Note that, even under this labored theory, Schrader's role explaining the Items to Be Seized list cannot make him a supervisor of the agents with respect to the two other types of Fourth Amendment violations alleged by Carpenter: (i) the agents' use of force during the search and (ii) Enstrom, *Schrader's own supervisor*, allegedly failing to show Carpenter the Items to Be Seized list. *See Kregler v. New York*, 770 F. Supp. 2d 602, 608 (S.D.N.Y. 2011) (equating supervisory status with the "authority to remedy or 'take action with respect to any constitutional violation'") (quoting *Koulkina v. New York*, 559 F. Supp. 2d 300, 317 (S.D.N.Y. 2008)).

acts or fails to act in conscious disregard or indifference to that risk.'" *Raspardo v. Carlone*, 770

F.3d 97, 116 (2d Cir. 2014) (quoting *Poe v. Leonard*, 282 F.3d 123, 140 n.14 (2d Cir. 2002)).

I can discern only two types of arguments attempted by Carpenter to show Schrader's

purported gross negligence: First, Carpenter appears to suggest that Schrader's liability can

derive from his absence during parts of the search (Opp. Br. at 8, 19), and second, Carpenter

suggests Schrader was insufficiently specific in his description, during pre-search briefing, of

those 419 plans that were pertinent to the investigation (Opp. Br. at 3, 19).[31]  Even if provable,[32]

neither of the preceding types of facts can show that gross negligence by Schrader led to a

constitutional violation.  Carpenter has failed to provide evidence that Schrader had reason to

know that his absence—i.e., leaving supervision of the search in Enstrom's hands—created a

high degree of risk of overseizure.  Carpenter has also failed to provide evidence or argument

capable of showing that a lack of detail in Schrader's explanation of the differences between

relevant and non-relevant 419 plans created a high degree of risk of overseizure.  In fact,

Carpenter's only specific example of purported overseizure is the seizure of documents unrelated

to 419 plans (Opp. Br. at 17-18), which cannot have been the result of a failure by Schrader to

distinguish among types of 419 plans.[33]  Carpenter seems to rely on *United States v. Wey* as the

---

[31] At one point in his submissions, Carpenter seems to attempt to argue that Schrader was not sufficiently enthusiastic in his supervision of the search.  Carpenter points to quotes from Schrader that indicate no more than a lack of clarity regarding Schrader's activities during the search.  (*See, e.g.*, Opp. Br. at 8 ("I assume I assisted with the search somehow"; "people were probably coming up to me and asking if this was relevant" (quoting Schrader Dep. at 90:6-91:2)).  It would be inappropriate to stretch Schrader's lack of specificity in a deposition response into a conclusion that Schrader could not be sufficiently specific about his actions precisely because he did not take any significant actions.  Moreover, even if such a leap of logic were appropriate, Carpenter has provided no evidence from which it could be concluded that Schrader had reason to know that his putative hands-off approach during the search created a high degree of risk of overseizure.

[32] Carpenter's citation to the record does not actually point to evidence capable of showing a failure by Schrader to provide sufficient details regarding 419 plans.  (*See* Opp. Br. at 3 (citing Schrader Dep. at 52:18-55:16).)

[33] In addition to not justifying his narrow reading of what the Items to Be Seized list provided should be seized, Carpenter's argument that overseizure occurred actually undermines his suggestion that Schrader's failure to supervise bears some responsibility:  Carpenter claims that documents unrelated to 419 plans were plainly not eligible for seizure, stating that, given the content of the Items to Be Seized list, "[a]gents should have easily connected th[e] dots" that the documents they seized were not suitable for seizure.  (Opp. Br. at 18.)  If the face of

sole support for his argument that a lack of details in Schrader's description of the Items to Be

Seized list amounted to a constitutional failing (s*ee* Opp. Br. at 20 (citing *United States v. Wey*,

2017 WL 2574026 (S.D.N.Y. June 13, 2017)), but *Wey* addressed a case where the warrants at

issue had already been determined to be invalidatingly vague, and the court was addressing

whether the supervision of expert officers and the explanations they provided to agents regarding

documents appropriate for seizure could by themselves have sufficiently constrained overseizure

in order to cleanse the search conducted pursuant to the invalid warrant, 2017 WL 2574026, at

*395-403. The warrant at issue in the case before me has already been ruled to be valid, and

accordingly, the government bears no burden to prove the extent of their additional good faith

attempts to prevent overseizure.

B.  <u>Carpenter was Not Deliberately Indifferent to Information that Unconstitutional Acts Were Occurring</u>

Carpenter has also failed to introduce evidence capable of showing that Schrader

exhibited deliberate indifference to Carpenter's rights by failing to act on information indicating

that unconstitutional acts were occurring. Carpenter has failed to provide any evidence that

Schrader was aware unconstitutional acts were occurring. I have previously acknowledged that

failure to train can constitute deliberate indifference, *Diaz-Bernal v. Myers*, 758 F. Supp. 2d 106,

130 (D. Conn. 2010), but that decision did not reject the need to establish knowledge of

unconstitutional practices, *id.* at 130. Moreover, the Supreme Court decision on which I based

---

the Items to Be Seized list provided easy and sufficient guidance regarding documents suitable for seizure, Schrader cannot have been grossly negligent by failing to provide extensive pre-search elaboration on the list. I note that Carpenter has also implied that the seizure of boxes with various legal-themed labels was inappropriate. (*See* Opp. Br. at 18 (describing seizure of boxes labeled "atty correspondence", "mock trial CD's", and "legal corresp & motions").) Despite his argument that the seizure of such items is "astonishing", Carpenter has not demonstrated that no box with a legal-themed label could be relevant (or even that any actual documents in the pertinent boxes were not relevant), or that Schrader was responsible for the instruction, training, or supervision of agents with respect to the appropriateness of seizing attorney-client related materials.

my holding in *Diaz-Bernal* made clear—as I acknowledged in my own ruling—that a failure to train can only amount to deliberate indifference in situations where "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights" that supervisors can be said to have been deliberately indifferent to the need for further training. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). Far from being such a case, Carpenter's argument here is essentially that Schrader was not specific enough in his explanation of the Items to Be Seized list.[34] That unsupported assertion alone cannot demonstrate that the need for more training rose to the high threshold of obviousness to constitute deliberate indifference. Carpenter provides no evidence that Schrader knew of any past instances of comparable overseizures by any agents he was allegedly responsible for "training".[35] Carpenter also provides no evidence that the need for further discussion of 419

---

[34] Carpenter also makes a limited effort to suggest that Schrader's failure to "instruct agents on the proper use of firearms . . . or proper entry through secondary doors" or on "whether it would be appropriate to carry and/or brandish their firearms" can result in his liability for failures to train related to long-gun- or entry-practice-related uses of force. That argument is without merit. First, Schrader possessed no responsibility for the instruction of agents in firearm use or entry techniques. Second, there was no mention of long guns being brought to the search in any of the pre-search documentation, where such notation would be expected, if any agents were planning on bringing long guns. (Schrader Dep. at 39:25-41:8; Enstrom Dep. at 73:14-74:5.) The record is similarly devoid of any evidence suggesting Schrader had reason to know entry would be made through a rear door, and certainly devoid of evidence suggesting Schrader had reason to know of a high risk that entry would be made through a rear door while brandishing a long gun. Accordingly, Schrader could hardly be said to have been deliberately indifferent to a high risk that long guns would be inappropriately brandished or that an inappropriate type of secondary entry might be made.

[35] It is questionable whether Schrader's explanation of the Items to Be Seized list is the type of training contemplated by a deliberate indifference claim. First, the Second Circuit has suggested that a failure to train claim must be premised on a failure to address a repeated pattern of conduct, and not the failure to train to prevent violations resulting from one encounter. *See Meriwether v. Coughlin*, 879 F.2d 1037, 1048 (2d Cir. 1989); *cf. Oklahoma City v. Tuttle*, 471 U.S. 808, 813 (1985) (suggesting that, in the context of municipal liability, a single excessive use of force cannot warrant an inference that inadequate training was responsible). Other circuits have taken the same approach. *See Randall v. Prince George's Cty.*, 302 F.3d 188, 207 (4th Cir. 2002) (rejecting supervisory liability for even "a litany of constitutional violations" where those violations occurred "roughly simultaneously", because "the courts have appropriately required proof of multiple instances of misconduct before permitting supervisory liability to attach"); *Braddy v. Fla. Dep't of Labor & Employment Sec.*, 133 F.3d 797, 802 (11th Cir. 1998) (requiring that violations be "sufficiently widespread", and noting that "[a] few isolated instances will not suffice, the 'deprivations that constitute widespread abuse . . . must be . . . rampant[] and of continued duration'" (quoting *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1998))); *Howard v. Adkison*, 887 F.2d 134, 138 (8th Cir. 1989) ("A single incident, or a series of isolated incidents, usually provides an insufficient basis upon which to assign supervisory liability."). Second, the potential need for a repeated pattern of conduct underscores the likelihood that Schrader is not the type of party properly subject to a failure to train claim. Schrader did not have

plans during the pre-search briefing should have been sufficiently obvious to Schrader.[36]

### C. Schrader Did Not Directly Participate in any Alleged Constitutional Violations

Finally, Carpenter has failed to provide any evidence that could show Schrader's direct participation in any Fourth Amendment violations. Direct participation can be shown via evidence that Schrader personally committed the violative acts, or evidence that Schrader formulated a plan for the search that provided for and resulted in the violations. *See Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014). Carpenter claims that Schrader directly participated in three types of Fourth Amendment violations during the search: (1) the use of unreasonable force, (2) the overseizure of documents, and (3) the failure by Enstrom to provide him with appropriate documents explaining and justifying the search.

Schrader cannot be said to have directly participated in Enstrom's failure to provide him with certain portions of the warrant documents. Carpenter has provided no evidence capable of showing that Schrader planned for Enstrom's decision not to provide certain documents to Carpenter, and Schrader was neither on site at the same time as Carpenter, nor in a position to remedy behavior by his supervisor of which he was not even aware.[37]

---

supervisory authority over the agents that executed the search, and was therefore not responsible for their regular training in such a way that might ensure recurring violations would not occur.

[36] As discussed previously, Carpenter's only substantive objection to Schrader's training is that he did not sufficiently distinguish relevant 419 plans from non-relevant 419 plans (Opp. Br. at 3), which, in addition to being unsupported by the deposition statements to which he cites, is weakened by his subsequent argument that the Items to Be Seized list by itself easily should have prevented the only purported overseizures he identifies.

[37] Carpenter's argument that "[s]ummary judgment cannot be rendered because it is unclear from the record whether Schrader was in the room at the time Enstrom refused Carpenter's requests for more than the top page of the search warrant" is frivolous. (*See* Opp. Br. at 21.) First, despite Carpenter's inexplicable suggestion in his opposition brief that Schrader's whereabouts at the time of Enstrom's refusal were unknown, and his insistence on the point during the hearing on the present motion, the evidence shows that Schrader was not even on site, and certainly not "in the room", at the time of such refusal. (Schrader Decl. at ¶ 28; Schrader Dep. at 98:7-11, 98:14-17.) Carpenter has failed to provide any evidence to the contrary. Second, in light of Carpenter's failure to provide any evidence that Schrader was present during Enstrom's refusal, Carpenter's argument that summary judgment is inappropriate because Schrader's whereabouts are unclear grossly misrepresents the standard for summary judgment. Carpenter bears the burden to provide evidence probative of Schrader's direct participation in any alleged violation, in order to survive summary judgment. *Celotex*, 477 U.S. at 322-23, 327. To the extent Carpenter points out that the record does not show Schrader's whereabouts during Enstrom's allegedly violative conduct, that is precisely why summary

Carpenter has likewise provided no evidence of Schrader's direct participation in any overseizures of documents. In addition to Carpenter's lack of specificity in describing any actual wrongfully seized documents, Carpenter has failed to adduce any evidence that Schrader personally seized any such documents.[38] Similarly, Carpenter has failed to provide evidence that Carpenter planned for any overseizure. To the extent that Schrader's role in the formulation of the Items to Be Seized list could be considered planning regarding which documents should be seized, Carpenter has advanced no evidence or arguments from which it could be concluded that the Items to Be Seized list provided for the overseizure of documents. In fact, as already discussed, the only types of overseizures that Carpenter has suggested relate to documents that he claims the Items to Be Seized list clearly excluded from eligibility for seizure.

Lastly, Carpenter has failed to provide evidence that Schrader personally committed or planned for any unreasonable uses of force during the execution of the search. Carpenter suggests numerous uses of unreasonable force: the number of agents involved; the use of rifles and their "brandishing" by the agents; physical force and threats applied to Carpenter during the search; the detention and/or interrogation of Carpenter during the search; and the "ransacking" of Carpenter's property.[39] As discussed previously, there is no evidence that Schrader planned for

_____

judgment in Schrader's favor is appropriate. Similarly, Carpenter's half-hearted suggestion that Schrader might be somehow responsible for Enstrom's behavior "if [Schrader] learned about [Enstrom's behavior] while on site" (Opp. Br. at 21) is equally unsupported by any evidence capable of successfully opposing summary judgment.

[38] In the interest of clarity, I note that any suggestion that Schrader *should have* been personally involved in the document seizures does not constitute evidence of his direct participation in document seizures, and definitely does not constitute evidence of direct participation in any (unspecified) particular wrongful seizures. Any arguments that Schrader can be deemed to have been personally involved based on an obligation to be so involved were addressed in the sections disposing of Carpenter's potential claims for Schrader's involvement via grossly negligent supervision or deliberate indifference.

[39] Carpenter also suggests that the interrogation of certain other employees present was unreasonable, but inasmuch as they are not plaintiffs in this action or employees of Grist Mill Capital (*see* Fact Response at ¶ 44), their Fourth Amendment claims are not properly before me. Carpenter has also suggested, in prior submissions, that the agents' attire was unreasonable, but he appears to have wisely abandoned that claim here; there is no indication that Schrader was responsible for the agents' attire, which Carpenter now appears to concede (Fact Response at ¶¶ 25-26), and Carpenter has himself stated that he does not object to the attire of those executing the Search Warrant (Carpenter Dep. at 99:20-100:21; Fact Response at ¶ 52).

the use or brandishing of rifles/long guns, and he did not himself carry or brandish a long gun or

any other weapon during the search. Similarly, there is no evidence that Schrader planned for

any force or threats to be applied to Carpenter or for Carpenter to be detained or interrogated,[40]

and Schrader did not personally use or threaten force towards Carpenter, or detain or interrogate

him.[41] It is also unlikely that Carpenter actually suffered a constitutionally defective

"ransacking" of his office,[42] but regardless of the resolution of that point, the only evidence in

the record shows that Schrader neither participated in nor planned for any ransacking of

Carpenter's office.

Carpenter's only remaining allegation of unreasonable force is his claim that the number

of agents used to execute the search was unreasonable. That claim merits at least some

---

[40] In so holding, I need not carefully balance the sparse evidence that force or threats were applied to Carpenter, or that he was interrogated or detained. I will discuss briefly, however, the subject of Carpenter's purported "interrogation", given that there is at least minimally colorable (albeit not significantly probative) evidence that Carpenter was a plausible subject for interrogation based on the Search Warrant Plan. No agents attempted to "sit down with [Carpenter] and ask [him] questions in an organized fashion" (Carpenter Dep. at 222:23-223:1), and any questions asked of Carpenter avoided the substance of the investigation and were limited to ascertaining where documents or offices were located, and whether Carpenter had a cell phone. Carpenter was also not handcuffed or threatened while these questions were asked. The only evidence that could even colorably suggest that Carpenter was considered a subject for questioning prior to the search is Carpenter's inclusion on a list in the Search Warrant Plan titled "Background on Subjects/Interview Targets", but the record shows that the title of that list must be interpreted disjunctively, to include the two separate groups of individuals who were either (i) the subjects of the investigation or (ii) interview targets. This interpretation is confirmed by both the lack of evidence that others appearing on the list—for example, Molly Carpenter—were "interview[ed]", as well as the context of the rest of the Search Warrant Plan, which includes lists dedicated exclusively to interview targets, on which Daniel Carpenter's name does not appear. Schrader has also provided evidence that Carpenter was expressly excluded from interview plans prior to the search.

[41] I note that Schrader has provided evidence that he did not engage in illegal behavior and evidence that he was not even on site during the relevant time period, and Carpenter has failed to adduce any evidence bringing either point into dispute.

[42] The evidence shows that the search did not cause any damage to Carpenter's furniture, walls, doors, windows, window blinds, paint, carpet, or fixtures. (Carpenter Dep. at 251:13-252:12.) Carpenter has stated that nothing was torn or damaged, and that the extent of the ransacking was that things "were out of place" or "strewn all over". (Carpenter Dep. at 252:13-24.) The evidence also shows that Carpenter's office was generally messy and that there is at most a question whether the office was made messier by the search. A search that makes an already messy office messier does not rise to the level of excessive or malicious damage that would violate the Fourth Amendment. *See, e.g., Martin v. Rodriguez,* 154 F. Supp. 2d 306, 315 (D. Conn. 2001) ("[D]espite the characterization of plaintiff's house as 'trashed' in plaintiff's brief, in his deposition he clearly stated that the only premises damage was that the officers left his office 'messy.' . . . [P]laintiff has provided no evidence that the search was unnecessarily thorough to fulfill its purpose. . . . [P]laintiff's claim of the nature of the search of the premises cannot constitute a Fourth Amendment violation.").

discussion because it does not run aground on the same shoals as his other allegations of force: Schrader's planning did contemplate the use of fifty-seven agents, which Carpenter claims constituted a Fourth Amendment violation. In analyzing whether the use of fifty-seven agents was unreasonable I must consider the "totality of the circumstances—the whole picture", *Palacios v. Burge*, 589 F.3d 556, 563 (2d Cir. 2009) (internal quotation marks omitted) (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)), but that consideration must be limited to "the facts known to the officers", *id.*; *cf. United States v. Chirino*, 483 F.3d 141, 148 (2d Cir. 2007), or at least those facts the officers reasonably should have known.

Whereas I would have grave concerns regarding the reasonableness of a search plan involving fifty-seven rifle-wielding agents in tactical gear descending like a SWAT team on a place of business that presented a low security risk, in order to execute a search warrant for documents relating to tax violations—in other words, the circumstances described in the plaintiffs' complaint—that is not the case before me at summary judgment. Even a combination of only some of the foregoing elements might suggest that the planned for search was an unreasonable attempt to intimidate or punish investigation targets, but, again, the evidence before me at this stage does not present comparable circumstances.

As a preliminary matter, the evidence does not show agents in tactical gear forcing their way into the Simsbury site and generally roughing up the occupants. The plan anticipated agents wearing business casual dress and the bulletproof vests required by IRS policy. On the day of the search many agents wore windbreakers over their vests. Similarly, the plan called for agents to enter through the unlocked front door, during business hours, with the agents generally announcing their presence while they walked through the building. The plan did not call for a

secondary rear entry to be made, and certainly did not call for the rear entry to be made by agents carrying rifles.

In fact, the plan did not call for any agents to be carrying rifles, and as previously discussed, Schrader cannot be said to have reasonably been on notice, during his planning, that any rifles would be brought to the search. The plan did call for agents to be armed with the handguns required by IRS policy, but did not anticipate that those firearms would be brandished or unholstered.

Accordingly, at the time that Schrader drafted the Search Warrant Plan calling for fifty-seven agents, the totality of the circumstances known to him were as follows: A plan was needed for a team of agents in business casual attire, bulletproof vests, and holstered sidearms to execute a search warrant through the unlocked front door of a building that was open for business. The building, which sat on an 11.2-acre site, covered 42,000 square-feet, with room for more than fifty offices and thirty to forty cubicles as well as conference rooms and other facilities. Thirty to forty workers were present at the site on a typical day, although Schrader and Enstrom apparently estimated that up to seventy workers might be present in their planning, and the office space available in the building does not make that estimate appear unreasonable.

In assessing the number of agents to recommend for the search, Schrader considered legitimate purposes and logistical requirements, such as the variety of responsibilities various officers would be assigned, the document-intensive nature of the search, and the need to maintain control on scene and ensure the safety of all present. The task assignments described in the Search Warrant Plan show that not all fifty-seven agents would participate in the entry or search, or would even be on site, and also show that many of the agents who would participate in the search were also assigned to other tasks, including, for example, interviewing Cherneski,

Belding, or Slattery, providing outside cover of the front and rear of the building and the driveway, and video-recording and sketching of the site. At most, thirty-nine officers were designated for search participation (and, of these thirty-nine, only twenty-one officers were assigned solely the task of search participation), and even with that number of officers assisting in the search, the search was not completed until approximately 10 o'clock that evening.[43]  I cannot hold that it was unreasonable for Schrader to plan for a need for 39 officers to search a

---

[43] Carpenter's description of the facts of the search appears to suggest that he thinks the agents improperly continued the search past 10 p.m. (10 p.m. being purportedly pertinent because the Search Warrant designated that it be served, and the search be made "in the daytime – 6:00 a.m. to 10:00 p.m.", Search Warrant, Ex. 1, Defendant Carpenter's Brief Motion to Suppress Evidence from the Raid of April 20, 2010, *United States v. Carpenter*, 3:13-cr-0026, doc. # 83-1. However, Carpenter does not press the point in his arguments opposing summary judgment. I note that, even if the facts could be interpreted to show that the agents did indeed continue their search past 10:00 p.m., that would not constitute a Fourth Amendment violation. The requirement, in Federal Rule of Criminal Procedure 41, that a warrant be executed in the "daytime", is satisfied as long as the search is commenced between 6:00 a.m. and 10:00 p.m., even if the search extends past 10:00 p.m. *United States v. Vasquez*, 2017 WL 1435861, at *2 (E.D.N.Y. April 23, 2017). Moreover, "[a] search that continues into the night does not violate the Fourth Amendment as long as the extension of the search was reasonable." *Id.* at *3. Factors considered in assessing the reasonableness of the extension include the inconvenience to the occupants of the searched location, the degree of freedom allowed to the occupants during the search, and whether the search was conducted in a professional manner. *See id.* Here, the search was not of a private residence that was likely to be occupied during the late night hours, and the erstwhile occupants were accordingly not significantly inconvenienced. And, although Carpenter disputes whether any detention of employees occurred in the early stages of the search, it is clear that no employees were detained past 10 p.m., nor otherwise had their freedom constrained at that time, beyond not being permitted to interfere with the search. Carpenter has acknowledged the professionalism of the search. It is also worth noting that Carpenter has not actually provided evidence from which a reasonable person could find that the search of the Simsbury site did continue past 10:00 p.m. *See Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (affirming grant of summary judgment where the district court had "found nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony", which the district court had found not reasonably believable); *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 105-06 (2d Cir. 2011) (holding that excerpts from plaintiff's depositions need not be credited when contradicted by evidence including contemporaneous letters and meeting notes). With one exception, all evidence available, including Carpenter's own testimony, together with the testimony of his wife and agents Schrader and Enstrom, as well as records of contemporaneous communications among Carpenter, his wife, and other building occupants, indicate that the search was completed by 10:00 p.m. And the only exception—one statement in Carpenter's own deposition testimony that he returned to the site after 10:00 p.m. and observed, from afar, agents carrying boxes—at most suggests that boxes of seized documents continued to be brought out of the building past 10:00 p.m. That statement need not be credited, because it is contradicted not only by Schrader's and Enstrom's testimony, but also by Carpenter's wife's testimony that he did not leave the house after 10:00 p.m. (as well as her testimony regarding the agents' departure time), Carpenter's own testimony that he is only aware of the agents' time of departure based on information from Benistar employees Donna Wayne and Joe Castagno, and evidence of a contemporaneous email among building occupants (including Molly and Dan Carpenter) that records both that the agents had indeed departed by 10:00 p.m., and that Donna Wayne and Joe Castagno were aware of the 10:00 p.m. departure. Even if a fact dispute were plausibly raised here, the agents' purported carrying of boxes out to the truck past 10:00 p.m. cannot demonstrate sufficient inconvenience to, or restriction on the freedom of, building occupants, or unprofessionalism by the agents, to constitute a Fourth Amendment violation. Finally, Carpenter has provided no evidence capable of showing Schrader's direct participation in any purported searching past 10:00 p.m.

large site and large quantity of documents—particularly where the amount of time it actually took the officers to complete their search suggests that such a large number of officers was indeed necessary.[44]

Even if I were to rule that a search by a large number of agents could, without more, be unreasonable, I would be unable to say that the unreasonableness of the number of agents called for in Schrader's plan was clearly established. There is no Second Circuit precedent addressing the reasonableness of the number of agents selected for a search warrant execution. The Eighth Circuit in *Mountain Pure* found that a search of a large bottling facility by thirty-five agents armed with handguns and ballistic vests was reasonable in light of the size of the facility. 814 F.3d 928, 931, 933 (8th Cir. 2016).[45] During the hearing on the present motion, Carpenter suggested that *Mountain Pure* was distinguishable because the absolute size of the bottling facility was 100,000 square feet, as compared to the 42,000 square feet of the building at the Simsbury site. Even if I were to agree that the pure square-footage of a building was the best determinant of the number of agents necessary, that distinction would require me to engage in a misplaced and oversimplified line-drawing exercise that would distort the nature of the

---

[44] Carpenter has likewise failed to provide any evidence that suggests that the number of agents was more than necessary to actually effectuate the required search. He does not dispute the large quantity of documents searched or seized, or that searching that quantity of documents with the number of agents who were present took a long time, nor does he point to any behavior by agents suggesting that they were not assisting in the search and that a smaller number of agents would therefore have been just as effective. Carpenter's sole argument addressing the lack of need for the number of agents appears to be a "box[es] per hour" calculation of the pace at which the agents present filled the boxes seized, given the total amount of time on site and the total number of boxes seized. It is unclear why searching agents should be conceived of as filling their time blindly carrying documents into boxes, as opposed to, for example, looking for and analyzing relevant documents. I decline to credit Carpenter's argument as showing that too many agents were used.

[45] The Eighth Circuit in *Mountain Pure* also rejected a claim of unreasonable force despite additional allegations of detention in a break room during the search, which lasted twelve hours, *id.* at 934, and allegations of employees being pushed up against a wall, or having guns pointed at them during initial entry, *id.* at 931. *Mountain Pure* is thus a case of approval of even more coercive methods than the case before me, inasmuch as, at a minimum, no one present at the Simsbury site was detained for the full duration of the search. It is also noteworthy that the Eighth Circuit decided that the defendant agents who had "le[ft] th[e] decision [regarding firearm use] to agent discretion" could not be liable for plaintiffs' claims of being held at gunpoint or pushed against walls, because they had not "participated in, ordered, or condoned" the pertinent alleged uses of excessive force. *Id.* at 931, 936.

reasonableness analysis. *See Ruttenberg v. Jones*, 283 F. App'x 121, 137 (4th Cir. 2008) ("The very term 'reasonableness' implies reasonable latitude and room for judgment."). Carpenter pointed, during the hearing, to the Fourth Circuit's decision in *Ruttenberg* for the contrary argument that the number of agents used here was clearly established to be unreasonable, but Carpenter has failed to establish that *Ruttenberg* is more comparable to the present situation than *Mountain Pure*, and *Ruttenberg* did not decide that the number of agents used was unreasonable in isolation from other indications of unreasonable force that were present in *Ruttenberg* but were not part of the circumstances surrounding Schrader's decisionmaking in this case. *See Ruttenberg*, 283 F. App'x at 124-26, 136 (noting allegations of long-standing animosity between the defendant officer and the plaintiff, prior attempts by the officer to retaliate against the plaintiff, and a search during which officers were "heavily armed SWAT team members dressed in full tactical gear" and during which the building occupants were "ordered against the wall to be searched by heavily armed officers" and held at gunpoint).[46] Accordingly, in light of *Mountain Pure*, Carpenter cannot rely on *Ruttenberg* to argue that the number of agents planned for by Schrader was clearly established to be unreasonable. Where the Second Circuit has not addressed the constitutionality of the number of agents planned for a raid, and the precedents from two other circuits are divided, there is no clearly established law on the issue.

Because Carpenter has failed to provide evidence from which a reasonable juror might conclude that Schrader either personally committed or planned for any Fourth Amendment

---

[46] Although I point, in my citation of *Ruttenberg*, to the observations of the Fourth Circuit panel suggesting that the search in question may have been undertaken for inappropriate motives, I do so because Carpenter attempts to make a similar argument here, albeit by mere conclusory assertions, and not backed by the significant fact allegations in *Ruttenberg* that the Fourth Circuit was obliged to credit at the motion to dismiss stage with which it was confronted. I note that the *Ruttenberg* Court actually recognized that "[s]tate officials can act lawfully even when motivated by dislike or hostility" and thus that a court "'need not address the alleged ill will between' the officers and the plaintiff". *Id.* at 134 (quoting *Crosby v. Paulk*, 187 F.3d 1339, 1344 (11th Cir. 1999) (holding alleged ill will to be irrelevant to the qualified immunity analysis)).

violations, I hold that Carpenter has not sufficiently demonstrated Schrader's direct participation in any such violations in order to survive summary judgment.

## IV. Conclusion

The record on summary judgment reveals a search that was far less violent or burdensome compared to the search that Carpenter's pleadings previously obliged me to imagine at the motion to dismiss stage. Similarly, the record reveals a far diminished role for Schrader in the search, and a complete absence of supervisory authority for Schrader over the other participating agents. Although there may or may not have been isolated incidents of unreasonableness on the part of agents executing the search, Schrader was not personally involved in such incidents, and accordingly cannot be held liable for them.

For the foregoing reasons, Schrader's motion for summary judgment (doc. # 129) is granted, and Schrader's motion to dismiss (doc. # 127) is denied as moot.

So ordered.

Dated at Bridgeport, Connecticut, this 29th day of March 2018.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge